## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## FORT LAUDERDALE DIVISION

SOKA GAKKAI INTERNATIONAL-USA,
a California non-profit religious corporation, and

FLORIDA NATURE AND CULTURE
CENTER, LLC, a Florida limited liability
company,

       Plaintiffs,

v.                                                               Case No. 0:24-cv-62452-WPD

UNITED STATES ARMY CORPS OF
ENGINEERS, and COLONEL BRANDON L.
BOWMAN, District Commander, Army
Corps of Engineers, Jacksonville Office,
In his official capacity,

       Defendants.

_____/

## EMERGENCY MOTION FOR PRELIMINARY INJUNCTION
## AND INCORPORATED MEMORANDUM OF LAW

Plaintiffs Soka Gakkai International-USA ("SGI-USA") and Florida Nature and Culture Center, LLC ("FNCC") (collectively, "Plaintiffs") request that this Court enter an emergency preliminary injunction preventing Defendants United States Army Corps of Engineers ("Corps") and Colonel Brandon L. Bowman ("Col. Bowman") (collectively, "Defendants") from continuing with their planned construction of the C-11 Impoundment Project and, in support, state:

### INTRODUCTION

SGI-USA is the American branch of a global Buddhist community that purchased a property near the Florida Everglades to create a religious retreat center for its members three decades ago ("FNCC Property"). FNCC owns and manages the Property. The FNCC Property is uniquely suited for SGI-USA's religious practices because of its serene natural and environmental features coupled with decades of Plaintiff's significant work and investment to create a tranquil religious retreat.

The Corps' imminent construction of the massive C-11 Impoundment Project ("C-11 Project") bordering the FNCC Property will irreparably harm Plaintiffs, their members, and their religious retreat center. Plaintiffs have sounded the alarm about these risks for nearly twenty years, but the Corps—acting as a bureaucratic steamroller—has ignored Plaintiffs and failed to consider the impacts of the C-11 Project on Plaintiffs' property and religious exercise rights. Plaintiffs ask the Court to preserve the status quo and prevent the Corps from illegally commencing construction of the C-11 Project, irreparably harming Plaintiffs' property rights and religious liberties.

## PLAINTIFFS' RELIGIOUS COMMUNITY AND THE CORPS' C-11 PROJECT

1. SGI-USA is part of the global Soka Gakkai community of more than eleven million Nichiren Buddhists. SGI-USA Buddhists follow the writings of Nichiren Daishonin and practice their faith through daily mantras (prayers and chanting), self-reflection, and emphasizing the interconnectedness between people and their environment. Group and communal prayer in peaceful tranquility is crucial to practicing the Nichiren Buddhist faith. [Doc. 1] ("**Compl.**") ¶¶ 2, 22, & 27;[1] **Ex. 1**, Affidavit of A. Uccello ("Uccello Aff."), ¶¶ 7-12, 18-19, 7-19; **Ex. 2**, Affidavit of J. Littlefield ("Littlefield Aff.") ¶¶ 16 and 23.

2. More than thirty years ago, SGI-USA identified an undeveloped property in western Broward County near the Florida Everglades with unique natural and environmental attributes as an ideal location for a Buddhist religious retreat center, and purchased the FNCC Property in 1994. FNCC was created exclusively to own and manage the FNCC Property.

3. Plaintiffs have spent decades turning the FNCC Property into an ideal retreat center for SGI-USA's members' religious exercise. Today, the FNCC Property includes five large prayer halls, multiple large religious exhibitions that house spiritual Buddhist artifacts, dormitories, contemplative gardens, walking paths, bicycle trails, wetlands, a lake, a pool, an amphitheater, a gymnasium, and a dining hall and associated terrace. Compl. ¶¶ 3, 23, 26–29; Uccello Aff., ¶¶ 14-15, 21-23; Littlefield Aff., ¶4-5, 16-18.

4. The FNCC Property continues to be used exclusively to serve the religious needs of SGI-USA and its members, hosting more than 30 multi-day spiritual retreats each year for thousands of SGI-USA Buddhists. The retreats include group prayer and religious discussions, spiritual reflection, and veneration of historically and spiritually significant Buddhist artifacts

---

[1] The Complaint is verified by SGI-USA's General Counsel, Michael Bynum. Compl. at 39.

located across the campus. All attendees must reside on the FNCC Property's on-site dormitories during the retreats. Several religious and spiritual retreats for hundreds of SGI-USA members are scheduled for the coming weeks and months, with the next one scheduled to begin on January 24, 2025. Uccello ¶¶ 13-19, 23; Littlefield Aff. ¶¶ 4, 9-17.

5.      ***In short, the FNCC Property is a religiously and spiritually significant property that is critical to SGI-USA and the thousands of Buddhists it represents. It is unique and irreplaceable. The C-11 Project threatens to render the entire FNCC Property unusable for its intended purpose: religious exercise***. Compl. ¶¶ 3, 23, 26–32; Uccello Aff., ¶¶ 13-20; Littlefield Aff., ¶¶ 9-17, 23-28.

6.      The Corps is authorized to restore the Florida Everglades through the Comprehensive Everglades Restoration Program ("CERP"), a series of projects and operational changes to address ecosystem health, the water supply, and flood control. Before proceeding with any particular component of the CERP, the Corps must publish a Project Implementation Report ("PIR") and conduct and publish an Environmental Impact Analysis and Statement ("EIS") as required by the National Environmental Policy Act ("NEPA"). The EIS must consider the direct and indirect effects that any CERP Project (including the C-11 Project) may have on surrounding properties and interests, including physical and environmental effects, and impacts on cultural and religious activities. *See generally* Compl. ¶¶ 4, 12, 41-52.

7.      In 2007, the Corps published a joint PIR/EIS ("2007 PIR/EIS") for a Broward County Water Preserve Area project ("BCWPA Project") with three subcomponents: the C-11 Impoundment, the C-9 Impoundment, and Water Conservation Area 3A/3B Seepage Management. The C-11 Impoundment Project consists of the S-503 Pump Station, an above ground earthen impoundment, a canal system, and large mitigation area. Compl. ¶¶ 4, 33–40, 47–49. The three components of the C-11 Impoundment cannot function independently; all subcomponents must be operational before any of them can provide any benefit.

