UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
FT. LAUDERDALE DIVISION

| | |
|---|---|
| SOKA GAKKAI INTERNATIONAL-USA, a California non-profit religious corporation, and FLORIDA NATURE AND CULTURE CENTER, LLC, a Florida limited liability company,<br><br>  Plaintiffs<br>v.<br><br>UNITED STATES ARMY CORPS OF ENGINEERS, COLONEL BRANDON L. BOWMAN, District Commander, Army Corps of Engineers, Jacksonville Office, in his official capacity,<br><br>  Defendants | Case No. 24-cv-62452<br><br>Judge William P. Dimitrouleas<br>Magistrate Judge Patrick M. Hunt |

## DEFENDANTS' OPPOSITION TO PLAINTIFFS' EMERGENCY MOTION

  This case involves a challenge to a U.S. Army Corps of Engineers project that the Corps approved in 2012. Plaintiffs have now, thirteen years later, moved to preliminarily enjoin project preparations.

  Plaintiffs' delayed and wholly unjustified attempt to invoke this Court's emergency powers defeats itself on only its second page: "Plaintiffs have sounded the alarm about the[] risks [of this project] for nearly twenty years." *Emergency Motion For Preliminary Injunction And Incorporated Memorandum Of Law*, ECF No. 10 at 2. *See also* Complaint, ECF No. 1, ¶ 60 ("Since January 2007, Plaintiffs have regularly attempted to engage with Defendants and SFWMD regarding the C-11 Impoundment Project."). If Plaintiffs' concerns about this project date back twenty years, Plaintiffs' request for an injunction presents an emergency entirely of Plaintiffs' making. There is another reason Plaintiffs' NEPA/APA claims hold little promise. Plaintiffs claim that the Corps ignored Plaintiffs' concerns about the project. But Corps project personnel describe the considerable efforts the Corps devoted to meeting with FNCC

1

representatives and to addressing FNCC's concerns. Ex.s B, G, H.

In addition, Plaintiffs' motion fails every one of the traditional tests governing emergency motions in the federal courts. Most conspicuously, Plaintiffs cannot show an immediate risk of any injury at all, let alone irreparable injury that would occur before this case can be litigated. The construction work that Plaintiffs' affiants complain about will not begin until 2026, and the ground-clearing work that is scheduled to take place in 2025 will not injure Plaintiffs. In addition, Plaintiffs cannot show that they are likely to succeed on the merits, in large part because Plaintiffs' claims are time-barred because they assert violations of law that Plaintiffs alleged occurred in 2012, well outside the six-year statute of limitations. And the balance of harms tips decidedly against granting Plaintiffs' requested injunctive relief here because the Project is in the public interest, the harm to Plaintiffs is small, and an injunction would waste taxpayer money.

## FACTUAL BACKGROUND

### A. The Comprehensive Everglades Restoration Plan

In the 1992 and 1996 Water Resource Development Acts (WRDA) Congress directed the United States Army Corps of Engineers (Corps) to develop a comprehensive plan "for the purpose of restoring, preserving, and protecting the South Florida ecosystem." *NRDC v. Van Antwerp*, Case No. 9:07-cv-80444-DMM, ECF No. 193 (2009) at 6 (quoting Pub. L. No. 104-303, § 528(b), 110 Stat. 3658, 3767-68 (1996)). In April of 1999, in accordance with Congress's mandate, the Corps released the "Central & South Florida Project Comprehensive Review Study Final Integrated Feasibility Report and Programmatic Environmental Impact Statement" (known as the Yellow Book, or the Restudy). *Id.*

The Restudy presented an Everglades restoration plan of large scope, encompassing 68 projects gathered under thirteen categories. In the 2000 WRDA, Congress adopted and authorized the Corps' Restudy, which became known as the Comprehensive Everglades Restoration Plan (CERP). WRDA 2000, Pub. L. No. 106-541, 114 Stat. 2572 (Dec. 11, 2000). As the bill's principal Senate sponsor, Public Works Committee Chairman Bob Smith, put it, the Restudy was the "blueprint" that "provides the details and layout of the 30-year restoration project." 146 Cong. Rec. S8885-02, 146 Cong. Rec. S8885-02, S8902, 2000 WL 1363534.

In WRDA 2000, Congress directed the Corps to implement CERP, and to integrate it

with ongoing federal and state projects. *Id*. § 601(b)(1)(A)-(B).[1] Congress envisioned the Corps playing the decisive role in implementation: as one Congressman put it, "[o]nly if the Corps of Engineers carries out their restoration initiative properly will [the Everglades] survive." 146 Cong. Rec. H11816-03, 146 Cong. Rec. H11816-03, H11824, 2000 WL 1651211.

### B. The History of The Broward County Project

The present cases challenges the Central and Southern Florida Project/Broward County Water Preservation Areas Project (BCWPA), which has been a part of CERP from the beginning.

**2000**. The project was first authorized by Congress in 2000, as part of CERP. WRDFA 2000, P.L. 106-541, §§ 601(b)(2)(C)(iv, v, vi); Complaint (ECF No. 1) ¶ 41.

**2007**. The Corps completed its Environmental Impact Statement (EIS) for the BCWPA project, together with the Project Implementation Report (PIR) (as required by CERP). Compl. ¶ 47.

