IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
FT. LAUDERDALE DIVISION

SOKA GAKKAI INTERNATIONAL-USA,
a California non-profit religious corporation, and

FLORIDA NATURE AND CULTURE
CENTER, LLC, a Florida limited liability
company,

      Plaintiffs,                        Case No.: 0:24-cv-62452-WPD

v.                                 Judge William P. Dimitrouleas
                                 Magistrate Judge Patrick M. Hunt

UNITED STATES ARMY CORPS OF
ENGINEERS, COLONEL BRANDON L.
BOWMAN, District Commander, Army
Corps of Engineers, Jacksonville Office,
in his official capacity,

      Defendants.

_____/

## FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs, Soka Gakkai International-USA ("SGI-USA") and the Florida Nature and Culture Center ("FNCC") (collectively, "Plaintiffs"), bring this action against Defendant United States Army Corps of Engineers ("the Corps") and Defendant Colonel Brandon L. Bowman, in his official capacity ("Colonel Bowman"), (collectively, "Defendants") and allege as follows:

## INTRODUCTION

1.      This is an action for declaratory and injunctive relief preventing Defendants from illegally proceeding with the construction for the C-11 Impoundment Project (also the "Project") that will damage Plaintiffs' real property, a religious site, and substantially burden Plaintiffs' and their members' free exercise of religion.

2.      SGI-USA is the American branch of the Soka Gakkai International ("SGI"), a global religious community of more than 11 million people that practice Nichiren Buddhism. The recitation of mantras (prayers) aiming to harmonize oneself with one's environment (including the natural environment) and awaken to the inseparability of life and the environment are core tenets of Nichiren Buddhism. Naturally, such tenets and practices make a peaceful natural environment a priority for SGI and a goal of the religious practices of Nichiren Buddhist members.

3.      Consistent with this priority, nearly thirty years ago, Plaintiffs created a retreat campus filled with historical and religiously significant buildings and artifacts, outdoor natural areas (including permanent dedicated conservation wetlands), and contemplative gardens on a 118-acre property in Weston, Florida ("FNCC Property"). The FNCC hosts thousands of SGI Buddhists every year at religious retreats to practice their faith in a serene, peaceful natural environment to refresh their faith and recharge their spirit. The location of the FNCC Property was carefully selected so as to provide the best climate and natural environment for SGI members.  The FNCC Property continues to be used exclusively for the purpose it was built for: servicing the SGI Buddhist religious community.

4.      In 2023, Congress appropriated funding for the Broward County Water Preserve Area ("BCWPA"), which includes the C-11 Impoundment Project.  The BCWPA is in turn a component part of the Corp's Comprehensive Everglades Restoration Program ("CERP").

5.      The C-11 Impoundment Project includes what is estimated to be an at least nine-year long construction process to clear, dig, and erect an above-ground earthen bermed reservoir covering over 1,000 acres, including a 25-foot deep and 180-foot-wide seepage capture canal and

a deep underground seepage barrier wall surrounding the reservoir, and a seven-story motorized Pump Station immediately adjacent to the FNCC Property.

6.      The construction and operation of the C-11 Impoundment Project will (i) physically damage the FNCC Property and related ecosystem, and (ii) substantially disrupt and interfere with SGI's and its members' protected religious activity on the FNCC Property.

7.      This 118-acre FNCC Property will be dwarfed by the C-11 Impoundment Project designed on an 1,830-acre site.  Aerial depictions of the C-11 Impoundment Project (shaded in grey) and proximity to FNCC's Property (outlined in red) are below:



8.      Since 2007, Plaintiffs regularly communicated in good faith with the Corps its concerns about the Project, providing the Corps with comprehensive data, information, and expert technical evaluations on the devastating effects of the C-11 Impoundment Project to the FNCC Property.  These expert evaluations concluded that the planned construction and operation of the Project will cause substantial physical and environmental harm to the FNCC Property.

Such harm also imposes substantial burdens on SGI and its thousands of members' ability to gather and freely exercise their faith at a site critical to their religion in the United States.

9.      Ignoring consideration of potential damages to Plaintiffs and the FNCC Property, the Corps restricted its legally mandated environmental impact analysis and statement ("EIS") to only impacts within the boundaries of the government-owned C-11 Impoundment Property itself. For years, Plaintiffs have sounded the alarm on the Corps faulty and unlawful approach and asked the Corps to mitigate the C-11 Impoundment Project's impact on Plaintiffs and the FNCC Property.

10.     The Corps—acting as a bureaucratic steamroller—refused and launched the Project without complying with *any* of the applicable legal and procedural safeguards.  In doing so, the Corps has violated its legal duty to consider the damage the Corps C-11 Impoundment Project will cause to Plaintiffs' property rights and religious liberties.

11.     On November 15, 2024, Defendants contracted with a private contractor and issued a Notice to Proceed ("NTP") to begin construction of the C-11 Impoundment Project in January 2025. Defendants' decision to proceed without evaluating damages to Plaintiffs and its ecosystem and considering mitigating alternatives violates the National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.* ("NEPA").

12.     Under NEPA, federal agencies undertaking major actions such as the C-11 Impoundment Project must take a "hard look" at the possible environmental consequences of the Project and prepare a formal EIS that considers both the direct and reasonably foreseeable indirect effects of the proposed action.  During this process, the Corps is obligated at different stages to seek and take into account input from the public.  Then, based on the EIS, the agency must prepare a Record of Decision ("ROD"), which serves as a final agency action, before

proceeding.  This process fulfills NEPA's purpose of fostering informed decision-making and public participation in major federal agency projects.

13.     Defendants' actions and inactions in the planning the construction and operation of the C-11 Impoundment Project violate NEPA and the Administrative Procedure Act, 5 U.S.C. § 500 *et seq.* ("APA") by:

> a.     failing to take a "hard look" at the impacts to Plaintiffs' immediately adjacent property (which includes wetlands) and related ecosystem in the 2007 Project Implementation Report ("PIR") and NEPA EIS ("2007 PIR/EIS") and 2012 Revised PIR/EIS;

> b.     concluding that any adverse effects of the C-11 Impoundment Project will be "temporary" and more than offset by alleged benefits, without having assessed the off-site adverse effects;

> c.     failing to update and supplement the 2012 Revised PIR/EIS when the Corps changed the design and construction plans for the Project after 2012 and received material information that was not previously considered (and after the Project was finally funded by Congress in 2023); and

> d.     failing to adequately consider and respond to the comments and information submitted by Plaintiffs, since 2007 and through to 2024.

14.     Defendants' actions also violate the Religious Freedom Restoration Act, 42 U.S.C. § 2000 *et seq.* ("RFRA"). The RFRA prevents the federal government from substantially burdening the free exercise of religion.  If the C-11 Impoundment Project proceeds as planned, it will impose significant, substantial, and lasting burdens on Plaintiffs and their members' ability to freely exercise their religion, including their use of the religiously significant FNCC Property, which was acquired nearly thirty years ago for the express purpose of creating and operating a Buddhist religious retreat.

15.     Plaintiffs must protect their property, property rights, related ecosystems, and the religious liberties of their members, all of which will be substantially and permanently harmed

by Defendants' illegal push to construct and operate the C-11 Impoundment Project without consideration of those rights or Defendants' legal obligations.

16.     Plaintiffs seek protection of their religious liberty, property rights, property, and related ecosystems from this Court through (i) a declaration that Defendants' impending (at least) nine-year long construction project set to begin in January 2025 is unlawful; and (ii) preliminary and permanent injunctions preventing Defendants from proceeding with their unlawful project.

## JURISDICTION AND VENUE

17.     This action arises under NEPA, 42 U.S.C. § 4321 *et seq.* through the APA, 5 U.S.C. § 500 *et seq.*, which waives Defendants' sovereign immunity and the RFRA, 42 U.S.C. §2000, which specifically provides for judicial review.

18.     An actual justiciable controversy exists between the parties within the meaning of 28 U.S.C. § 2201, and the Court may issue a declaratory judgment and further relief pursuant to 28 U.S.C. §§ 2201–2202 and 5 U.S.C. §§ 705–706.