8.      The C-11 Project spans approximately 1,830 acres and includes an over 1,000 acre above-ground water impoundment area surrounded by a berm or embankment approximately 16 feet high; the C-11 Project can store roughly 1.5 billion gallons of water. That is about 24 times larger than the largest domed stadium in the world (AT&T Stadium in Arlington, Texas). Compl. ¶ 33.

9. This massive federal project, which is immediately adjacent to the FNCC Property, includes a 25-foot-deep, 180-foot-wide seepage canal running along the edge of the FNCC Property. Constructing the seepage canal will require blasting or heavy construction equipment that can hammer through concrete-like limestone. Excavating the canal is just one of the Corps' massively disruptive plans during the at least nine-year construction schedule. Compl. ¶ 34.

10. Disruption will continue after construction is completed. The Corps intends to place a seven-story-high pumping station immediately next to the FNCC Property, which will generate disruptive engine noise and is visually disruptive. **Ex. 3**, Affidavit of J. Goldasich ("Goldasich Aff."), ¶¶ 6, 42-47. **Ex. 4**, Affidavit of D. John ("John Aff."), ¶¶ 30, 42-43.

11. Despite the C-11 Project's proximity to the FNCC Property, the 2007 PIR/EIS failed to consider the potential impacts of the C-11 Project on the FNCC Property or Plaintiffs' religious activities, or identify and assess any alternatives that mitigate those impacts. Compl. ¶¶ 4, 33-40, 50, & 87; Goldasich Aff. ¶7-8, 15, 18, 24, 49, 54, 65, 74; John Aff. ¶ 6-8, **Ex. 5**, Affidavit of C. Sawyer ("Sawyer Aff.") ¶ 11.



12. Plaintiffs recognized the significant risks the C-11 Project poses to the FNCC Property. Goldasich Aff. ¶¶ 6-20. 25-77; Sawyer Aff. ¶¶ 7-11.

13. Beginning in 2007 and since, Plaintiffs have retained numerous scientific experts and performed comprehensive analyses of the potential adverse impacts of the C-11 Project on the FNCC Property. Those adverse impacts included, but are not limited to, the following:

   a. wildlife intrusions that increase the risk of dangerous animal encounters and animal-to-human disease transmission;

b.      destructive vibrations caused from both construction and operation that pose risks to the FNCC Property's facilities and artifacts;

c.      decreased water quality, changes to groundwater levels and other negative hydrological effects;

d.      decreased air quality due to dust, particles, emissions, and noxious odors;

e.      significant increased noise levels from both construction and operation that could be more than eight times louder than the current ambient noise level on the FNCC Property; and

f.      adverse aesthetics.

Plaintiffs have regularly shared their professional opinions and scientific findings with the Corps. Compl. ¶¶ 8, 60–64, 69, 71–73, 88, 110–114; Uccello Aff., ¶ 20; Littlefield Aff., ¶¶ 20-21; Goldasich Aff., ¶ 8.; John Aff., ¶¶ 3-34, 46-48; Sawyer Aff., ¶¶ 7-11.

14.     These adverse effects would be bad enough for any property, but the adverse impacts imposed by the C-11 Project will render the FNCC Property functionally useless for its sole intended purpose: a religious retreat center for SGI-USA's members.  Compl. ¶¶ 8, 9, 14, 64; Uccello Aff., ¶¶ 13-20; Littlefield Aff., ¶¶ 9-17, 23-28.

15.     The Corps issued an updated and revised PIR/EIS in 2012 ("2012 Revised PIR/EIS").  This was the last EIS issued for the C-11 Project. Again, it completely ignored Plaintiffs and the FNCC Property.  The 2012 Revised PIR/EIS, again, failed to assess the adverse impacts of the C-11 Project's construction and operation on the FNCC Property, an adjacent property that the Corps knows is used exclusively for religious exercise. John Aff. ¶¶ 5-6 5-6; Goldasich Aff. ¶¶ 9, 11, 18-19, 47, 54, 65, 74; Sawyer Aff. ¶¶ 9-11.

16.     When the Corps issued the 2007 and 2012 Revised PIR/EIS, the design and construction plans remained uncertain, further subtracting from the value and adequacy of the EIS. The Corps could not properly evaluate the C-11 Project's impacts and evaluate potential alternatives without a clear understanding and depiction of the design and construction plans. In fact, the Corps did not issue a "Preliminary" Development Design Report ("DDR") for the BCWPA until 2021, nine years after the last EIS. Compl. ¶ 58.

17.     There have been significant design and construction planning changes since the 2012 Revised PIR/EIS, such as the inclusion of a 35-foot-deep seepage barrier wall embedded around the almost seven-mile circumference of the C-11 Project to control seepage and

/groundwater impacts associated with stacking 1.5 billion gallon of water within the Impoundment structure.  Compl. ¶ 53.

18.     The construction plan has also changed from what the 2012 Revised PIR/EIS characterized as a "temporary" event to what is now an at least nine-year construction process (construction is likely to take longer, since the Corps has doubled its estimate in the past ten years, with a 20% increase just between 2023 and 2024).  None of these significant, or other changes, or alternatives to them, were evaluated by the 2012 Revised PIR/EIS. Goldasich Aff. ¶¶ 9, 12-19, 24, 47, 54, 65, 74; John Aff. ¶¶ 14-18, 20-24, 41-44.

19.     To date, the Corps has failed to specify key elements of the construction process, making it impossible to evaluate the adverse impacts of the at least nine-year heavy construction schedule on Plaintiffs' property and religious activities.  For example, the Corps has not specified how, and with what kind of equipment, it will blast or hammer through the thick concrete-like limestone cap overlaying the top of the planned 25-foot-deep and 180-foot-wide seepage collection canal bordering the FNCC Property (not to mention the related rock crushing operation).  This is despite the Corps' own August 10, 2021, Intermediate DDR stating that "both blasting and mechanical methods are expected for limestone excavations."  Of course, the 2012 Revised PIR/EIS did not evaluate the impacts of blasting or mechanically excavating limestone on the properties adjacent to the C-11 Project because such activities were not planned at the time. Goldasich Aff. ¶ 33.