**2012**. A revised EIS/PIR was published (in April) and a Record of Decision (in October). Compl. ¶ 52. Volume 1 of the Revised EIS/PIR is attached as Exhibit A .Public comment was solicited and received throughput the EIS process – after the 2005 publication of the draft EIS, after the 2007 publication of the final EIS/PIR, and after the 2012 publication of the revised Final EIS/PIR. *See* Ex. A at iii, xxiii, xxiv-xxv, 9-1 – 9-8.

**2014.** Congress specifically authorized the BCWPA Project as part of CERP under § 7002 of the 2014 Water Resources Reform and Development Act, PL 113-121, June 10, 2014, 128 Stat 1193.

**2022-23**. Starting in April 2022 the Corps and Plaintiffs met regularly to discuss Plaintiffs' concerns about the project and to devise ways of addressing those concerns. Lisa M. Ingram Declaration (Ex. B).

**2023**. Congress provided funding for the BCWPA Project in the Infrastructure Investment and Jobs Act of 2022. PL 117-58, November 15, 2021, 135 Stat 429, P.L. 117-58. In September 2023 the Corps reviewed its NEPA compliance in the years starting in 2007 with the initial EIS/PIR Report. The detailed Memorandum for the Record ("MFR") concluded that "[t]he

---

[1] Our references to "WRDA 2000" are shorthand for Title VI of that statute – the Title that dealt with the Everglades and CERP. The other titles of the 2000 legislation address water resource issues throughout the country not relevant to this case.

3

BCWPA project has not significantly changed since the 2007 PIR/EIS," and that "[i]n light of the [information reviewed] it has been determined that the BCWPA is in compliance with NEPA and that no further NEPA documentation is needed at this time." Ex. C at 7.

**2024**. The first of three contracts relevant to the C-11 Impoundment, which abuts Plaintiffs' property, was awarded in September 2024.

### C.  The Purpose and Design of The Broward County Project

The major features of the overall project are two impoundments connected by a canal. The Corps' revised EIS/PIR described the project as follows:

> The selected plan includes two above-ground impoundments and associated pumps and water control structures: the C-11 Impoundment with an effective interior storage of 1,068 acres and two wetland marsh mitigation areas (per Department of the Army permits) north of the C-11 Impoundment with 488 acres of wetland marsh; the C-9 Impoundment with an effective interior storage of 1,641 acres and canal conveyance improvements to connect the two impoundments; and an approximately 4,353 acre seepage management area east of the Water Conservation Area 3.

*Central And Southern Florida Project Broward County Water Preserve Areas Revised Final Integrated Project Implementation Report And Environmental Impact Statement*, April 2007 (Revised May 2012) (Ex. A) at iii-iv. Diagrams in the EIS/PIR (*id*. at vii-viii) illustrate the location and configuration of the project.

The project is designed to retain and store surface water for delivery to the Everglades (and to other users), and to improve wildlife habitat.

> The selected plan would restore the quantity, timing and distribution of freshwater flows in the [Water Conservation Areas] and [Everglades National Park], increase the spatial extent of natural areas by improving flow patterns at the project site, and potentially provide water for other restoration projects. It would also help meet municipal, agricultural. and environmental water supply demands in the region during dry periods. The plan would restore approximately 563,000 acres of fish and wildlife habitat in the WCAs and 200,000 acres In the ENP, which would improve native plant and animal species abundance and diversity.

*RECORD OF DECISION, Central and Southern Florida Project/Broward County Water Preservation Areas Project/ Broward and Miami·Dade Counties, Florida* (October 25, 2012) (Ex. D) at 2. At present, the land at issue "is very low environmental quality Everglades habitat filled

with an impenetrable exotic/invasive forest which provides little to no food or habitat for native wildlife." Declaration of Robert J. Kirby (Ex. E) ¶ 6. Significant amounts of the higher-quality habitat will be left undisturbed, or enhanced. *Id*. ¶ 8.

### D.  The Development Plan for The Broward County Project

Plaintiffs' property will adjoin the C-11 impoundment, so that is the portion of the project they are interested in. As described in the attached declaration of Michael B. Rogalski (Ex. F), the C-11 impoundment will be developed under three separate contracts, known as "contract 2.1," "contract 2," and "contract 3." Ex. F ¶ 3.

The only contract in effect today is contract 2.1, which is limited to clearing the periphery of the land of (mostly exotic and invasive) vegetation. The 2.1 contract was advertised in July 2024; bids were solicited in August 2024; the contract was awarded in September 2024. Ex. F ¶ 4. Work is scheduled to begin next month and is expected to be complete by year's end. Ex. F ¶ 7. Because the contractor is commencing the clearing work in the northeast corner of the C-11 tract, clearing adjacent to Plaintiffs' property will not happen before April at the earliest. Declaration of Jeffrey A. Pohlig (Ex. G) ¶ 5.

Contract 2 will cover the construction of much if the C-11 Impoundment and Mitigation Area. It is expected that the contract will be advertised in Late Spring, 2025; bids will be received over the course of the Summer, and a bid selected in September 2025. Ex. F ¶ 5. Actual work under Contract 2 is not expected to commence until 2026 and is expected to be complete at or around year-end 2030. *Id*. ¶ 7.