19.     This Court has subject-matter jurisdiction for each claim under 5 U.S.C. § 701-706 (APA judicial review provision), 42 U.S.C. § 2000bb-1(c) (RFRA), and 28 U.S.C. §1331 (federal question).

20.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because the Southern District of Florida is where the events giving rise to the claims are occurring.

21.     Venue is also proper in this Court pursuant to 28 U.S.C. § 1391(e)(1) because Defendants' C-11 Impoundment Project is located in this district, and because Colonel Bowman is an officer of the United States and a named defendant in his official supervisory capacities.

## PARTIES

22.     Plaintiff Soka Gakkai International-USA, is a California religious non-profit corporation with a principal office address of 606 Wilshire Blvd, Santa Monica, California 90401.  SGI-USA is part of the global Soka Gakkai community-based network of more than 11 million people in 192 countries and territories that practice Nichiren Buddhism. Soka Gakkai was founded in Japan in 1930, and SGI-USA was established in 1963.  SGI-USA constructed the FNCC Property in 1996 as the ideal facility and campus to conduct its retreats.  SGI-USA has standing to sue because it and its members are continually harmed by the Corps failure to comply with NEPA, burdening and disrupting its members ability to practice their religion in violation of the RFRA, it and its members will be damaged if the C-11 Impoundment Project continues as planned, and its grievances can and will be redressed by the relief sought in this action.

23.     Plaintiff Florida Nature & Culture Center is a Florida limited liability company (Registration No. L11000138678) that was organized exclusively to further the religious purposes of SGI-USA.  On behalf of SGI-USA, FNCC owns and operates the religious retreat and conference facilities located at 20000 Manatee Isles Drive, Weston, Florida 33332. FNCC organizes and conducts approximately 33 multi-day retreats each year for several thousand SGI Buddhist members.  These retreats enable SGI members to gather in community to engage in the exercise of their Buddhist spiritual faith utilizing the FNCC's conference, dining, dormitory, and outdoor facilities.  A central attribute of the FNCC retreats is that they are held in the serene and peaceful solitude of the FNCC, which was constructed almost thirty years ago and has since been maintained and utilized exclusively for this purpose.  FNCC has standing to sue because the C-11 Impoundment Project is being launched in violation of NEPA and the RFRA, its construction and operation will cause damages and harms to FNCC's Property and the religious and spiritual

activities conducted on it, and FNCC's grievances can and will be redressed by the relief sought in this action.

24.    Defendant United States Army Corps of Engineers is a federal agency under the Department of Defense.  The Corps' authority is limited to the authority granted to it by Congress and the Constitution of the United States.  The Jacksonville District of the Corps is responsible for building and maintaining civil works projects associated with the Everglades watershed, including, as relevant here, the BCWPA (of which the C-11 Impoundment Project is one component).

25.    Colonel Bowman, sued in his official supervisory capacity, is the District Commander of the Corps' Jacksonville Division. As District Commander, he is the official ultimately responsible for administering and managing the Corps' projects and for ensuring the Jacksonville District implements and complies with applicable laws and regulations.  Colonel Bowman is also the official responsible for reviewing staff recommendations, reviewing the environmental assessments for the C-11 Impoundment Project, considering and rejecting alternatives, and ultimately approving the C-11 Impoundment Project. In this capacity, Colonel Bowman is named as a defendant pursuant to 5 U.S.C. § 552(a)(4)(B) and against whom declaratory judgment and injunctive relief is sought pursuant to 5 U.S.C. § 552(a)(4)(B) and 28 U.S.C. §§ 2201, 2202.

## FACTUAL ALLEGATIONS

### A.    SGI-USA and Religious Practices at the FNCC Property

26.    Since it was constructed in 1996, the purpose of the FNCC is to serve the spiritual interests of the thousands of SGI members who come to the FNCC to participate in religious and spiritual retreats to practice their Nichiren Buddhism.

27.     The core religious tenets and practices of the Nichiren Buddhist spiritual faith are set forth in the Soka Gakkai Liturgy Book, which teaches that communal recitation of mantras (prayers or chanting), are necessary for advancing spiritual growth of the person and fellowship within the Soka Gakkai community.  Another principal tenet of Nichiren Buddhism is oneness of the individual person and their environment and self-reflection to awaken to this interconnectedness.  Similarly, tranquility at FNCC is uniquely important to SGI Buddhists and their religious practices.  The grounds and structures of the FNCC are specifically designed, constructed, operated, and maintained to provide the built and natural environment that enables and enhances these religious practices.

28.     The FNCC's facilities include Ikeda Hall (named after Daisaku Ikeda, the third president at Soka Gakkai and the founding president of SGI who oversaw and approved the establishment and construction of the FNCC Property), the Friendship Auditorium, Sunshine Dining Hall, Conference Center, Humanism of the Lotus Sutra Exhibit, several dormitories, and a Community Center as well as several beautiful outdoor spiritual spaces such as the Ikeda Peace Garden, Toda Lake (named after Josei Toda, the second president of the Soka Gakkai) which features the Makiguchi Fountain (named after Tsunesaburo Makiguchi, the founder of the Soka Gakkai), and an Amphitheater.

29.     The FNCC Property includes a permanently dedicated 40-acre wetland conservation area constructed in 1996.  An aerial depiction of the property with the facilities labelled is below:



30.     FNCC typically hosts over 30 religious retreats each year.   Each retreat lasts approximately four days with 160-170 participants, totaling over 5,000 members participating in the retreats during more than 30 weeks over the course of a year.

31.     At the retreats, SGI-USA members participate in indoor and outdoor religious and spiritual activities and pray at several indoor altars that have historic and religious Buddhist significance, attend several sessions on Buddhist study and religion with discussion and small group breakouts that meet all over the FNCC campus, indoors and outdoors, and practice tranquility and oneness with nature consistent with the tenets of their faith.

32.     For prayerful veneration, the Ikeda Hall and Humanism of Lotus Sutra Exhibit display objects of deep spiritual and historical significance to Buddhists, including a unique, irreplaceable, and valuable handblown glass statuary that Daisaku Ikeda specifically selected and donated to the FNCC.   Spiritual retreat attendees engage in individual and communal prayer,

10

including chanting, reflection, and veneration of Buddhist objects of historic and spiritual significance throughout the entire FNCC Property.

**B.     The C-11 Impoundment Project**

33.     The C-11 Impoundment Project will cover approximately 1,830 acres, on which will be include an above-ground impoundment surrounded by a berm or embankment approximately 15.8 feet high, with an interior area of over 1,000 acres, and the capacity to store approximately 1.5 billion gallons of water.

34.     The C-11 Impoundment Project is planned to be one-mile long in the east-west direction, with a 25-foot-deep, and approximately 180-foot wide, barrier canal designed to capture seepage from the impoundment, placed only 50 feet from the western boundary of the FNCC Property (about the width of a small residential real estate lot).  In only the last few years the Corps changed the design, and the seepage barrier canal is going to be supplemented by the construction of a deep, largely underground, seepage barrier "wall" that will circumvent the Impoundment (almost seven miles long).

35.     The seepage barrier canal will be dug into very hard rock that will require significant time, effort and non-typical, exceedingly heavy construction equipment to accomplish the task because the underlying geology has questionable "ability to be mechanically excavated," and the Corps, in Appendix A on Engineering in the 2012 Revised PIR/EIS, admitted that "[t]he presence of voids in the rock may require special blasting techniques."  2012 Revised PIR/EIS at A-445. These same concerns apply to the subsurface seepage wall that has been recently added to the Project design.

36.     The Project also includes the construction and operation of a seven-story high Pump Station that will be located adjacent the FNCC Property. The Pump Station will be highly

visible in this flat area with no other tall structures, and the diesel engines and electric motors that power the Pump Station will generate significant noise.