20.     Even after the flawed and inadequate 2012 Revised PIR/EIS, Plaintiffs continued for years to communicate information to the Corps in good faith (and at significant cost) about the adverse effects associated with the design, construction, and operation of the C-11 Project.  From 2021 through 2024, Plaintiffs and their experts met regularly with the Corps, presenting a range of technical and engineering information on the potential disruption and damage to the FNCC Property and related eco-system. They also explained how the C-11 Project will disrupt SGI-USA and its members' religious exercise on the FNCC Property.  For example, in a January 12, 2023, meeting with the Corps, Plaintiffs presented detailed technical information regarding the impacts of blasting or mechanically removing limestone, and the impact of construction-related dewatering activities on the groundwater levels (which would likely cause subsidence and damage FNCC Property's structures and wetlands).  John Aff. ¶¶ 3-4, 9-37, 46-48; Goldasich Aff. ¶¶ 10-15.

21.     The Corps has continuously ignored Plaintiffs and pushed forward with the C-11 Project without taking the required "hard look" at its adverse impacts on the FNCC Property and Plaintiffs' religious exercise.  The Corps also breached its legal duty to identify and evaluate alternative plans for the C-11 Project, and its duty to implement such alternatives to avoid infringing on Plaintiffs' religious exercise rights.  In its nearly twenty years of preparing the C-11 Project, and even now on the eve of construction, the Corps has never materially addressed Plaintiffs' concerns about the C-11 Project.  Compl. ¶¶ 9–13, 40, 50, 52, 54–59, 65, 69, 71–99, 140; Goldasich Aff. ¶¶ 8-15, 19-24, 45-47, 54, 65, 74; John Aff. ¶¶ 8-48.

22.     The Corps failed to revise, update, or supplement the inadequate 2012 Revised PIR/EIS, leaving it without any adequate assessment that comprehensively considers the impacts of the C-11 Project or potential alternatives to it. In addition to being a blatant failure to comply with NEPA, this failure leaves SGI-USA and its members without any accommodation to protect their rights to religious expression on the FNCC Property, a religious retreat center operated exclusively for that purpose. *See generally* Compl.

23.     The Corps anticipates beginning initial land clearing work for the C-11 Project in January 2025. Compl. ¶¶ 11, 16, 106; John Aff. ¶41.

24.     Preventing the Corps from proceeding with the C-11 Project is necessary to preserve the status quo and to ensure that Plaintiffs' property rights and religious liberties are not unlawfully infringed upon without the Corps first considering the C-11 Project's adverse impacts.

## MEMORANDUM OF LAW

Preliminary injunctions preserve the status quo until the merits of a controversy can be fully adjudicated so the district court retains the "power to render a meaningful decision after a trial on the merits." *Long v. Benson*, 383 F. App'x 930, 931 (11th Cir. 2010) (quoting *Canal Auth. of State of Fla. v. Callaway*, 489 F.2d 567, 572 (5th Cir. 1974)); *Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. Jacksonville*, 896 F.2d 1283, 1284 (11th Cir. 1990).  To obtain a preliminary injunction, Plaintiffs must establish: (1) a substantial likelihood of success on the merits, (2) irreparable harm, (3) that the threatened injury outweighs the harm to the non-movant, and (4) that the public interest supports injunctive relief.  *Winter v. NRDC*, 555 U.S. 7, 22 (2008); *Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1223, 1225-26 (11th Cir. 2005).  Plaintiffs can readily establish all four elements and are entitled to a preliminary injunction preventing Defendants from beginning the C-11 Project without complying with the law.

I.    **Plaintiffs are Likely to Succeed on the Merits of Their NEPA and RFRA Claims.**

A "substantial likelihood of success on the merits" means that the movant's success is "probable" or "likely." *City of Boerne v.* Flores, 521 U.S. 507, 517 (1997); *Schiavo*, 403 F.3d at 1232. The Southern District of Florida applies "a sliding scale" that allows it to "balance[e] the hardships associated with the issuance or denial of a preliminary injunction with the degree of likelihood of success on the merits." *Faculty of Senate of Fla. Int'l Univ. v. Winn*, 477 F. Supp. 2d 1198, 1203 (S.D. Fla. 2007). Thus, "[w]here the balance of equities weighs heavily in favor of granting the injunction, the movant need only show a substantial case on the merits" to satisfy the element. *Alston v. www.calculator.com*, 476 F. Supp. 3d 1295, 1309 (S.D. Fla. 2020) (quoting *Garcia-Mir v. Meese*, 781 F.2d 1450, 1453 (11th Cir. 1986)) (cleaned up); *Faculty of Senate of Fla. Int'l Univ. v. Winn*, 477 F. Supp. 2d 1198, 1203 (S.D. Fla. 2007).

Plaintiffs bring two causes of action, both of which request injunctive relief. Count I alleges that Defendants cannot proceed with the C-11 Project because they violated NEPA and the Administrative Procedure Act ("APA"). Compl. ¶¶ 138-144. Count II alleges that Defendants cannot proceed with the C-11 Project because they violated the Religious Freedom Restoration Act ("RFRA"). Compl. ¶¶ 145-152. The Complaint and Plaintiffs' evidence clearly demonstrates, at minimum, a substantial likelihood of success on the merits.

A.    ***Count I: Plaintiffs are substantially likely to succeed on the merits of their NEPA/APA claim.***

Violations of NEPA are enforced through the APA, which provides a private right of action to challenge final agency actions as arbitrary and capricious. *Ctr. for a Sustainable Coast v. U.S. Army Corps of Eng'rs*, 100 F.4th 1349, 1355 n.2 (11th Cir. 2024). NEPA ensures that federal agencies undertaking major actions (1) "consider every significant environmental impact of a proposed action," and (2) "inform the public that it has considered environmental concerns in its decision-making process." *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council*, 462 U.S. 87, 97 (1983). This requires the agency to take a "hard look" at all potential environmental consequences and provide broad dissemination of the relevant environmental information. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349–50 (1989). Such procedures are designed so that an "agency will not act on incomplete information, only to regret its decision if its too late to correct." *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 371 (1989); *Robertson*, 490 U.S. at 349 ("NEPA ensures that important effects will not be overlooked or underestimated only to be discovered after

resources have been committed or the die otherwise cast."). A generalized or incomplete analysis is insufficient under NEPA. *Robertson*, 490 U.S. at 351.