Contract 3 will cover the construction of the S-503 Pump Station and the remainder of the C-11 Impoundment.  It is expected that Contract 3 will be bid and selected in 2026, and that the work under contract 23 will be performed between late 2026 and early 2031. *Id*. ¶ 6. The following schematic (*see* Ex. F ¶ 7) summarizes these schedules (together with the contracts for the C-9 Impoundment.)

5

| Contract | Description | FY2024 | FY2025 | FY2026 | FY2027 | FY2028 | FY2029 | FY2030 | FY2031 | FY2032 | FY2033 | FY2034 | FY2035 | FY2036 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CNT 1 | Mit A Berm | | | | | | | | | | | | | |
| CNT 2.1 | C-11 Impoundment Land Clearing | DESIGN | CONSTRUCTION | | | | | | | | | | | |
| CNT 2 | C-11 Impoundment and Mitigation Area A | DESIGN | | CONSTRUCTION | | | | | OTMP | | | | | |
| CNT 3 | S-503 Pump Station and C-11 Impoundment Remainder | DESIGN | | | CONSTRUCTION | | | | | OTMP | | | | |
| CNT 4 | WCA 3A/3B SMA | | | DESIGN | | CONSTRUCTION | | | | | OTMP | | | |
| CNT 5 | C-9 Impoundment | | | | DESIGN | | | CONSTRUCTION | | | | | | OTMP |

## ARGUMENT

There is absolutely no reason for this Court to exercise its extraordinary injunctive powers. This case is not the emergency that Plaintiffs claim. Setting aside the time that has passed since Corps approval in 2012, the project Plaintiffs want the Court to halt currently consists of nothing but clearing the land (of mostly invasive/exotic plantlife). None of the activities Plaintiffs appear to be worried about will occur for at least one full year. Indeed, the fact that Plaintiffs are trying to invent an emergency where none exists is demonstrated by their admission that they have been aware of, and have been communicating with the Corps about, this project "for nearly twenty years." *Emergency Motion For Preliminary Injunction And Incorporated Memorandum Of Law*, ECF No. 10 at 2. If Plaintiffs' concerns about this project date back twenty years, the present "emergency" is entirely of Plaintiffs' making.

As explained in the materials that follow, Plaintiffs face no risk of injury in the immediate future. For this reason, and because Plaintiffs' claims on the merits hold little promise and the balance of equities tilts against them, Plaintiffs' motion should be denied.

### A. Standard of Review

To receive an emergency injunction, the plaintiff must clearly establish: "(1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury; (3) that the threatened injury to the plaintiff outweighs the potential harm to the defendant; and (4) that the injunction will not disserve the public interest." *Keister v. Bell*, 879 F.3d 1282, 1287–88 (11th Cir. 2018) (quoting *Palmer v. Braun*, 287 F.3d 1325, 1329 (11th Cir. 2002) (citing *Suntrust Bank v. Houghton Mifflin Co.*, 268 F.3d 1257, 1265 (11th Cir. 2001)))). The Supreme Court has described this second factor as "critical," and has noted that "simply showing some 'possibility

of irreparable injury ... fails to satisfy the second factor.'" *Lustig v. Stone*, No. 15-20150-CIV, 2016 WL 8983414, at *2 (S.D. Fla. Mar. 7, 2016) (*quoting Nken v. Holder*, 556 U.S. 418, 434-35 (2009)). "A preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly establishes the burden of persuasion as to the four requisites." *All Care Nursing Serv., Inc. v. Bethesda Mem'l Hosp., In*c., 887 F.2d 1535, 1537 (11th Cir. 1989)).

### B. Plaintiffs Have Not Shown that *Any* Injury is Imminent, Let Alone Irreparable Injury.

Likelihood of "irreparable injury [is] essential to equitable relief by injunction." *Pub. Serv. Comm'n of Utah v. Wycoff Co.*, 344 U.S. 237, 241, 73 (1952). *See also Alexander v. Americans United Inc.*, 416 U.S. 752, 762, (1974) ("irreparable injury . . . is the essential prerequisite for injunctive relief under traditional equitable standards . . ."); *Lewis v. S. S. Baune*, 534 F.2d 1115, 1121 (5th Cir. 1976) ("The finding prior to issuance, most essential to a preliminary injunction, is that the failure to grant it will result in irreparable injury to the person requesting the relief. An injunction is an extraordinary remedy and should not issue except upon a clear showing of possible irreparable injury") (citations omitted). Plaintiffs have not shown and cannot show that an injunction is necessary to prevent irreparable injury. The activities that Plaintiffs' affiants claim will cause Plaintiffs injury will not occur until 2026 and afterwards, and the activities planned for 2025 will not cause significant injury at all.

#### 1. The Threatened Injuries Plaintiffs Posit Are All Connected With Contracts That Will Not Be Performed Until 2026 and Later

As we described in the Background Section, the C-11 Impoundment Project will be implemented through three separate contracts, only one of which will be operative in 2025. Ex. F ¶¶ 4-7. But the injuries Plaintiffs claim to be threatened by almost all involve the construction and operation of the impoundments — specifically, the digging of a water-gathering canal, the installation of a deep groundwater barrier, and the building and operation of the pumps. This work will be performed under Contracts 2 and 3, which will not take effect until 2026 and later.