37.     The Project site is adjacent to and wraps around two borders of the FNCC Property.

38.     Construction of the Impoundment will require the removal of the existing natural environment (trees, roots, vegetation, etc.) and existing habitat for wildlife, and scraping he surface, which is composed in part of hard limestone. And the large seepage canal, as well as the deep underground seepage barrier trench, will also be excavated deep into material that includes hard limestone. Given the high water table in the area, the surface development and excavation work has been described in Corps documents as including de-watering measures.  Construction will also involve the removal of large volumes of soil and vegetation from the Project site, and vast amounts of material will have to be brought to the Project site to build the 1,000+ acre impoundment with 15-foot-high walls, all of which will result in years of high-volume diesel truck traffic.

39.     Construction will require the use of heavy-duty mining equipment and may require explosive blasting, both of which will result in extreme noise and vibration.

40.     The Corps for several years, including for both the 2007 and 2012 Revised EIS, called the construction "temporary." Several years after the 2012 Revised EIS, the Corps estimated construction would take four years in its first schedule.  After repeated updates since then, the Corps' current estimate has more than doubled, to nine years. That construction schedule may increase even more, given that the Corps' estimate escalated by almost 20% just between 2023 and 2024.

### C.   Congressional Authorization and Funding

41.     On December 11, 2000, Congress passed the Water Resources Development Act of 2000 ("WRDA 2000"), P.L. 106-541, approving and establishing the framework for CERP, by authorizing the Corps to implement multiple projects and make operational changes for ecosystem health, water supply, and flood control in order to restore the Everglades.  WRDA 2000 requires the Corps to develop a decision document known as a Project Implementation Report ("PIR") for specific CERP Projects.

42.     On August 13, 2009, the Corps and the South Florida Water Management District ("SFWMD") entered into a "Master Agreement for Cooperation in Constructing and Operating, Maintaining, Repairing, Replacing, and Rehabilitating the CERP."

43.     In 2014, Congress specifically authorized the BCWPA Project as part of CERP under § 7002 of the 2014 Water Resources Reform and Development Act, P.L. 113-121 ("WRRDA 2014").

44.     The WRDA 2000 and WRRDA 2014 authorized the BCWPA Project in principle, but Congress did not fund it.  Authorized federal agency programs only become real actions that can be implemented on the ground when Congress funds them through separate appropriations legislation.  Without Congressional funding, key elements of the C-11 Impoundment Project planning, such as establishing defined implementation schedules or letting construction contracts for execution, could not be completed.

45.     Congress did not fund the BCWPA Project until the Infrastructure Investment and Jobs Act of 2022, P.L. 117-58, through the 2023 Omnibus Appropriations Bill (which was signed by the President on December 29, 2022).  With that funding, the Corps was for the first time in a position to take the final agency action to construct and operate the Project.

46.     Congressional authorization and funding of the BCWPA Project did not relieve the Corps of its NEPA obligations or authorize the Corps to ignore or violate the RFRA with respect to the specific technical design, construction, and operation of any component of the BCWPA Project, including the C-11 Impoundment Project.

**D.     The C-11 Impoundment Project's Inadequate EIS**

47.     In 2007, the Corps issued the 2007 PIR/EIS for all three subcomponents of the BCWPA Project: the C-11 Impoundment, C-9 Impoundment, and Water Conservation Areas 3A and 3B Levee Seepage Management Areas.  These three primary subcomponents include several associated pump stations, mitigation areas, ancillary features for water control and are intended to work together to form a regional project.

48.     BCWPA's three components are mutually dependent, meaning that all three of the BCWPA components must be completed for the C-11 Impoundment to be fully functional.  The Corps anticipates completion of the BCWPA Project by 2035.  *See* 2012 Revised PIR/EIS at xxviii; *see also* Corps' 2024 CERP Project Schedule.

49.     The C-11 Impoundment Project is functionally useless unless and until the BCWPA Project is completed.  At best, the C-11 Impoundment Project's cannot even begin to produce any of its contingent claimed or expected benefits for more than a decade.

50.     The 2007 PIR/EIS was issued before the material details of the BCWPA project components, including the C-11 Impoundment, were fully known, and did not evaluate impacts from the construction or operation of the C-11 Impoundment Project on any neighboring property or landowner, including Plaintiffs.

51.     After a several year hiatus, the Corps revised the 2007 PIR/EIS in 2012 ("2012 Revised PIR/EIS").  When the PIR/EIS was finalized in 2012, Congress had still not funded the C-11 Impoundment Project. The Project remained speculative and incomplete.

52.     The Corps issued an ROD on the 2012 Revised PIR/EIS on October 25, 2012. The 2012 Revised PIR/EIS still failed to consider the direct and indirect impacts of the C-11 Impoundment Project on neighboring properties and ecosystems, such as the FNCC, and failed to address the public's comments, including those submitted on several occasions by Plaintiffs since 2007.

53.     There have also been material changes to the Project design since the 2012 Revised PIR/EIS, including the addition of the almost seven-mile long and approximately 35-foot-deep seepage barrier trench, and the estimated construction time that has expanded from merely "temporary" to more than nine years, materially changing any evaluation of the adverse impacts caused during the construction phase.

54.     The 2012 Revised PIR/EIS, without having evaluated any adverse effects of the Project on neighboring properties or ecosystems, made the following assertions:

**Adverse Effects of the Plan**

Any adverse effects associated with the selected plan will be more than offset by the numerous benefits associated with the selected plan implementation. The design of the selected plan minimizes impacts to existing wetlands, Section 404 mitigation sites, and fish and wildlife habitat, and includes environmentally responsible design features.  Adverse effects to the existing Section 404 mitigation sites will be compensated for as previously described.

***

Potential adverse effects of a temporary nature include emission of dust, mobilization of sediments and generation of noise during construction of proposed structures, including excavation, earth moving and embankment and impoundment construction.  The USACE construction specifications include appropriate requirements to maintain acceptable levels of noise generation, local water contamination, and air emissions within required limits.

2012 Revised PIR/EIS, at xxi-xxii.

55.     The assertion that adverse impacts would be offset by "numerous benefits" was not supported by an evaluation that identified the impacts (including not identifying any impacts outside of the Project footprint) and benefits that went into the offset analysis, or how the offset conclusion was reached.

56.     The 2012 Revised PIR/EIS acknowledged the "unavoidable impacts to existing mitigation sites located within both of the impoundment footprints" without identifying or evaluating impacts outside the impoundment footprint, such as the immediately adjacent mitigation wetland on the FNCC Property. *Id.* at xiv.  Reflecting that the seepage barrier canal will be dug into very hard rock that will require time, effort and non-typical, exceedingly heavy equipment to accomplish the task, the Corps, admitted that "[t]he presence of voids in the rock may require special blasting techniques."  2012 Revised PIR/EIS at A-445.

57.     The Corps nonetheless dismissed construction impacts as "temporary" though it failed to evaluate the anticipated duration of construction.  The Corps has since conceded that the construction will take at least nine years, and will likely take even longer, given that the Corps increased the time estimate by almost 20% just between 2023 and 2024. The Corps also failed to fully or adequately investigate the nature and extent of construction impacts by relying on its own undemonstrated and unsupported conclusion that such impacts will be limited to the Project footprint (as well as making an unsupported assertion that such impacts would somehow be offset).  *Id.* at 6-50 ("Construction activities associated with implementing Alternatives F1, F4, A1 or A4 would temporarily increase dust ***within*** the proposed project area. Temporary increases in noise levels would be expected during construction of any of the alternatives; however, this would be limited to the immediate area of construction.") (emphasis added).  This already

inadequate analysis of construction impacts has been rendered even more flawed and outdated by the fact that the Corps' construction estimate has now ballooned to nine years, and could easily grow from there.