NEPA requires federal agencies to publish, before work on a project is initiated, a "detailed statement" addressing:

(i)    [the] reasonably foreseeable environmental effects of the proposed agency action;

(ii)    any reasonably foreseeable adverse environmental effects which cannot be avoided should the proposal be implemented;

(iii)    a reasonable range of alternatives to the proposed agency action, including an analysis of any negative environmental impacts of not implementing the proposed agency action in the case of a no action alternative, that are technically and economically feasible, and meet the purpose and need of the proposal;

(iv)    the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity; and

(v)    any irreversible and irretrievable commitments of Federal resources which would be involved in the proposed agency action should it be implemented.

42 U.S.C. § 4332(2)(C). NEPA also requires agencies to consider the religious or cultural implications of a project that are raised during the decision-making process. 42 U.S.C. § 4331(b)(4); *see, e.g.*, *Center for Biological Diversity v. U.S. BLM,* 746 F.Supp.2d 1055, 1096 (N.D. Cal 2009) (finding that in preparing an EIS "the onus is on the BLM to inform the public of the impacts of the Plan on cultural resources," and that to "for those areas in which [t]he effect of BLM routes of travel on public land cultural resources has not been fully determined . . . the FEIS is inadequate because it does not inform the public of the scope and extent of the impacts of the" proposed action); *National Parks Conservation Association v. Semonite*, 916 F.3d 1075, 1082 (D.C. Cir. 2019) ("Congress has declared that preserv[ing] important historic, cultural, and natural aspects of our national heritage constitutes an important goal of . . . 42 U.S.C. § 4331(b)(4)" (quotations omitted)).

The 2007 and 2012 Revised PIR/EIS failed to seriously identify or consider any off-site environmental impacts of the C-11 Project, particularly the obvious impacts on immediately adjacent properties such as the FNCC Property. Defendants' 2007 and 2012 Revised PIR/EIS contain—at best—mere generalities with no significant analysis of the potential adverse impacts of the C-11 Project. Many of the details of the C-11 Project were unknown or at least unspecified at the time of the 2007 and 2012 Revised PIR/EIS, and the construction process and related impacts

were dismissed as merely "temporary."  For example, the 2012 Revised PIR/EIS did not evaluate the impact of removing the thick layer of concrete-like limestone by blasting or mechanical means on Plaintiffs' property, ecosystem or religious activities, did not evaluate the "offsite" impacts of dewatering associated with construction, did not evaluate the impacts of the massive construction effort that will take at least nine years, and did not evaluate alternative locations for the seven-story high diesel-powered pumphouse that will tower over the FNCC Property.  Defendants' disregard for the adverse impacts of the C-11 Project on adjacent properties led it to similarly fail to substantively consider alternatives or reasonable mitigation efforts that could limit, if not eliminate, the adverse impacts that will befall the FNCC Property and the spiritual and religious activities conducted there.  Compl. ¶¶ 9–13, 40, 50, 52, 54–59, 65, 69, 71–99, 140; Uccello Aff. ¶¶ 20-31; Littlefield Aff. ¶¶ 21-29; Goldasich Aff. ¶¶ 7-77; John Aff. ¶¶ 2-48.

The Corps failed to comply with its legal duty under NEPA to evaluate the C-11 Project's adverse impacts and potential alternatives to avoid them.  Such failures fall woefully short of satisfying Defendants' duties under NEPA.  *See, e.g.*, *Sierra Club v. Van Antwerp*, 709 F. Supp. 2d 1254, 1272-73 (S.D. Fla. 2009) (finding the Corps violated NEPA by failing to consider potential adverse impacts of a mining project); *Fla. Wildlife Fed'n v. U.S. Army Corps. of Eng'rs*, 401 F. Supp. 2d 1298, 1330 (S.D. Fla. 2005) (explaining that failing to consider viable alternatives is a violation of NEPA).

Further, the Corps must supplement an EIS when an action is incomplete or ongoing, and (i) the agency makes substantial changes to the proposed action that are relevant to environmental concerns; or (ii) there are substantial new circumstances or information about the significance of adverse effects that bear on the analysis.  33 C.F.R. § 230.13(b); 40 C.F.R. § 1502.09(d).

> The standard for determining when a SEIS (Supplemental EIS) is required is essentially the same as the standard for determining when an EIS is required. If the post-original EIS changes in the project will have a significant impact on the environment that has not previously been covered by the original EIS, a supplement is necessary.

*City of Dania Beach, Fla. v. U.S. Army Corps of Eng'rs*, No. 12-60989-CIV, 2012 WL 3731516, at *2 (S.D. Fla. July 6, 2012). A supplemental EIS was clearly necessary here, where the 2012 PIR/EIS was inadequate in the first place, and there have since been major changes to the design and construction plans for the Project.

Defendants failed to supplement the 2012 Revised PIR/EIS even though the Corps has made significant changes to the BCWPA Project, including changes to the C-11 Project since 2012.

These changes include actions with significant potential environmental impacts, such as the almost seven-mile long and 35-foot-deep seepage barrier wall that will surround the compound and extending the construction period from a "temporary" inconvenience to an at least nine-year long odyssey.  Compl. ¶¶ 66–74, 90–93, & 100–109.  Further, key construction plan impacts such as the blasting or mechanical removal and crushing of limestone and dewatering have not been disclosed or fully evaluated.  It is inconceivable that Defendants' bare bones and out-of-date 2012 Revised PIR/EIS reports from more than a decade ago can satisfy NEPA.  The significant changes to the Corps' plans demand further consideration of potential adverse impacts and an analysis of potential alternatives that could mitigate the same.  In any event, such post-2012 efforts could not "cure" the patently deficient and unlawful 2012 Revised PIR/EIS.  Its deficiency can only be cured by conducting a full and compliant EIS that takes a "hard look" at the adverse impacts of the C-11 Project on Plaintiffs' property, related ecosystem, and religious practices.  Any post-2012 evaluations or changes are simply irrelevant to the determination that the 2012 Revised PIR/EIS violated NEPA.  Indeed, the Corps' post-2012 actions only underscore that the 2012 Revised PIR/EIS was facially inadequate and violated NEPA.

In short, Defendants' 2007 and 2012 Revised PIR/EIS were deficient from the get-go by fundamentally failing to substantively consider the potential adverse impacts of the C-11 Project on the FNCC Property and Plaintiffs' religious and property rights.  The EISs were rendered even less compliant by the Corps significantly changing its plans since 2012 and not supplementing the 2012 Revised PIR/EIS.  Such acts violate NEPA and are arbitrary and capricious under the APA.  Accordingly, Plaintiffs are likely to succeed on the merits of their NEPA/APA claim.