In trying to show the likelihood of irreparable jury, Plaintiffs' Motion relies upon two affidavits. *See* ECF No. 10 at 16-17. At both cited locations, Plaintiffs' Motion cites paragraphs 20-31 of the Uccello Affidavit (ECF No. 10-1) and paragraphs 21-29 of the Littlefield Affidavit

(ECF No. 10-2). But those affidavits are almost entirely focused on the construction and operation of the impoundments — not the ground-clearing that will happen this year. First, the Uccello affidavit:

> ¶ 20: "the consequences to FNCC from the 9-year long construction and permanent operation of the C-11 lmpoundment Project."
>
> ¶ 21 "The imposition of loud and constant external construction related sounds from the adjacent C-11 lmpoundment."
>
> ¶ 24 "deployment of heavy mining equipment for digging the C-11 Impoundment's planned 25-foot-deep and 180-foot wide seepage canal."
>
> ¶ 25 "Excessive noise from the construction of the C-11 Impoundment."
>
> ¶ 26 "Odor and dust from the at least 9-year long construction process."
>
> ¶27 "The seven-story high C-11 lmpoundment Pump Station only about 125 yards from Ikeda Hall will result in noise and vibrations."
>
> ¶28 "the impacts from the C-11 Impoundment construction and operation, including noise, dust, vibrations, disruption of wildlife and impacts on groundwater."

All of these "construction" impacts are scheduled to occur in 2026 and later years. The only work scheduled for 2025 is ground clearing.

> Next, the Littlefield affidavit:
>
> ¶ 21 "the Corps' planned 9-year construction and the long-term operation of the C-11 Impoundment."
>
> ¶ 23 "The disruption of the FNCC's serene environment caused by the C-11 Impoundment Project, including the significant noise, vibration, odor, and dust caused by the operation of heavy construction equipment next door to FNCC."
>
> ¶ 26 "The construction and operation of the seven-story high Pump Station."

Again, *all* of these effects, from the construction and operation of the impoundments, barriers,

and pumps, are at least a full year away.

We do not concede that these construction and operation activities will cause Plaintiffs any irreparable injury. But the point now is that these activities all lay at least a year in the future. They present no "emergency," and the twelve months that will pass before they occur will provide ample time to litigate Plaintiffs' claims.

And it is clear that these affiants are *not* referring to the 2025 ground-clearing Contract 2.1 when they refer to "construction." Apart from the plain meaning of the words (cutting down trees and shrubs is not normally thought of as "construction"), Mr. Littlefield expressly distinguishes the two when he refers (ECF No. 10-3 ¶ 25) to the effects of "the C-11 [impoundment] *land clearing and subsequent construction* over nine years or more" (emphasis added).

### 2. Plaintiffs Do Not Realistically Posit Any Injury Threatened by the 2025 Site-Clearing Contract

The Littlefield affidavit does set out one possible harm to Plaintiffs from the ground-clearing activity that will occur in 2025.

> The most heavily wooded portion of the existing C-11 site is that area adjacent to the FNCC, most all of which the Corps will soon strip and clear, resulting in the forced migration of the wildlife that currently resides there and elsewhere on the C-11 Impoundment site. This wildlife includes dangerous and aggressive species (venomous snakes, aggressive and dangerous monitor lizards, wildcats, etc.) that will migrate onto the FNCC property and threaten retreat attendees and FNCC staff. All of these wildlife impacts will cause FNCC to expend additional limited resources in an attempt to mitigate the increased safety concerns caused by such wildlife by hiring and deploying wildlife patrols and increased pest control.

ECF No. 10-3 ¶ 22. In light of the facts, this concern is at best speculative.

The facts are, first, that the land involved is severely degraded with extremely poor habitat values. Little if any wildlife uses this land. Ex. E ¶ 6 ("[T]he area being cleared under Contract 2.1 is very low environmental quality Everglades habitat filled with an impenetrable exotic/invasive forest which provides little to no food or habitat for native wildlife. The regional drainage in the area also contributes to the poor habitat quality."). There is no support for the assertion that wildcats and Nile Monitor Lizards are present and will seek shelter on Plaintiffs land. Indeed, the retention of higher-value tracts on the C-11 site provide what little wildlife

there is appropriate refugia. *Id.* ¶ 8. ("Contract 2.1 leaves an appreciable amount of undisturbed higher-quality native marsh that can serve as a refuge for any wildlife that is disturbed by the land clearing. The scarce number of animals living in degraded, inhospitable habitat being cleared can freely move to this more favorable area within the interior of the project footprint rather than to Plaintiffs' property.").

Second, prior to brush- and tree-clearing activities, barriers will be installed that will impede migration onto Plaintiffs' property by large and most small animals. *Id.* ¶ 7; *see also* Ex. G ¶ 6. Mr. Pohling describes some of the many efforts that are being made to reduce any impact on Plaintiffs during the brush-clearing phase.

> A contract modification for Contract 2.1 is expected to be executed shortly to create buffer zone greater than 1,000 feet between Plaintiffs' property line and incineration locations to minimize impacts of incineration on Plaintiffs. Attached as Exhibit B is Sheet 2 of 2 of the Clearing and Grubbing Plan showing the buffer.
>
> Contract 2.1 also limits work hours to between 7:00 AM and 5:30 PM, Monday through Friday, and requires compliance with the City of Weston Noise Ordinance. The contractor is required to limit sound pressures at neighboring buildings to 70 decibels, the level of a washing machine or dishwasher. The sound will be loudest to the Plaintiffs during the brief period the contractor is directly adjacent to Plaintiffs' land.
>
> Contract 2.1 directs the contractor to do pre- and post-construction surveys of all structures within 200 feet of work limits to document the condition of buildings. Plaintiffs declined the Corps' request for the contractor to enter Plaintiffs' property for the pre-construction survey.
>
> The contract modification to Contract 2.1 that is expected to be executed shortly also requires the contractor supply a vibration control plan, staff, and equipment, to provide daily vibration reports at the job site.