58. The 2012 Revised PIR/EIS stated that "[t]hrough the public participation process of the outreach and NEPA scoping, no significant and adverse impacts became known" and that "[t]here was sufficient public input to feel confident that scoping was successful and that the breadth of the potential impacts were communicated and understood by the public[.]" *Id.* at xxix. This conclusion did not acknowledge or address the specific comments made by Plaintiffs since 2007. The 2012 Revised PIR/EIS was and is inadequate and out-of-date for several reasons, including, but not limited to:

    a.    the Corps limited its evaluation of adverse impacts to the footprint of the Project and did not evaluate reasonably foreseeable adverse impacts to neighboring properties and ecosystems, including the FNCC Property and its related ecosystems;

    b.    the Revised 2012 PIR/EIS did not evaluate the impacts of the construction, presence and operation of the Pump Station on the FNCC Property and the religious activities conducted there;

    c.    the Project had not even been authorized by Congress at the time of the Revised 2012 PIR/EIS, and the Corps was not in a position to finalize its design and construction plans until 2023, after Congress funded the BCWPA;

    d.    the Project design has changed since 2012. The Corps was just issuing "Preliminary" Development Design Reports ("DDR") in 2021, almost a decade after the Revised 2012 PIR/EIS, and additional revised design plans have been issued since then. To provide just one example of a post-2012 change, the Corps, only in the past few years (upon information and belief, after the 2021 Preliminary DDR), added the almost seven-mile long, 35-foot deep, seepage barrier wall to the design;

    e.    the Project's construction plans have changed since 2012. For example, the Corps has gone from describing the construction phase as merely "temporary" to now estimating that construction will take at least nine years, a development directly relevant to the evaluation of the adverse impacts of construction on Plaintiffs; and

     f.    the 2012 Revised PIR/EIS also relied on out-of-date climate information, an important factor in evaluating a massive water impoundment in Florida. For example, average and peak rainfalls have increased significantly since 2012. The 2012 Revised PIR/EIS assumed rainfall averages in South Florida of 54.9 inches, ranging between 37 and 60 inches. However, recent data for Broward County indicate the 30-year annual average was 60.3 inches, shows a trend of significant rainfall increases, with annual rates of over 70 inches in 2017, 88.1 in 2020, and 87.3 in 2023.

59.    Despite this, the Revised PIR/EIS states that the "revisions to the PIR/EIS since the 2007 version do not include substantial changes in the proposed action that are relevant to environmental concerns, nor are there significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." *Id.* at xxx.

60.    Lastly, the Corps stated that "[t]he Revised Final PIR/EIS will be coordinated with Federal, state, and local agencies as well as *interested* stakeholders," but fails to identify and list FNCC as an interested stakeholder, even though Plaintiffs had been communicating with the Corps since 2007 about the Project. 2012 Revised PIR/EIS at xxix (emphasis added) *compare with id.* at Appendix E-1-2.

61.    Having failed to even identify FNCC as an interested stakeholder, the 2012 Revised PIR/EIS is entirely devoid of any consideration of the cultural and religious resources impacted at the FNCC Property, and is deficient in failing to inform the public of the impacts of the Project on cultural and religious resources.

62.    On June 27, 2017, the Department of Interior, Fish and Wildlife Service ("USFWS") issued a Letter Of Concurrence regarding the BCWPA. TAILS Code: 2006-FA-0606.

63.    On July 5, 2023, the USFWS issued a Biological Opinion for the BCWPA. Consultation Code 2023-0038571.

64.    On September 18, 2023, the Corps issued a detailed Memorandum for Record ("2023 MFR") that reviewed the Corps' NEPA compliance and made a NEPA coverage determination for the BCWPA.  Memorandum for Record, Broward County Water Preserve Areas National Environmental Policy Act Coverage Determination (Sept. 18, 2023), Doc. 14-3. The 2023 MFR acknowledged that the BCWPA project footprint "has changed" since the 2007 PIR/EIS and that the footprint was "reduced by approximately 150 acres." *Id.* at 6.   The 2023 MFR also acknowledged that a "ring levee was added to the design" of the C-11 Impoundment Project. *Id.*   The 2023 MFR also acknowledged that the Corps reinitiated the "Endangered Species Act consultation"  with the USFWS on November 29, 2022 "due to the length of time from the original determination," which consultation was completed in 2023. *Id.*

65.    The 2023 MFR further acknowledged that "cultural resource investigations" were conducted as recently as 2020-2022, including for the C-11 Impoundment Project. *Id.* at 7.  This included a Phase I cultural resources investigation completed in 2022 entitled "Cultural Resource Assessment Survey for the Broward County Water Preserve Area (BCWPA) Seepage Management Area (SMA), Broward and Miami-Dade Counties, Florida (Kerns, 2022)."  None of these cultural resource investigations identified the FNCC Property.

66.    Despite all these discussed changes, the 2023 MFR claimed that "[t]he BCWPA project has not significantly changed since the 2007 PIR/EIS," and that "[i]n light of the [information reviewed] it has been determined that the BCWPA is in compliance with NEPA and that no further NEPA documentation is needed at this time."

**E.    The SGI-USA and FNCC's Longstanding Communications and Engagement with the Corps**

67.    Since January 2007, Plaintiffs have regularly attempted to engage with Defendants and SFWMD regarding the C-11 Impoundment Project.

68.     Plaintiffs have repeatedly and specifically identified themselves to the Corps, explained the explicit purpose and use of the FNCC Property as a Buddhist religious facility, and identified the adverse impacts to the FNCC Property and the religious activities practiced there that would be caused by the Project.  Plaintiffs attended the Defendants' public meetings on the C-11 Impoundment Project, submitted detailed written comments on the 2007 PIR/EIS and subsequently presented detailed technical evaluations over the next several years, and repeatedly hosted both SFWMD and Corps representatives for multiple tours of the FNCC Property.  These communications and submissions, which extended from 2007 to 2024, were supported by technical experts retained by the Plaintiffs.

69.     In 2007, SGI-USA hired JJ Goldasich and Associates, Inc. ("Goldasich") experts in biological and ecological sciences, to evaluate the impacts to the FNCC Property from the C-11 Impoundment Project.

70.     Plaintiffs provided Goldasich's technical assessment to the Corps on June 4, 2007, specifically informing the Corps in writing that it failed to consider any potential negative impacts of the C-11 Impoundment Project in the 2007 PIR/EIS, and detailed the following threatened adverse impacts on the FNCC:

    a.     increased noise;

    b.     noxious odors;

    c.     decreased water quality and groundwater levels threatening FNCC buildings and on-site wetlands;

    d.     degraded air quality;

    e.     increased wildlife intrusion onto the FNCC Property;

    f.     destructive vibrations; and

    g.     adverse aesthetics.

71.     During numerous interactions, Plaintiffs also expressed several concerns about the adverse impacts to Plaintiffs and their members' ability to engage in their Buddhist religious practices during the construction and operation of the C-11 Impoundment Project and its associated Pump Station. Plaintiffs described these adverse impacts to the Corps, including:

a.     hydrological effects to FNCC's wetlands mitigation area and FNCC buildings;

b.     relocation of wild animals (including raccoons, foxes, snakes, reptiles, rodents, arthropods, and birds) from the C-11 Impoundment Project's footprint onto the adjacent FNCC Property, threatening unwanted encounters between people at the FNCC with wildlife;

c.     increased mosquito populations from the new massive stagnant water source, placing people on the FNCC land at increased risk from mosquito transmitted disease;

d.     continuous maintenance of the levee/berm surrounding the impoundment (including mowing of grassed slopes and swales, degrading the peaceful experience on FNCC's Property);

e.     noise and vibrations from construction and operation of the Pump Station disturbing Plaintiffs' members residing overnight on the FNCC Property and disrupting their religious practices; and

f.     increased odors from the storage of water over organic materials.

72.     The Corps repeatedly informally assured Plaintiffs that their "concerns" would be "addressed," but failed to do so.  Indeed, the 2012 Revised PIR/EIS ignored all of Plaintiffs' concerns, focused solely on purported "temporary" impacts within the Project footprint, and failed to even include the FNCC Property the C-11 Impoundment Project's immediate neighbor, as an interested party.  *See* 2012 Revised PIR/EIS, Annex B at B-1-3.