**B.**     ***Count II: Plaintiffs are substantially likely to succeed on the merits of their RFRA claim.***

RFRA provides "very broad protection for religious liberty." *Burwell v. Hobby Lobby Stores, Inc.,* 573 U.S. 682, 693 (2014).  Under RFRA, "[a] person whose religious exercise has been burdened in violation of this section may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief against a government." 42 U.S.C. § 2000bb-1(c); *see Bostock v. Clayton Cnty.*, 590 U.S. 644, 682 (2020) (explaining that RFRA "displace[s] the normal operation of other federal laws").  The initial burden is on the plaintiff to show a government action is substantially burdening its exercise of religion.  42 U.S.C. § 2000bb-1(a); *Gonzalez v. O Centro Espirita Beneficiente Uniao do Vegetal*, 546 U.S. 418, 428 (2006).  Once a plaintiff satisfies its initial burden, the government must satisfy strict scrutiny and establish that its

action (1) "is in furtherance of a compelling governmental interest;" and (2) "is the least restrictive means of furthering that compelling governmental interest."  42 U.S.C. § 2000bb-1(b); *see Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. 657, 680–81 (2020).

There can be no doubt that (i) the C-11 Project substantially burdens Plaintiffs' religious exercise on the FNCC Property; and (ii) even assuming Defendants' goals constitute a compelling governmental interest, Defendants have failed to adequately consider alternatives such that the C-11 Project as planned could be considered the "least restrictive means" of furthering their goals.

### 1.    The C-11 Project substantially burdens Plaintiffs' religious exercise on the FNCC Property.

Plaintiffs' use of the FNCC Property as a religious retreat campus for thousands of SGI-USA Buddhists is a sincere religious exercise protected under the RFRA.[2]  42 U.S.C. § 2000cc-5(7)(B) ("The use, building, or conversion of real property for the purpose of religious exercise shall be considered to be religious exercise of the person or entity that uses or intends to use the property for that purpose.").  The question is only whether the C-11 Project's adverse impacts on Plaintiffs' religious practices are a "substantial burden" under RFRA.  A government action creates a "substantial burden" on religious exercise if it, directly or indirectly, "impede[s] the observance" of the plaintiff's religion.  *Sherbert v. Verner*, 374 U.S. 398, 404 (1963); *see also Civil Liberties for Urban Believers v. City of Chicago*, 342 F.3d 752, 761 (7th Cir. 2003) (explaining that a substantial burden on religious expression occurs when government actions render religious exercise "effectively impracticable").

As detailed in the Complaint and in the attached affidavits, the C-11 Project will prevent Plaintiffs from using the FNCC Property for its intended and long-used religious exercise purposes. Quiet, peaceful contemplation, accompanied by oneness and harmony with nature and the environment, are core tenets of Nichiren Buddhism practiced at the FNCC Property for decades. The FNCC, including the structures, artifacts, and landscaping, were intentionally designed and have for decades been maintained and operated specifically to enable and enhance the successful practice of these Nichiren Buddhist beliefs.  Uccello Aff. ¶¶ 20-31; Littlefield Aff. ¶¶ 21-29.

 The noise, vibration, dust, heavy construction equipment vehicle emissions, and other adverse impacts, beginning now and throughout the at least nine-year construction process, destroy

---

[2] The Supreme Court has cautioned federal courts not to fall into the trap of questioning the sincerity of a plaintiff's religious beliefs as part of a RFRA analysis.  *Hobby Lobby*, 573 U.S. at 724.

or materially impair the peace, natural harmony, and oneness with nature necessary to Plaintiffs' practice of their religious beliefs as they have for several undisturbed decades.  This disruption will continue during the C-11 Project's operation, including the operation of the seven-story high diesel-power pump station adjacent to the FNCC Property.  Uccello Aff. ¶¶ 20-31; Littlefield Aff. ¶¶ 21-29; Goldasich Aff. ¶¶ 7-77.

It is nearly certain, that these adverse impacts will impede the Buddhist religious activities on the FNCC Property.  The impacts will make the FNCC Property entirely unsuitable for the specific and exclusive religious purpose for which it exists.  Such a result unmistakably imposes a substantial burden on Plaintiffs' and their members' religious exercise rights.

> **2.   Even assuming Defendants' goals constitute a compelling government interest, Defendants have failed to adequately consider alternatives such that the C-11 Project as planned could be considered the "least restrictive means" of furthering their goals.**

Defendants bear the burden of establishing that they are furthering a "compelling government interest" through the "least restrictive means" available to promote those interests.  A "compelling government interest" requires a "high degree of necessity."  *Brown v. Entm't Merchs. Ass'n*, 564 U.S. 786, 804 (2011).  The government must show "an 'actual problem' in need of solving" and that the imposition on religious expression is "actually necessary" to solve the problem.  *Id.* at 799.  For purposes of this analysis only, Plaintiffs assume (without conceding) that Defendants' Everglades restoration goals constitute such a compelling government interest.  Nonetheless, it is highly unlikely that Defendants can satisfy their burden and establish that the C-11 Project, in its current form, is the "least restrictive means" available.

> The least-restrictive-means standard is exceptionally demanding, and it requires the government to show that it lacks other means of achieving its desired goal without imposing a substantial burden on the exercise of religion by the objecting party. If a less restrictive means is available for the Government to achieve its goals, the Government must use it.

*Holt v. Hobbs*, 574 U.S. 352, 364–65 (2015) (quoting *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 728 (2014)) (cleaned up).  Such less restrictive means are mandatory even if the Government must "expend additional funds to accommodate citizens' religious [expression]." *Davila v. Gladden*, 777 F.3d 1198, 1207 (11th Cir. 2015) (quoting *Hobby Lobby*, 573 U.S. at 730).

Defendants' NEPA violations expose their lack of consideration for Plaintiffs' religious exercise rights. [3]  Under NEPA, Defendants already had an affirmative duty to identify all potential adverse impacts, including religious exercise concerns, from the C-11 Project and consider all reasonable alternatives and related impacts. Since 2007, Plaintiffs have constantly warned Defendants of the risks that the C-11 Project poses to the FNCC Property and to Plaintiffs' religious exercise rights, but still Defendants failed to consider (i) the adverse impacts of the C-11 Project on the FNCC Property and Plaintiffs' religious exercise, and (ii) alternative means to achieve their Everglades restoration goals, including alternative design, construction, and operational plans that could mitigate the severe adverse impact of the C-11 Project on Plaintiffs' ability to exercise their religion on the FNCC Property.