Ex. G ¶¶ 9-12; *see also* Ex. B (Ingram Decl.) ¶¶ 7-11; *see also* Declaration of April N. Patterson (Exhibit H) (describing numerous tri-weekly meetings between FNCC and the Corps project team in 2022 and 2023 (one of which included Jacksonville District Commander Brandon Bowman) to discuss FNCC concerns about the project and possible ways of addressing those concerns).

Nor does the invocation of the so-called "bureaucratic steamroller" (ECF No. 10 at 17)

10

substitute for a showing that irreparable injury is likely absent an injunction. *See Gwich'in Steering Comm. v. Bernhardt*, No. 3:20-CV-00204-SLG, 2021 WL 46703, at *9 (D. Alaska Jan. 5, 2021) (discussing cases). Plaintiffs do not explain how allowing the initiation (or completion) of the clearing contract will somehow make the later construction activities inevitable or unstoppable.

      **C.      Plaintiffs Have Not Shown Any Likelihood of Success on the Merits.**

           **1.   Plaintiffs' Claims are Time-Barred under 28 U.S.C. § 2401(a).**

Plaintiffs are not likely to succeed on their claims, first, because their claims are time-barred. Plaintiffs' Complaint focuses on the 2012 EIS/PIR and the 2012 ROD. Compl. ¶ 12, Pls.' Mot. at 9–11. Given that, Plaintiffs were required to raise those issues during the six years after the EIS/PIR and ROD were issued. *U.S. Steel Corp. v. Astrue*, 495 F.3d 1272, 1280 (11th Cir. 2007) ("Because this claim for review is brought under the APA and the Coal Act does not provide a statute of limitations, this action is barred unless filed within six years of the final agency action."); *Corner Post, Inc. v. Bd. of Govs. of Fed. Res. Sys.*, 603 U.S. 799, 809 (2024) ("A right of action 'accrues' when the plaintiff has a 'complete and present cause of action'—i.e., when she has the right to 'file suit and obtain relief.'"). By their own admission, Plaintiffs have known about the Project and the purported harm to Plaintiffs for decades. *See, e.g.*, Pls.' Mot. at 2, 7, 14, 17. Indeed, Plaintiffs assert that "[a]ny post-2012 evaluations or changes are simply irrelevant to the determination that the 2012 Revised EIS/PIR violated NEPA." *Id.* at 11. Plaintiffs therefore admit that they could have challenged the EIS and ROD within six years of the ROD's issuance. Similarly, on Plaintiffs' RFRA claim, Plaintiffs note that they "have been warning Defendants for ***eighteen years*** that the C-11 Project will restrict their ability to exercise their religion on the FNCC Property." *Id.* at 14. They also state that any consideration of Plaintiffs' religious exercise concerns "would have been included in the Corps 2007 and 2012 Revised EIS/PIR." *Id.* In short, Plaintiffs knew whether they were injured no later than 2012 and their claims accrued with the issuance of the 2012 ROD. The statute of limitations has passed and Plaintiffs' claims are time-barred.

      To the extent that Plaintiffs claim that the Corps should have supplemented its NEPA analysis after the 2012 EIS/PIR, that claim is also time-barred. Plaintiffs' NEPA claim is a challenge to the 2012 EIS/PIR. *See* Pls.' Mot. at 11 (stating that 2012 EIS/PIR was invalid and

cannot be cured by supplementation). Plaintiffs' Complaint also does not raise a failure to act claim under 5 U.S.C. § 706(1). In addition, Plaintiffs have not identified any final agency action that occurred within the last six years. Accordingly, Plaintiffs have not properly stated an APA claim that is not time-barred.

In addition, Plaintiffs' claims are barred by the laches doctrine. A successful laches defense requires a showing of three elements: "(1) a delay in asserting a right or a claim; (2) that the delay was not excusable; and (3) that there was undue prejudice to the party against whom the claim is asserted." *Kason Indus., Inc. v. Component Hardware Grp., Inc.*, 120 F.3d 1199, 1203 (11th Cir. 1997) (citing *AmBrit, Inc. v. Kraft, Inc.,* 812 F.2d 1531, 1545 (11th Cir. 1986)). Here, Plaintiffs have known about the C-11 Project for decades, but failed to bring suit until *after* the Corps issued a contract and a notice to proceed with construction. Plaintiffs have offered no excuse for such delay and the delay has prejudiced Defendants, as explained further below. Thus, Plaintiffs claims are barred by laches.