73.     In the absence of Congressional authorization and funding, there was an extended hiatus in the C-11 Impoundment Project between late 2012 and 2015.

74.     The C-11 Impoundment Project became live again in 2015, as a result of the Congressional authorization in the 2014 WRDA, and SFWMD budget allocation of $362.5

million of non-federal funds for FY 2015 to build projects and implement programs for Everglades restoration efforts (though federal funds for the Corps would not become available until Congress funded the Project at the end of 2022).

75.    When attention to the C-11 Impoundment Project recommenced, FNCC hosted SFWMD representatives and the City of Weston's Public Works Director at the FNCC Property on December 14, 2015.

76.    During this meeting, Plaintiffs reiterated its concerns with the C-11 Impoundment Project.  While the Corps was not present at this meeting, SFWMD repeatedly assured Plaintiffs that their concerns would be addressed.

77.    On February 22, 2021, the Corps completed a Preliminary Development Design Report ("DDR") for the BCWPA. The DDR, again, failed to evaluate the impacts to the FNCC Property and Plaintiffs or their members, but warned that "excavation into hard limestone requires blasting . . ." *See* Preliminary DDR 10-1.

78.    Plaintiffs set a meeting with the Corps on July 13, 2021.  Two days before the meeting, Plaintiffs shared a written outline with the Corps that, once again, expressed Plaintiffs' concerns about the C-11 Impoundment Project, including the Corps' repeated failure to analyze off-site impacts.

79.    At the July 13, 2021 meeting, Plaintiffs reiterated the same concerns that Plaintiffs had first raised in 2007.  The Corps again verbally responded with expressions of understanding and assurances of its intentions to be "a good neighbor."

80.    Despite the July 2021 meeting, on August 10, 2021, Defendants completed the BCWPA Intermediate DDR.  Again, the Corps failed to evaluate any of the impacts to FNCC from the construction and/or operation of the C-11 Impoundment Project, and maintained the

conclusion that "excavation into hard limestone requires blasting . . ." *See* Intermediate DDR at 10-1.

81.     The Intermediate DDR also indicated that the Corps would conduct pre-construction surveys on developed areas south of the FNCC site and conduct vibration monitoring in residential areas.  Notably, however, the Intermediate DDR did not include any surveying or monitoring of the FNCC Property. FNCC's buildings are about 250 feet from the the C-11 Impoundment Project's fence line, much closer than other areas the Corps surveyed (*e.g.*, the "Southwest Ranches" subdivision). The Corps continued to ignore Plaintiffs and did not consider the potential or cumulative impacts of its currently planned C-11 Impoundment Project or otherwise address any of Plaintiffs' concerns in the Intermediate DDR.

82.     On December 16, 2021, FNCC sent a letter to the Corps and SFWMD detailing how the DDRs failed to analyze "offsite" impacts from the C-11 Impoundment Project, including the adverse impacts to the FNCC Property, including flooding, wetlands damage, insects, dust, runoff, blasting, vibration, burning, increased traffic of construction vehicles, among others.

83.     The Corps responded to the Plaintiffs' 2021 correspondence on February 2, 2022. This response primarily referred Plaintiffs to the 2012 Revised PIR/EIS (which specifically excluded any analysis of impacts beyond the Project footprint) or indicated that concerns would be addressed in the construction contract.  The response also claimed to partially address some of FNCC's concerns: indicating that groundwater controls were optimized based on two attached technical memoranda, and that blasting would not be used.

84.     Because the Corps still had not addressed any of Plaintiffs' concerns, Plaintiffs hired its own professional engineer to further liaison with the Corps, as well as expert geotechnical engineers (Schnabel Engineering, LLC ("Schnabel")).

85.     Schnabel was hired to review existing information, conduct FNCC site reconnaissance, host peer review meetings, provide engineering analyses, and assist communications with the Corps.

86.     Schnabel reviewed existing available information, performed site visits, and conducted subsurface mapping and modeling/analysis to evaluate potential impacts to the FNCC Property from the planned C-11 Impoundment Project (since the Corps failed to).

87.     Schnabel, on behalf of the FNCC, sent the Corps requests for data and documents from April 2022 through March 2023, as the requested information was necessary to fully evaluate the impacts of the C-11 Impoundment Project on Plaintiffs and operations at the FNCC Property.

88.     Schnabel found the documents and information the Corps provided insufficient, reaffirming Plaintiffs' concerns; namely, that dewatering the C-11 Impoundment site during construction would adversely impact FNCC's grounds, structures, and 40-acre wetland preserve, that blasting would have to be used for the construction given the rock type present (which would increase the already burdensome  significant noise, vibration, and dust), and that there were no wildlife or noise mitigation plans.

89.     Schnabel presented these findings to the Corps on April 20, 2022, observing that without the Corps' factual data inputs and design assumptions, it is not possible to independently assess whether the results presented by the Corps were reasonable or correct.

90.     Plaintiffs also engaged Avirom & Associates, Inc., Surveyors & Mappers ("Avirom") in July 2022 to assist Schnabel by surveying and documenting the existing ground surface elevations at the FNCC Property. Avirom created a detailed topographical map with

ground elevations and building elevations as well as features such as wells, roads and pathways, buildings, amenities, and other features.

91.     Schnabel sent several requests for information and clarification by email to the Corps, including on May 4, 2022 and June 22, 2022, by phone on July 12, 2022, and in person when the Corps visited FNCC on August 3, 2022.

92.     Plaintiffs' professional engineer set up tri-weekly meetings with the Corps from September 2022 through March 2023 for Plaintiffs' and the Corps to discuss the progress of the design plans and construction considerations for the C-11 Impoundment Project with the goal of resolving the outstanding issues prior to the Corps finalizing design and construction plans.

93.     Schnabel completed a Preliminary Geotechnical Report on October 10, 2022 and an Evaluation of Impacts from Dewatering on February 3, 2022, all of which detailed how the FNCC Property is subject to being significantly damaged – both from physical damage to the FNCC Property, including seepage during construction that will impact the FNCC's mitigation wetland and structural integrity of FNCC's buildings, and from substantial burdens imposed on the use and enjoyment of its FNCC Property as a religious retreat facility, including vibrations and noise impacts.

94.     In early 2023, Plaintiffs asked the Corps for more information on the seven-story Pump Station for the C-11 Impoundment Project because the Pump Station would be located only 450 feet from the FNCC fence line and 1,075 feet from FNCC's primary buildings, easily within both an audible and visible line of site, and because the Corps had indicated that while it considered eight total BCWPA project alternatives, it never considered an alternative to the chosen Pump Station location.

95.     Schnabel and the FNCC presented information on the adverse impacts of the C-11 Impoundment Project to the Corps at a meeting held at FNCC on January 12, 2023, which included:

    a.     the Corps' planned construction dewatering of the C-11 Impoundment site would change the groundwater regime in the vicinity of the C-11 Impoundment site, threatening FNCC's buildings and on-site 40-acre wetlands;

    b.     subsurface rock at the shared FNCC Property and C-11 Impoundment site fence line was not suitable for mechanical excavator removal and would likely require blasting to the adjacent C-511 Canal which is only 50 feet from the FNCC Property, resulting in threatening additional damage from vibration, fly rock, dust, and noise onto the FNCC Property;[1]

    c.     noise, vibration, dust/air quality during construction and the impact on FNCC's Buddhist retreat activities as well as potential damage to the FNCC's buildings, structures and irreplaceable historical and religious contents caused by the Defendants' planned multi-year C-11 Impoundment-related construction activities;

    d.     short and long-term wildlife displacement in the general area of the C-11 Impoundment Project site, including onto the FNCC Property, caused by the mechanical stripping of vegetation from the C-11 Impoundment Project site construction area; and

    e.     long-term noise and visual impacts from the construction and operation of the planned seven-story C-11 Impoundment Pump Station and other impoundment-related activities onto the FNCC Property and Plaintiffs and their members.