In short, Plaintiffs have been warning Defendants for *eighteen years* that the C-11 Project will restrict their ability to exercise their religion on the FNCC Property.  To whatever extent Defendants considered Plaintiffs' religious exercise concerns and reviewed alternatives that could mitigate or eliminate them, such consideration and review would have been included in the Corps' 2007 and 2012 Revised PIR/EIS.  Yet, they are nowhere to be found.  This failure is especially egregious in the RFRA context because, unlike NEPA—which only requires the Corps to consider alternatives to avoid adverse impacts—*RFRA requires the Corps to implement reasonable alternatives to avoid infringing on religious exercise. Holt*, 574 U.S. at 365 ("If a less restrictive means is available for the Government to achieve its goals, *the Government must use it*.").

The Corps has done no better in the long years after the deficient 2012 Revised PIR/EIS. For example, one of the Corps' "solutions" to the overwhelming construction noise was to propose a chicken wire fence with a fabric covering.  The Corps has also referred to unrealistic and unenforceable contract specifications, such as a "requirement" that noise levels during construction cannot exceed 70 decibels ("dBA").  However, that noise level will be exceeded throughout the at least nine-year plus construction process, because the construction plans require heavy construction machinery, possible blasting and hammering, rock crushing, all of which

---

[3] Plaintiffs note that the implication of religious expression rights dramatically changes the nature of Defendants' duties in this case.  If NEPA were the only statute at issue, then the question would be purely procedural: whether the 2012 Revised PIR/EIS, the sole EIS for the C-11 Projects, complies with NEPA.  *See Robertson*, 490 U.S. at 350 ("Although these procedures are almost certain to affect the agency's substantive decision, it is now well settled that NEPA itself does not mandate particular results, but simply prescribes the necessary process."). But because Defendants' actions also violate religious protections, the RFRA imposes an affirmative duty on the Corps to implement alternative means that mitigate, if not eliminate, the burdens imposed on Plaintiffs' religious practice. *Holt*, 574 U.S. at 365.

typically exceed 70 dBA.  The Corps recently claimed there will be no blasting to cut through the thick concrete-like limestone cap, but their own design documents call for blasting and they have not disclosed construction plans indicating how blasting will not be necessary.   Goldasich Aff. ¶¶ 10-77; John Aff. ¶¶ 9-46.  The Corps never considered any alternative locations for the diesel-powered seven-story high pump station that will tower over the FNCC Property.  If anything, the prognosis for peace, quiet, and harmony with nature has gotten worse because the Corps extended the construction schedule to at least nine years.

In sum: (i) the C-11 Project will substantially impair Plaintiffs' religious exercise on the FNCC Property; (ii) Plaintiffs informed the Corps that the C-11 Project would substantially impair their religious exercise at the FNCC Property; (iii) NEPA required the Corps to document all adverse impacts—including the impairment of Plaintiffs' religious exercise on the FNCC Property—and potential alternatives to address such impacts; (iv) RFRA requires the Corps to implement reasonable alternatives to avoid impairing Plaintiffs' religious exercise on the FNCC Property; and (v) the Corps did not document any potential adverse impact on Plaintiffs' religious exercise or consider—much less implement—any reasonable alternatives to protect Plaintiffs' religious exercise.  Defendants failed to heed Plaintiffs' religious exercise concerns, much less consider less restrictive means of achieving their goals.  Such facts establish Plaintiffs' likelihood of success on the merits of their RFRA claim.

## II. Plaintiffs Will Suffer Irreparable Harm if the C-11 Project Begins.

Whether a plaintiff will suffer irreparable harm is "the sine qua non of injunctive relief." *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000).  Harm is "irreparable" if it "cannot be undone through monetary remedies" and is "neither remote nor speculative, but actual and imminent."  *Telestra, LLC v. NetTalk.com*, 126 F. Supp. 3d 1344, 1353 (S.D. Fla. 2015). Here, there can be no doubt that the injuries that will befall Plaintiffs if the C-11 Project proceeds constitutes irreparable harm because of (a) infringement on their religious exercise rights; (b) the environmental injuries and adverse impacts that the construction and operation of the C-11 Project will inflict; and (c) the impending "bureaucratic steamroller" constitutes irreparable harm.

### A. *Infringement on Plaintiffs' exercise of their religious rights is irreparable harm.*

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable harm." *Elrod v. Burns*, 427 U.S. 437, 373 (1976); *Beckwith Elec. Co. v. Sebelius*, 960 F. Supp. 3d 1328, 1351 (M.D. Fla. 2013) ("The First Amendment, and its statutory

corollary the RFRA, endow upon the citizens of the United States the unalienable right to exercise religion[.]"). Religious or spiritual harm cannot be remedied through monetary relief. *Ramirez v. Collier*, 495 U.S. 411, 433 (2022); *Roman Catholic Diocese of Brooklyn v. Cuomo*, 592 U.S., 14 (2020) (finding New York's COVID-19 restrictions on religious activity constituted irreparable harm). Infringement on use of a property for its intended religious purpose constitute irreparable harm. *See, e.g.*, *City Walk-Urban Mission, Inc. v. Wakulla Cnty., Fla.*, 471 F. Supp. 3d 1268, 1287-88 (N.D. Fla. 2020) (entering a preliminary injunction in favor of a church preventing a county from enforcing a local ordinance that would prevent the church from using its property for its intended religious purpose). The FNCC Property's sole purpose is to serve as a religious retreat center for Plaintiffs and their thousands of members. The construction and operation of the C-11 Project will render the FNCC Property entirely unsuitable for its intended religious purpose. Uccello Aff. ¶¶ 20-31; Littlefield Aff. ¶¶ 21-29. This undeniably infringes on Plaintiffs' religious exercise rights and constitutes irreparable harm.