## 2. Plaintiffs' NEPA/APA Claims Are Not Likely to Succeed

Congress passed NEPA to focus governmental and public attention on the potential environmental effects of any proposed "major Federal action." *See* 42 U.S.C. § 4332(2)(C); *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 371 (1989). The statute does not mandate particular results, instead prescribing a process to ensure that federal decision-makers consider, and that the public is informed about, a proposed action's potential environmental consequences. *Wilderness Watch & Pub. Emps. for Envtl. Responsibility v. Mainella*, 375 F.3d 1085, 1094 (11th Cir. 2004) ("NEPA essentially forces federal agencies to document the potential environmental impacts of significant decisions before they are made, thereby ensuring that environmental issues are considered by the agency and that important information is made available to the larger audience that may help to make the decision or will be affected by it") (citing *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989))). "NEPA imposes procedural requirements rather than substantive results, and so long as an agency has taken a 'hard look' at the environmental consequences, a reviewing court may not impose its preferred outcome on the agency." *Id.* "Moreover, an agency's NEPA decisions are only reviewed under the APA's highly deferential standard." *Sierra Club v. Van Antwerp*, 526 F.3d 1353, 1360 (11th Cir. 2008)

NEPA requires the preparation of an Environmental Impact Statement for any major federal action "significantly affecting the quality of the human environment[.]" 42 U.S.C. § 4332(2)(C). "[A]n agency need not supplement an EIS every time new information comes to light after the EIS is finalized." *St. Johns Riverkeeper v. U.S. Army Corps of Eng'rs*, 304 F. Supp. 3d 1229, 1238 (M.D. Fla. 2018) (citing *Marsh*, 490 U.S. at 373). A supplement is necessary if the agency makes "substantial changes in the proposed action that are relevant to environmental concerns that "will 'affec[t] the quality of the human environment' in a significant manner or to a significant extent not already considered." *Marsh*, 490 U.S. at 374 (quoting 42 U.S.C. § 4332(2)(C)); *see also Sierra Club v. U.S. Army Corps of Eng'rs*, 295 F.3d 1209, 1215 (11th Cir. 2002).

Setting aside the fact that Plaintiffs' NEPA claim is time-barred, Plaintiffs' challenge to the 2012 EIS/PIR and ROD is not likely to succeed on the merits. First, the EIS/PIR reasonably analyzed the environmental impacts of the C-11 Project as required by NEPA. Plaintiffs assert that the EIS/PIR was deficient, but the document clearly indicates that the Corps took a thorough look at the environmental impacts of the Project, disclosed impacts, and made a reasoned decision. Ex. A. The EIS/PIR is over 500 pages long, describes the purpose and need for the Project, considers alternatives, and describes the selected alternative plan. *Id.* The Court should find that the agency satisfied its NEPA obligations by taking the requisite "hard look" at the environmental consequences of its action. *See Wilderness Watch*, 375 F.3d at 1094; *St. Johns Riverkeeper*, 462 F. Supp. 3d at 1268 (noting that court's only role is to determine whether agency satisfied NEPA by taking a hard look at the environmental consequences of its actions).

Plaintiffs' argument that the Corps was required to supplement the EIS is also not likely to succeed. First, to the extent that Plaintiffs are making a claim that the Corps failed to take an action that it was required to take, Plaintiffs have not asserted such a claim in their Complaint. Compl. ¶¶ 139–144. In addition, while the APA allows a plaintiff to state a failure to act claim under 5 U.S.C. § 706(1), such a claim "can only proceed where a plaintiff asserts that an agency failed to take a discrete agency action that it is required to take." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64–65 (2004). In order to prevail on a claim that the Corps unlawfully failed to prepare an SEIS, Plaintiffs must show that the Corps has made design changes to its project that will cause significant impacts that were not considered in the 2012 EIS. *Marsh*, 490 U.S. at 374.

13

The Court must apply the deferential "arbitrary and capricious" standard of review to the Corps' determination that it did not need to supplement the EIS. *Id.* at 376.

Plaintiffs have not demonstrated here that the Corps acted arbitrarily or capriciously in determining that there were no major project changes that would have a significant environmental impact not already considered. Plaintiffs have alleged that the Corps made design changes but make only conclusory and meritless statements that the changes will have significant environmental effects not already considered. This is not sufficient to show that they are likely to succeed on the merits.

Plaintiffs' argument that the Corps must prepare an SEIS is contradicted by the Corps' Memorandum for Record (MFR) documenting the NEPA compliance for the BCWPA project. Ex. C. The Corps considered whether additional NEPA work was required and concluded that the Project's impacts had not changed. The Corps found in the MFR that the project footprint was smaller than it was in 2007, thus reducing environmental impacts. *Id.* at 5. The Corps also found that the addition of a ring levee to the C-11 Project did not have a "significant impact on the project or on the [affected] environment." *Id.* The Corps concluded that the BCWPA project had not changed significantly since the 2007 EIS/PIR and that the project would not have "any significantly different effects to the environment beyond what [was] found in the 2007 EIS/PIR." *Id.* at 7. "Impacts to water quality, air resources, wetlands etc. analyzed in the 2007 EIS/PIR remains sufficient for the project." *Id.* The MFR also noted that the project was expected to provide greater benefits than originally described, based on increased knowledge of ecological responses and "the continued decline of the environmental conditions within the expected benefit areas and areas downstream that receive project flows." *Id.* Accordingly, the MFR concluded that no additional NEPA documentation was necessary. *Id.* Plaintiffs have not provided evidence that the Corps' conclusions were arbitrary or capricious and this Court should accordingly find that Plaintiffs are not likely to succeed on the merits of their NEPA claim.[2]

### 3. Plaintiffs' RFRA Claim is Not Likely to Succeed

---

[2] There is another reason Plaintiffs' NEPA/APA claims hold little promise. Plaintiffs claim that the Corps ignored Plaintiffs' concerns about the project. But Corps project personnel describe the considerable efforts the Corps devoted to meeting with FNCC representatives and to addressing FNCC's concerns. Ex.s B, G, H.