96.      From 2022 to 2024, Schnabel, at significant cost to FNCC, did the technical assessment work that the Corps should have done.  Schnabel continued to present its findings to the Corps, including, but not limited to presentations on January 12, 2022 and October 14, 2022 regarding a Technical Memorandum on Flood Protection, an Evaluation of Dewatering, and reporting subsurface data, as well as the January 12, 2023 meeting.

---

[1] Notably, the Corps' own consultants raised this same concern to the Corps, indicating the potential need for blasting.  *See* Intermediate DDR, Aug. 10, 2021.

97.     As of March 20, 2023, the Corps had only provided Schnabel four of the requested documents, leaving 20 documents requested outstanding, and the only design documents that the Corps provided were the Preliminary and Intermediate DDR, which were provided heavily redacted.

98.     After the March 2023 tri-weekly meeting, the Corps requested that Plaintiffs cease reaching out to the Corps because the Corps would not be sharing anything with Plaintiffs while the Corps worked on its revised DDR.  The Corps also stated that the Project design was changing.

99.     On September 14, 2023, Plaintiffs sent a letter to the Corps' Senior Project Manager, regarding their several outstanding technical concerns regarding unaddressed adverse impacts of the C-11 Impoundment Project on the FNCC Property.  This included describing issues with the Corps C-11 Impoundment plans, which did not evaluate or account for the adverse impacts to FNCC that had been presented in great technical detail to the Corps over the course of several years.

100.    Despite the significant information provided to the Corps by Plaintiffs from 2007 through 2023, the Corps issued the 2023 MFR on September 19, 2023, which claimed that "[t]he BCWPA project has not significantly changed since the 2007 PIR/EIS," and that "[i]n light of the [information reviewed] it has been determined that the BCWPA is in compliance with NEPA and that no further NEPA documentation is needed at this time."

101.    On November 14, 2023, the Corps shared with Schnabel selected draft plans and one volume of Technical Specifications dated September 29, 2023, which were focused on "Contract 2, C-11 Impoundment and Mitigation Area".  The Corps did not provide a complete set of plans, but only select individual plan sheets.  On November 19, 2023, the Corps posted a

Geotechnical Data Report on its website.   Both the selected draft plan sheets and the Geotechnical Data Report failed to address and evaluate the impacts of the C-11 Impoundment Project on the FNCC Property.

102.    On December 12, 2023, Plaintiffs sent another letter to the Corps again requesting the Corps address Plaintiffs' significant concerns because the Corps' selected draft plan sheets and Geotechnical Data Report failed to address the several adverse impacts to the FNCC Property, despite the impacts having previously been described in great detail to the Corps.

103.    After approximately seven months of not receiving any further Corps response to its several communications and requests, on July 19, 2024, Plaintiffs wrote to the Assistant Secretary of the Army for Civil Works, the Chief of Engineers, of the U.S. Army Corps of Engineers, and the Corps Division and Jacksonville District Commanders about the lack of communication and responsiveness, reiterating Plaintiffs' several significant concerns about the C-11 Impoundment Project.

104.    On August 13, 2024, the Corps' Jacksonville District Supervisory Civil Works Attorney invited Plaintiffs' representatives to a September 3, 2024 meeting in Jacksonville, Florida with Colonel Bowman, the newly appointed District Commander, and Corps' C-11 Impoundment Project Staff.

105.    At the September 3, 2024 meeting, Plaintiffs' representatives again reviewed their several long-standing concerns about the significant and permanent adverse effects to the FNCC Property that would be caused by the construction and operation of C-11 Impoundment Project.

106.    In response, Colonel Bowman and Corps' Project Staff verbally promised to be more communicative and to specifically respond in writing to Plaintiffs' several prior correspondences and concerns.

107.    However, as with every encounter beginning in 2007, nothing at all has come from that September 3, 2024 meeting.  Thus, the inadequate 2012 Revised PIR/EIS has never been revised to identify and evaluate adverse impacts outside the Project footprint, the numerous detailed comments submitted, or information provided by Plaintiffs beginning in 2007, or the numerous changes to the design and construction plans since 2012.  In addition, the Corps has never responded in any material way to the concerns raised by Plaintiffs about the disruption to their religious practices. Plaintiffs are not aware of any action taken by the Corps to respond to Plaintiffs since the September 3, 2024 meeting.

**F.    The Corps' C-11 Impoundment Project Land Clearing Contract**

108.    Since the 2007 PIR/EIS, and including the 2012 Revised PIR/EIS, the Corps has consistently referred to, planned, and evaluated the C-11 Impoundment Project as one project, under one contract.

109.    However, only since early 2024, the Corps' Project Staff advised FNCC that construction of the C-11 Impoundment Project was going to now be split into separate construction contracts for "land clearing/grubbing", "C-11 Impoundment construction", and "C-11 Impoundment Pump Station construction".

110.    Prior to the parties' September 3rd meeting, on July 24, 2024, the Corps posted an advertisement for bidders for the land clearing contract.

111.    On September 24, 2024, the Corps awarded Omega Foundation Services, Inc. ("Omega") the contract for the C-11 Impoundment land clearing work ("Clearing Contract"), and issued Omega a Notice to Proceed (NTP) with an effective date of November 15, 2024.

112.    Under the Clearing Contract, the authorized timeframe for performance (of the land clearing only) starts the day after the NTP was issued, Omega then has 30 days to provide the Corps several pre-construction submittals, has 60 days from the effective date of the NTP to begin work, and has 360 calendar days to complete construction.

113.    According to the Corps' Clearing Contract, Omega's pre-construction requirements include completing a Noise Mitigation Plan, Accident Prevention Plan, Contractor Quality Control Plan, Mobilization and Demobilization Plan, Traffic Control Plan, Environmental Protection Plan, Solid Waste Management, among others, for the Corps' review and approval. None of these documents have been shared with Plaintiffs, in draft or final form.

114.    The Corps currently anticipates that it will begin land clearing work in January 2025.

115.    As of June 17, 2024, the Corps' schedule indicates land clearing construction will extend into FY 2026 and overlap with the construction of the C-11 Impoundment, which the Corps' current schedule indicates will extend into FY 2031 and construction of the Pump Station will extend into FY 2032.

116.    Subdividing the C-11 Impoundment Project and revising its designs in the Preliminary DDR, Intermediate DDR, and the draft plans and specifications necessitates supplementing the Revised 2012 EIS (in addition to all of the other reasons why the EIS needs to be supplemented), which the Corps has done for other CERP projects with design revisions. *See e.g.*, CERP A-2 EIS (Jan. 24, 2020).

117.    Despite the Corps dividing the C-11 Impoundment Project into separate subcontracts and notwithstanding all of the technical data generated by Plaintiffs and technical consultants and Corps' major changes to construction timelines and scope, the Corps is still treating the Project as though it is under one contract.

**G.      Summary of Adverse Impacts Caused by the C-11 Impoundment Project**

118.    Plaintiffs have been presenting the Corps, through many written submissions and in-person presentations, beginning in 2007 and through and into 2024, detailed information on the adverse impacts of the construction and operation C-11 Impoundment Project on the FNCC Property and the religious activities conducted there by SGI-USA and its members. These adverse effects, which are identified throughout this Complaint and summarized here, include:

a.      noise, vibration, dust/air quality during construction and the impact on FNCC's Buddhist retreat activities as well as potential damage to the FNCC's buildings, structures and irreplaceable historical and religious contents caused by the Defendants' planned multi-year C-11 Impoundment-related construction activities;

b.      decreased air quality (including dust and emissions from diesel-powered construction equipment and trucks, including the long-term high-volume truck traffic associated with moving large volumes of material on and off the Project site);

c.      changes to groundwater levels caused by the Project (including dewatering), which will threaten the stability of the FNCC Property, as well as the 40-acre wetland on the Property;

d.      noxious odors and disease vectors associated with the billions of gallons of stagnant water stored in the Impoundment;

e.      visual/aesthetic impacts from the construction activities, and the presence and operation of the seven-story Pumping Station and the massive above-ground bermed Impoundment in an area that is otherwise flat with no buildings taller than one-story otherwise visible from the FNCC Property;

f.      wildlife displacement in the general area of the C-11 Impoundment Project site, including onto and from the FNCC Property (which could include the invasion of venomous snakes and other species that will discourage or prevent that use of outdoor areas for spiritual purposes), caused by the

permanent removal and devastation of vegetation and habitat from the C-11 Impoundment Project site; and

g. long-term noise from the operation of the planned seven-story C-11 Impoundment Pump Station adjacent to the FNCC, and other impoundment-related activities onto the FNCC Property and Plaintiffs and their members.