### B.      *Environmental Injury to the FNCC Property constitutes irreparable harm.*

Environmental injury constitutes irreparable harm. *See, e.g.*, *Nat. Res. Def. Council v. Texaco Refin. & Mktg., Inc.*, 2 F.3d 493, 506 (3d Cir. 1993); *Protect Key W., Inc. v. Cheney,* 795 F. Supp. 1552, 1563 (S.D. Fla. 1992) ("Irreparable harm results where environmental concerns have not been addressed by the NEPA process."). "Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.,* irreparable." *Amoco Prod. Co. v. Village of Gambell,* 480 U.S. 531, 545 (1987). NEPA's procedural requirements are designed to avoid irreparable harm by ensuring that an agency does "not act on incomplete information, only to regret its decision if its too late to correct." *Marsh*, 490 U.S. at 371; *Robertson*, 490 U.S. at 349 ("NEPA ensures that important effects will not be overlooked or underestimated only to be discovered after resources have been committed or the die otherwise cast."). For example, in *Fla. Wildlife Fed'n v. U.S. Army Corps of Eng'rs*, the Southern District of Florida found the Corps' insufficient EIS threatened irreparable injury to Plaintiffs, explaining that

> the irreparable injury to Plaintiffs is not simply the direct environmental harm from the dredging and filling of wetlands on the 535–acre parcel. Rather, the principal harm to Plaintiffs is the Corps' permitting of such activity for the construction of a large-scale, growth-inducing development in an environmentally sensitive area, without first taking into account the reasonably foreseeable indirect and cumulative effects of such action.

404 F. Supp. 2d at 1362.

Defendants failed to properly analyze the reasonably foreseeable and cumulative adverse impacts the construction and operation of the C-11 Project will have on the FNCC Property and consider mitigating alternatives.  In addition to that harm, the information developed by Plaintiffs and presented to the Corps over eighteen years, have demonstrated the damage that the 1800-acre C-11 Project will inflict on the FNCC Property and its eco-system.  Those damages will also render the FNCC Property functionally unsuitable for its intended and exclusive purpose as a religious retreat center.  Uccello Aff. ¶¶ 20-31; Littlefield Aff. ¶¶ 21-29.

  **C.**  ***The impending "bureaucratic steamroller" constitutes irreparable harm.***

A plaintiff is irreparably harmed when an agency starts an action that will bias it toward completion of the challenged project even if doing so would be improper.  *See, e.g.*, *Richland/Wilkin Joint Powers Auth. v. U.S. Army Corps of Eng'rs,* 826 F.3d 1030, 1039 (8th Cir. 2016) (finding preliminary construction activities would cause irreparable harm because "there would be added difficulty in stopping the specific iteration of the larger project"); *Sierra Club v. U.S. Army Corps of Eng'rs,* 645 F.3d 978, 995 (8th Cir. 2011) (recognizing "the difficulty of stopping a bureaucratic steam roller, once started"); *Sierra Club v. Marsh*, 872 F.2d 497, 504 (1st Cir. 1989) (same); *see also Nat'l Wildlife Fund v. Nat'l Marine Fisheries Serv.,* No. 20-cv-00362, 2017 WL 1829588, at *12 (D. Or. Apr. 3, 2017) (recognizing that "bureaucratic steamroller" or "bureaucratic momentum" can constitute irreparable harm, finding that the Corps "spending hundreds, tens, or even millions of dollars … during the NEPA remand period is likely to cause irreparable harm by creating a significant risk of bias in the NEPA process").

The Corps' conduct in this matter is the poster child of a bureaucratic steamroller.  The C-11 Project has been pending for decades, and the Corps is now desperate to begin it.  The last thing the Corps wants to do is consider Plaintiffs' religious exercise, property, and procedural rights because such analyses might delay the project and force the Corps to consider and implement alternatives.  But this is a dilemma of the Corps' own doing: if the Corps had taken its NEPA and RFRA obligations seriously nearly twenty years ago, it would not be in this situation today.  After ignoring its legal obligations and Plaintiffs input for almost two decades, the Corps cannot insist on the urgency of the C-11 Project to justify their continued non-compliance.  There is only one way to prevent Plaintiffs from being thrown under the tremendous weight of the bureaucratic steamroller: a preliminary injunction preventing the Corps from beginning the C-11 Project until the Corps complies with its legal obligations under both NEPA and RFRA.

**III.    The Threatened Harm to Plaintiffs Outweighs the Harm Any Delay Could Theoretically Impose on Defendants.**

The Court must compare the interests involved "to determine on which side the risk of irreparable harm weighs most heavily." *Blum v. Caldwell*, 446 U.S. 1311, 1315 (1980). "[T]he public's true interest lies in the correct application of the law." *Kentucky v. Biden*, 23 F.4th 585, 612 (6th Cir. 2022). There is generally no public interest in the perpetuation of unlawful agency action." *League of Women Voters of United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). "[O]ur system does not permit agencies to act unlawfully even in pursuit of desirable ends." *Ala. Assoc. of Realtors v. Dep't of Health & Hum. Servs.*, 594 U.S. 758, 766 (2021) (citing *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 582 & 585-86 (1952)). Religious exercise rights generally predominate over governmental interests. *See, e.g.*, *City Walk-Urban Mission*, 471 F. Supp. 3d at 1288 ("[O]n balance, the harm to Plaintiff's religious exercise in the absence of an injunction far outweighs any harm Defendant would suffer if an injunction [preventing the application of its zoning ordinance] is entered.").

Plaintiffs are seeking to protect the FNCC Property and its related and surrounding ecosystem to ensure that it can continue to serve its intended purpose: a religious retreat for thousands of Plaintiffs' Buddhist members. If the C-11 Project begins, it is highly unlikely that it will be stopped, rendering the FNCC Property unsuitable for its intended religious purpose. Not only will Plaintiffs lose decades of hard work and investment developing the FNCC Property into a Buddhist retreat center for their members' religious exercise, but they will also lose the ability to continue using the FNCC Property that has deep religious significance for SGI-USA and its members.

By contrast, the only harm that would befall Defendants is time and money spent on a project that has been under contemplation for decades—though now suddenly presented as time-sensitive. While Defendants might prefer to begin the C-11 Project construction without considering adverse impacts on the FNCC Property and Plaintiffs' religious rights, such concerns are woefully insufficient to justify allowing the Corps to proceed before the Court has the chance to fully adjudicate whether the Corps has complied with NEPA and RFRA.