Plaintiffs are not likely to succeed on their RFRA claim. RFRA forbids the government from "substantially burden[ing] a person's exercise of religion" unless "application of the burden to the person" furthers a "compelling governmental interest" and is "the least restrictive means of furthering that" interest. 42 U.S.C. § 2000bb-1(a) and (b). "Thus, to establish a *prima facie* RFRA claim, a [movant] must first show (1) that he or she was exercising (or was seeking to exercise) his or her sincerely held religious belief, and (2) that the government substantially burdened the defendant's religious exercise." *United States v. Grady*, 18 F.4th 1275, 1285 (11th Cir. 2021) (citing *Davila v. Gladden*, 777 F.3d 1198, 1204 (11th Cir. 2015)). Plaintiffs cannot establish the second prong.

As an initial matter, Plaintiffs rely on an incorrect standard. They assert that a government action creates a substantial burden on religious exercise if it "directly or indirectly, 'impedes the observance of the plaintiff's religion." Pls.' Mot. at 12. But under RFRA, an adverse effect or "inconvenience on religious exercise" is not enough to establish a substantial burden. *Midrash Sephardi, Inc. v. Town of Surfside,* 366 F.3d 1214, 1227 (11th Cir. 2004). Rather, to show a "burden," the claimant must show that the government is *exercising coercion over him or his property*—such as by imposing a fine or denying an otherwise available benefit—in a manner that impacts his religious exercise. In *Sherbert v. Verner*, the case on which Plaintiffs rely for their broad interpretation of "burden," the burden was the denial of unemployment benefits due to the plaintiff's refusal to work on her Sabbath day. 374 U.S. 398, 400-01 (1963).

The Supreme Court has rejected claims that the government's management of its own programs or property can impose a substantial burden on the exercise of religion. *See Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 449 (1988); *Bowen v. Roy*, 476 U.S. 693, 707–08 (1986). In *Lyng*, a group of Indian and environmental plaintiffs challenged the Forest Service's decision to construct a road and allow logging on federal lands in an area within a national forest that was traditionally used for religious purposes. *Lyng*, 485 U.S. at 441–42. The Supreme Court acknowledged that the proposed project would have "severe adverse effects on the practice of [the plaintiffs'] religion." *Id.* at 447. But the Court nonetheless rejected the plaintiffs' free-exercise claim, explaining that the government's management of its own property did not impose a cognizable burden on the plaintiffs' exercise of their religion because it did not

15

*coerce* them into violating their religious beliefs nor *penalize* them for adhering to them. *Id.* at 449. The Court found that the First Amendment does not confer any right to a "religious servitude" on public lands. *See id.* at 452–53. Other courts have similarly found that the government does not substantively burden religious exercise when it uses or transfers its own property. *See, e.g.*, *Bowen*, 476 U.S. at 707–08 (no substantial burden where government action interfered with, but did not coerce, an individual's religious beliefs); *Apache Stronghold v. United States*, 101 F.4th 1036 (9th Cir. 2024) (en banc) (holding that RFRA "subsumed" *Lyng*'s holding and rejecting claim that government use of public land in a manner adversely impacting plaintiffs' religious use of that land imposed a substantial burden under RFRA) (cert. petition pending); *accord Lockhart v. Kenops*, 927 F.2d 1028 (8th Cir. 1991), and *Wilson v. Block*, 708 F.2d 735 (D.C. Cir. 1983) (reaching same result under Free Exercise Clause).

Here, as in *Lyng*, Plaintiffs have not established that they are being coerced to act contrary to their religious beliefs. Instead, they assert that the C-11 Project will adversely impact their religious activities by producing "noise, vibration, dust, heavy construction equipment vehicle emissions, and other adverse impacts." Pls.' Mot. at 12–13. They also assert that the Project will make their property "unsuitable" for religious purposes. *Id.* But Plaintiffs have not shown that the Corps is coercing Plaintiffs into violating their religious beliefs or punishing them for exercising their religious belief. Plaintiffs therefore cannot establish a substantial burden under the RFRA.

In addition, Plaintiffs do not seek a religious exemption from a generally applicable federal law or policy. Instead, Plaintiffs seek to prevent the federal government from using property owned by its local sponsor for a land use project intended to benefit the state of Florida and the public as a whole. But RFRA does not give Plaintiffs the right to control how *someone else's* property is used. *See Omnipoint Communications, Inc. v. City of White Plains*, 202 F.R.D. 402 (S.D.N.Y. 2001) (holding that RFRA's sister statute, RLUIPA, does not provide cause of action for synagogue to challenge construction "on someone else's property"). Consequently, Plaintiffs are unlikely to succeed on the merits of their RFRA claim.