119. The damages from vibration, flying rocks and debris, dust and noise will be enhanced by the likely need to use blasting to excavate the 25-foot-deep barrier trench within 50 feet of the FNCC Property, since the subsurface rock is not susceptible to being removed by a mechanical excavator.

120. These adverse impacts will damage the FNCC's buildings, structures, and irreplaceable historical and religious artifacts and symbols.

121. These adverse impacts will damage the FNCC Property's ecosystems, including wildlife habitat, and the dedicated conservation areas such as the 40-acre wetland.

122. These adverse impacts, both during construction and subsequent operation of the Project, will burden, disrupt, and discourage the religious practices of SGI-USA's members on the FNCC Property, practices that are fundamentally based on quiet and contemplative harmony with nature.

## STATUTORY FRAMEWORK

### A.    National Environmental Policy Act

123. NEPA imposes substantial procedural requirements to "ensure[] that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989).

124. NEPA has two main aims: requiring agencies to (1) "consider every significant aspect of the environmental impact of a proposed action" and (2) "inform the public that it has

indeed considered environmental concerns in its decision-making process." *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council*, 462 U.S. 87, 97 (1983); *Robertson*, 490 U.S. at 349.

125.    When significant adverse impacts to the environment are anticipated from a federal action, NEPA requires an agency to prepare a detailed statement (an EIS). *See* 42 U.S.C. § 4332(C)(iii), (E).

126.    When developing an EIS, NEPA requires an agency to: (i) consider reasonable alternatives to the proposed action; and (ii) take a "hard look" at the environmental consequences of the decision. *See* 42 U.S.C. § 4332(2)(C)(i)–(iii).

127.    NEPA's purpose is to ensure that "the agency will not act on incomplete information, only to regret its decision after it is too late to correct." *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 371 (1989); *Robertson*, 490 U.S. at 349 ("NEPA ensures that important effects will not be overlooked or underestimated only to be discovered after resources have been committed or the die otherwise cast.").

128.    Requiring a "hard look" before acting ensures "that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts," and general statements about possible effects and some risks do not constitute a "hard look" absent a justification for why more definitive information could not be provided. *Robertson*, 490 U.S. at 349.

129.    "NEPA requires federal agencies to 'study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources[,]'" and failing to consider a viable alternative, constitutes a violation of NEPA. *Fla. Wildlife Fed'n v. U.S. Army Corps of Engineers*, 401 F. Supp. 2d 1298, 1330 (S.D. Fla. 2005) (quoting 42 U.S.C. § 4332(2)(E)).

130.    NEPA also requires federal agencies to consider the religious or cultural implications of a project that are raised during the decisionmaking process.   42 U.S.C. § 4331(b)(4); *see, e.g.*, *Center for Biological Diversity v. U.S. BLM,* 746 F.Supp.2d 1055, 1096 (N.D. Cal 2009) (Finding that in preparing an EIS "the onus is on the BLM to inform the public of the impacts of the Plan on cultural resources," and that to "for those areas in which [t]he effect of BLM routes of travel on public land cultural resources has not been fully determined . . . the FEIS is inadequate because it does not inform the public of the scope and extent of the impacts of the" proposed action); *National Parks Conservation Association v. Semonite*, 916 F.3d 1075, 1082 (D.C. Cir. 2019) (Congress has declared that preserv[ing] important historic, cultural, and natural aspects of our national heritage constitutes an important goal of . . . 42 U.S.C. § 4331(b)(4)" (quotations omitted)); *Oglala Sioux Tribe v. U.S. Nuclear Regulatory Commission*, 896 F.3d 520, 529 (D.C. Cir. 2018) (Noting that "NEPA's procedural mandate was intended to vindicate" the public interest in protecting "vulnerable but as-yet-unidentified historical, cultural, or religious sites.")

131.    The Corps' NEPA implementing regulations require "[p]ublic concerns on issues, studies needed, alternatives to be examined, procedures and other related matters will be addressed during scoping."  33 C.F.R. § 230.12.

132.    According to the Corps' NEPA implementing regulations, "[i]n all cases, the scope of analysis used for analyzing both impacts and alternatives should be the same scope of analysis used for analyzing the benefits of a proposal."  33 C.F.R. Part 325, Appendix B § 7(b)(3); *Fla. Wildlife Fed'n*, 401 F. Supp. 2d at 1330 (finding the Corps' analysis improperly narrowed review of proposed project's impacts to smaller project area while extending scope of its benefits and alternatives analysis to larger project area).

133.    The Corps' NEPA regulations also require consideration of reasonable environmental impacts of the proposed action and the alternatives in comparative form, thereby sharply defining the issues and providing a clear basis for choice among the options considered by the agency and the public.  *Fla. Wildlife Fed'n*, 401 F. Supp. 2d at 1330; *see* 33 C.F.R. § 230.12; Appendix A(1)(a), (2)(a).

134.    Under the Corps' implementing NEPA regulations, the Corps must also supplement an EIS if a major federal action is incomplete or ongoing, and:

(i)     The agency makes substantial changes to the proposed action that are relevant to environmental concerns; or

(ii)    There are substantial new circumstances or information about the significance of adverse effects that bear on the analysis.

*See* 33 C.F.R. § 230.13(b); *City of Dania Beach, Fla. v. U.S. Army Corps of Engineers*, No. 12-60989-CIV, 2012 WL 3731516, at *2 (S.D. Fla. July 6, 2012) ("The standard for determining when a SEIS (Supplemental EIS) is required is essentially the same as the standard for determining when an EIS is required.  If the post-original EIS changes in the project will have a significant impact on the environment that has not previously been covered by the original EIS, a supplement is necessary.").

**B.    Administrative Procedure Act**

135.    Parties may seek judicial review of an agency's NEPA determination under Section 10(a) of the APA, 5 U.S.C. § 702, which provides: "A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof."  *See also Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 882 (1990) (quoting 5 U.S.C. § 702).

136.    Actions that are reviewable under the APA include final agency actions "for which there is no other adequate remedy in a court."  *Id.* § 704.

35

137.     Under the APA, reviewing courts shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

138.     In general, an agency decision is arbitrary and capricious where "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Id.*

### C.     Religious Freedom Restoration Act

139.     The RFRA provides that the federal "Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability" and that the federal "Government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person--

(1)     is in furtherance of a compelling governmental interest; and

(2)     is the least restrictive means of furthering that compelling governmental interest."

42 U.S.C. § 2000bb-1(a), (b); *Little Sisters of the Poor Saints Peter and Paul Home v. Pennsylvania*, 140 S. Ct. 2367, 2389 (2020).

140.     The United States Supreme Court has repeatedly held that RFRA provides "very broad protection for religious liberty."  *Burwell v. Hobby Lobby Stores, Inc*., 573 U.S. 682, 693 (2014). "Congress mandated that this concept be 'construed in favor of a broad protection of religious exercise, to the maximum extent permitted by the terms of this chapter and the Constitution."'  *Id.* at 696 (quoting 42 U.S.C. § 2000cc-39g)).

141.    The net effect of the RFRA is that the federal government may substantially burden a person's exercise of religion if and only if the government's action can survive "strict scrutiny." *See Gonzales v. O Centro Espírita Beneficente União do Vegetal*, 546 U.S. 418, 430 (2006).

142.    To meet this standard, the Government must "sho[w] that it lacks other means of achieving its desired goal without imposing a substantial burden on the exercise of religion." *Id.* at 728.

143.    The RFRA "applies to all Federal law, and the implementation of that law, whether statutory or otherwise." 42 U.S.C. § 2000bb-3(a).