**IV.    The Public Interest Favors Enforcing NEPA and RFRA.**

A preliminary injunction would promote the public interest. "The vindication of constitutional rights and the enforcement of a federal statute serve the public interest almost by definition." *City Walk-Urban Mission*, 471 F. Supp. 3d at 1288 (quoting *League of Women Voters*

*of Fla. v. Browning*, 863 F. Supp. 2d 1155, 1167 (N.D. Fla. 2012)); *see also Kentucky*, 23 F.4th at 612 ("[T]he public's true interest lies in the correct application of the law."). Plaintiffs ask the Court to promote the public interest by enforcing two statutes: NEPA and RFRA.

*First*, "[i]t is always in the public interest to prevent the violation of a party's constitutional rights." *Hobby Lobby*, 723 F.3d at 1147. "Conversely, public interest is never served by [government] depriving an individual of a constitutional right." *Arnold v. Barbers Hill Indep. Sch. Dist.*, 479 F. Supp. 3d 511, 531 (S.D. Tex. 2020). Plaintiffs' religious expression rights are paramount as a matter of law. *See* U.S. Const., amend. I; 42 U.S.C. § 2000bb-1(a). It would turn the entire U.S. Constitutional Order on its head if the Court were to conclude that Defendants' bureaucratic priorities predominate over Plaintiffs' and their members' rights to religious expression, and such an order would constitute reversible error.

*Second*, NEPA imposes environmental procedural protections and public participation rights. *South Fork Band Council of W. Shoshone of Nevada v. US. Dep't of Interior*, 588 F.3d 718, 728 (9th Cir. 2009) ("Congress's determination in enacting NEPA was that the public interest requires careful consideration of environmental impacts before major federal projects may go forward. Suspending a project until that consideration has occurred thus comports with the public interest."); *San Luis Valley Ecosystem Council v. US. Fish & Wildlife Serv.*, 657 F. Supp. 2d 1233, 1242 (D. Colo. 2009) ("[T]he public has an undeniable interest in the [government's] compliance with NEPA's environmental review requirements and in the informed decision-making that NEPA is designed to promote ... [and] there is a public interest in maintaining the status quo pending proper review."). Such public interest is further served because Plaintiffs timely seek injunctive relief before the C-11 Project has begun, ensuring the public is not forced to expend substantial costs caused by delay while the Court considers whether Defendants complied with NEPA.

## V.     Plaintiffs Request the Court Waive the Bond or Enter a Nominal Bond.

Courts may waive Fed. R. Civ. P. 65(c)'s bond requirement. Fed. R. Civ. P. 65(c); *BellSouth Telecomms., Inc. v. MCImetro Access Transmission Servs.*, 425 F.3d 964, 971 (11th Cir. 2005). Bond waivers are appropriate when a preliminary injunction enforces constitutional rights against governmental entities. *Scott v. City of Daytona Beach, Fla.*, 689 F. Supp. 3d 1160, 1170 (M.D. Fla. 2023) ("Waiving the bond requirement is particularly appropriate where a plaintiff alleges the infringement of a fundamental constitutional right." (quoting *Complete Angler, LLC v. City of Clearwater*, 607 F. Supp. 2d 1326, 1335 (M.D. Fla. 2009))). Similarly, NEPA cases often only

justify imposing a nominal bond. *See, e.g.*, *Davis v. Mineta*, 302 F.3d 1104, 1126 (10th Cir. 2002) ("Ordinarily, where a party is seeking to vindicate the public interest served by NEPA, a minimal bond amount should be considered."). Plaintiffs therefore request that the Court waive the bond requirement or impose a nominal bond.

## CONCLUSION

The circumstances here are straightforward. Plaintiffs are a religious group that has exclusively operated their religious retreat center for their Buddhist members for nearly thirty years. Defendants want to construct a massive above-ground project without conducting NEPA required analysis that will render the property—both during construction and after the project is completed—entirely unsuitable for their religious expression. Plaintiffs have made their religious, environmental, and procedural concerns clear to Defendants for decades. Defendants have a legal duty to investigate the adverse impacts of the project and consider alternatives to avoid such impacts; Defendants further have an affirmative duty to implement those alternatives to avoid impairing religious exercise. Nonetheless, Defendants have facially failed to comply with their legal obligations. The law does not only justify a preliminary injunction—***it demands it***.

## REQUEST FOR ORAL ARGUMENT

Pursuant to S.D. Fla. Local Rule 7.1(b)(2), to the extent necessary, Plaintiffs request oral argument to provide the Court with additional information and context that might aid in its determination that a preliminary injunction is not just warranted, but absolutely necessary, to protect Plaintiffs from actual and imminent irreparable harm.

**WHEREFORE**, Plaintiffs request that the Court enter an order (i) granting this Motion, (ii) preliminarily enjoining Defendants from commencing construction of the C-11 Project absent further order from this Court, and (iii) granting such other and further relief as the Court deems just and proper.

Date: January 24, 2025

Respectfully Submitted,

**GREENBERG TRAURIG, LLP**
1144 15th Street, Suite 3300
Denver, Colorado 80202
T. 303.572.6584

**GREENBERG TRAURIG, P.A.**
401 East Las Olas Boulevard, Suite 2000
Fort Lauderdale, Florida 33301
T. 954.765.0500

*/s/ Paul M. Seby*
**PAUL M. SEBY**
*Admitted Pro Hac Vice*
sebyp@gtlaw.com

*/s/ Glenn E. Goldstein*
**GLENN E. GOLDSTEIN**
Fla. Bar No. 435260
goldsteing@gtlaw.com
geistc@gtlaw.com
**ZACHARY R. NEEDELL**
Fla. Bar No. 1011742
zachary.needell@gtlaw.com
jennifer.shiner@gtlaw.com
flservice@gtlaw.com

*Counsel for Plaintiffs*


## CERTIFICATE OF EMERGENCY

After reviewing the facts and researching applicable legal principles, we certify that this motion in facts presents a true emergency (as opposed to a matter that may need only expedited treatment) and requires an immediate ruling because the Court would not be able to provide meaningful relief to a critical, non-routine issue after the expiration of seven days. We understand that an unwarranted certification may lead to sanctions.

*/s/ Paul M. Seby*
**PAUL M. SEBY**

*/s/ Glenn E. Goldstein*
**GLENN E. GOLDSTEIN**


## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on January 24, 2025, I electronically filed the foregoing with the Clerk of Court using CM/ECF. I also certify that the foregoing document was served on all counsel of record via transmission of Notice of Electronic Filing generated by CM/ECF.

*/s/ Glenn E. Goldstein*
**GLENN E. GOLDSTEIN**