        D.      **The Equities, and the Public Interest, Weigh Against an Injunction**

Plaintiffs must show that their threatened injury outweighs any harm the injunction may cause Defendant, and that the proposed injunction is in the public interest. These two factors

merge when, as here, a government entity is the opposing party. *See Nken v. Holder*, 556 U.S. 418, 435 (2009); *Gonzalez v. Governor of Ga.*, 978 F.3d 1266, 1271 (11th Cir. 2020). Here, the public interest in not disrupting an important public works project far outweighs any injury the project might cause Plaintiffs during the course of normal litigation.

"The Comprehensive Everglades Restoration Project ('CERP') promises the most far reaching and transformative alteration to the complicated system of water management that pervades Florida and the Everglades in particular." *Ctr. for Biological Diversity v. Salazar*, 770 F. Supp. 2d 68, 77 (D.D.C. 2011). The Everglades are a fraction of the natural wonder they once were. CERP seeks to restore them. The public interest in the success of CERP is intense.

And while the BCWPA project is only three of sixty-plus CERP components, it is no small thing. "The plan would restore approximately 563,000 acres of fish and wildlife habitat in the WCAs and 200,000 acres in the ENP."  Ex. D at 2.

An injunction could jeopardize the project. If land clearing and grubbing activities are paused by the Court, there will be significant costs associated with delays and standby damages. Ex. F ¶ 10. Contract delay expense could exceed $12,000 per day.  Ex. G ¶ 13. Contract delays could also jeopardize the funding Congress has allocated to the project. *See*  Ex. F ¶¶ 11-14:

> A delay in the award of Contract 2.0, particularly if it extends beyond fiscal year 2025, could jeopardize the use of the Infrastructure Investment and Jobs Act/Bipartisan Infrastructure Law funding allocated for the project.
>
> A gap between the completion of Contract 2.1 and the award of Contract 2.0 could result in regrowth of cleared areas, necessitating rework.
>
> If the procurement of Contract 2.0 is delayed by more than six months from the BCOES (biddability, constructability, operability, and environmental, and sustainability analysis) certification, the certification will become void and a new certification will be required adding time and expense.
>
> A short delay in the completion of the plans and specifications for Contract 3.0 could impact the Fiscal Year 2026 construction contract award, which could jeopardize funding.

Balanced against this is the negligible to nonexistent impact the project will have on Plaintiffs during the coming months. And the Corps is actively working to reduce even this minimal burden. *Id.* ¶ 15 ("The Corps is currently reviewing the requirements for all contracts to

address concerns raised by the Florida and Nature Culture Center. Modifications to the contracts may be necessary to ensure mitigative measures the Corps has planned and discussed with Plaintiffs are implemented. The Corps is actively working to identify and incorporate any necessary changes to Contract 2.1.")

"The award of an interlocutory [i.e., preliminary] injunction by courts of equity has never been regarded as strictly a matter of right, even though irreparable injury may otherwise result to the plaintiff." *Yakus v. United States*, 321 U.S. 414, 440, (1944). "A court must always balance the equities in determining whether, in the exercise of its discretion, a preliminary injunction is warranted." *Fac. Senate of Fla. Int'l Univ. v. Winn,* 477 F. Supp. 2d 1198, 1209 (S.D. Fla. 2007). In exercising this "sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Weinberger v. Romero–Barcelo*, 456 U.S. 305, 312 (1982)). This is particularly true where the potential injunctive relief impacts a legislative enactment. *Wynn v. Vilsack*, 545 F. Supp. 3d 1271, 1293 (M.D. Fla. 2021) (citation omitted).

Here, the public interest in restoring the Everglades, a project to which Congress has devoted decades of effort and billions of dollars, is large. And Congress has entrusted this immense undertaking to the Corps. In the case of the particular component of the larger Everglades restoration effort that Plaintiffs here seek to block -- at the last minute of the eleventh hour -- the Corps has devoted twenty years of work, and great care. *See* Ex. A.

## CONCLUSION

The Court should deny Plaintiffs' motion.


Dated this 29th day of January 2025.

                Respectfully submitted,

                LISA LYNN RUSSELL
                *Deputy Assistant Attorney General*
                U.S. Department of Justice
                Environment and Natural Resources Division

                                           */s/Peter Kryn Dykema*
Peter Kryn Dykema
Devon Lehman McCune
U.S. Department of Justice
Environment and Natural Resources Division
Natural Resources Section
P.O. Box 663
Washington, D.C.   20044-0482
peter.dykema@usdoj.gov
devon.mccune@uusdoj.gov

Phone: (202) 305 0436
Fax: (202) 305 0274
Attorneys for Defendants

Electronically filed.

## LIST OF EXHIBITS

EXHIBIT A   *Central And Southern Florida Project Broward County Water Preserve Areas Revised Final Integrated Project Implementation Report And Environmental Impact Statement*, April 2007 (Revised May 2012)

EXHIBIT B   Declaration of Lisa M. Ingram

EXHIBIT C   MEMORANDUM FOR RECORD, Broward County Water Preserve Areas National Environmental Policy Act Coverage Determination (18 September 2023)

EXHIBIT D   *RECORD OF DECISION, Central and Southern Florida Project/Broward County Water Preservation Areas Project/ Broward and Miami·Dade Counties, Florida* (October 25, 2012)

EXHIBIT E   Declaration of Robert J. Kirby

EXHIBIT F   Declaration of Michael B. Rogalski

EXHIBIT G   Declaration of Jeffrey A. Pohlig

EXHIBIT H   Declaration of April N. Patterson