144.    The RFRA expressly defines the "exercise of religion" to include "[t]he use of real property" for religious exercise. 42 U.S.C. §§ 2000bb-2(4); 2000cc- 5(7)(B).

145.    Courts should defer to a claimant's articulation of how a government action would burden its religious beliefs. *See Little Sisters*, 140 S.Ct. at 2389 (examining whether compliance with a government directive would "cause the objecting party to violate its religious beliefs, *as it sincerely understands them*"); *see also Hobby Lobby*, 537 U.S. at 725 ("[I]t is not for us to say that [claimants'] religious beliefs are mistaken or insubstantial. Instead, our narrow function in this context is to determine whether the line drawn reflects an honest conviction.") (citation and internal quotation marks omitted).

146.    The RFRA expressly creates a remedy in a United States district court, granting a "person whose religious exercise has been burdened in violation of" RFRA the right to "assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief against the government." 42 U.S.C. § 2000bb-1(c).

**COUNT I**
**VIOLATION OF NATIONAL ENVIRONMENTAL POLICY ACT AND THE**
**ADMINISTRATIVE PROCEDURE ACT**

147.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 153 above as if set forth fully in this Complaint.

148.    The Corps violated NEPA by not adequately addressing and responding to Plaintiffs' comments, data and concerns made and provided to the Corps from 2007 through 2024 regarding the construction and operation of the C-11 Impoundment Project.

149.    The Corps violated NEPA in the 2007 and 2012 Revised PIR/EIS and 2023 MFR by failing to take a "hard look" at the impact of the construction and operation of the C-11 Impoundment Project on lands and the environment outside of the Project site, including on Plaintiffs' immediately adjacent property (which includes wetlands).

150.    The Corps violated NEPA in the 2007 and 2012 Revised PIR/EIS and 2023 MFR by not adequately addressing offsite impacts or considering alternatives for the C-11 Impoundment-related Pump Station.

151.    The Corps violated NEPA in the 2007 and 2012 Revised PIR/EIS and 2023 MFR by failing to engage in any detailed analysis of the impacts of the C-11 Impoundment Project at offsite properties such as FNCC while dismissing offsite impacts in light of the entire project's benefits.  This included failing to consider the religious and cultural implications of the C-11 Impoundment on Plaintiffs' immediately adjacent property.

152.    The Corps' violations of NEPA, and the Corps' failure to adequately address and respond to Plaintiffs' comments, data and concerns communicated to the Corps regarding the C-11 Impoundment Project, were arbitrary, capricious, an abuse of discretion, and contrary to law, all in violation of the APA.

153.     There is no adequate at law other than the imposition of a preliminary and permanent injunction.  Absent a preliminary and permanent injunction preventing the Corps from proceeding without proper mitigation efforts, Plaintiffs will suffer irreparable harm.

### COUNT II

### <u>VIOLATION OF NATIONAL ENVIRONMENTAL POLICY ACT AND THE ADMINISTRATIVE PROCEDURE ACT</u>

154.     Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 153 above as if set forth fully in this Complaint.

155.     The Corps violated NEPA in the 2007 and 2012 Revised PIR/EIS and 2023 MFR by not supplementing the already flawed, inadequate, and incomplete 2007 and 2012 Revised PIR/EIS based on changes to the design and construction plans and schedules for the C-11 Impoundment Project.

156.     The Corps further violated NEPA in the 2007 and 2012 Revised PIR/EIS and 2023 MFR by not supplementing the already flawed, inadequate, and incomplete 2007 and 2012 Revised PIR/EIS based on new information provided by the public, including Plaintiffs, after 2012.

### COUNT III
### <u>VIOLATION OF THE RELIGIOUS FREEDOM RESTORATION ACT OF 1993</u>

157.     Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 153 above as if set forth fully in this Complaint.

158.     Plaintiffs and their members hold and exercise sincerely held Buddhist religious beliefs.

159.    Plaintiffs' FNCC Property is not and has not been used for any secular purpose, but has exclusively been used for Buddhist religious exercise purposes since 1996, including as a Buddhist retreat facility and as a center for religious education.

160.    Plaintiffs' practice of their religious beliefs at the FNCC Property, including chanting, reflection, meditation, serenity, and harmony with nature that are key tenets of Buddhism, will be substantially burdened and disrupted by Defendants during the at least nine years of construction of, and the subsequent operation of, the C-11 Impoundment Project.

161.    As set forth in this Complaint, the construction and subsequent operation of the C-11 Impoundment Project will damage to buildings in which Plaintiffs and their members practice their religion, damage the artifacts and symbols they revere, substantially burden their ability to use the carefully landscaped outdoor areas for religious practices, and disrupt the serenity and harmony with nature central to their religious practices.

162.    The Corps' failed to consider less restrictive means of achieving the objectives of CERP that would have alleviated the burden on the FNCC Property in moving forward with the C-11 Impoundment Project.

163.    Therefore, the construction and operation of the C-11 Impoundment will substantially burden Plaintiffs' and their members' free exercise of their Buddhist religion in violation of the RFRA.

164.    There is no adequate remedy at law other than the imposition of a preliminary and permanent injunction.  Absent a preliminary and permanent injunction preventing the Corps from proceeding without proper mitigation efforts, Plaintiffs will suffer irreparable harm.

## REQUEST FOR RELIEF

THEREFORE, Plaintiffs respectfully request that this Court:

(a)     Declare that Defendants violated NEPA and the APA;

(b)     Declare that Defendants violated the RFRA;

(c)     Enjoin Defendants from commencing construction of the C-11 Impoundment as contemplated in the Clearing Contract unless and until a supplemental EIS is created;

(d)     Grant Plaintiffs their reasonable attorney's fees and costs of this action, including expert witness fees; and

(e)     Grant such other and further relief as the Court may deem just, equitable, and proper.

Date: March 6, 2025                    Respectfully Submitted,

**GREENBERG TRAURIG, LLP**          **GREENBERG TRAURIG, P.A.**
1144 15th Street, Suite 3300          401 East Las Olas Boulevard, Suite 2000
Denver, Colorado 80202               Fort Lauderdale, Florida 33301
T. 303.572.6584                      T. 954.765.0500

*/s/ Paul M. Seby*                   */s/ Glenn E. Goldstein*
**PAUL M. SEBY**                     **GLENN E. GOLDSTEIN**
*Admitted Pro Hac Vice*              Fla. Bar No. 435260
sebyp@gtlaw.com                      goldsteing@gtlaw.com
                                     geistc@gtlaw.com
                                     **ZACHARY R. NEEDELL**
                                     Fla. Bar No. 1011742
                                     zachary.needell@gtlaw.com
                                     jennifer.shiner@gtlaw.com
                                     flservice@gtlaw.com

                                     *Counsel for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FORT LAUDERDALE DIVISION**

SOKA GAKKAI INTERNATIONAL-USA,
a California non-profit religious corporation, and

FLORIDA NATURE AND CULTURE
CENTER, LLC, a Florida limited liability
company,

       Plaintiffs,

v.                                                            Case No. 0:24-cv-62452-WPD

UNITED STATES ARMY CORPS OF
ENGINEERS, COLONEL BRANDON L.
BOWMAN, District Commander, Army
Corps of Engineers, Jacksonville Office,
In his official capacity,

       Defendants.

_____/

## **VERIFICATION**

      I, Mike Bynum, on behalf of SOKA GAKKAI INTERNATIONAL-USA, LLC, and

FLORIDA NATURE AND CULTURE CENTER, LLC, hereby verify under penalty of perjury

pursuant to 28 U.S.C. § 1746 that the facts alleged in the foregoing FIRST AMENDED

COMPLAINT are true and correct to the best of my knowledge.

      This 6th day of March, 2025.

                    *Michael Bynum*
                    _____
                    MICHAEL BYNUM
                    General Counsel
                    Soka Gakkai International-USA
                    606 Wilshire Blvd.
                    Santa Monica, CA 90401