**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FORT LAUDERDALE DIVISION**

SOKA GAKKAI INTERNATIONAL-USA,
a California non-profit religious corporation, and

FLORIDA NATURE AND CULTURE
CENTER, LLC, a Florida limited liability
company,

      Plaintiffs,

v.                                     Case No. 0:24-cv-62452-WPD

UNITED STATES ARMY CORPS OF
ENGINEERS, and COLONEL BRANDON L.
BOWMAN, District Commander, Army
Corps of Engineers, Jacksonville Office,
In his official capacity,

      Defendants.

_____/

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS'**
**MOTION FOR PARTIAL DISMISSAL**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

FACTS ............................................................................................................................... 2

    A.    The Comprehensive Everglades Restoration Plan as Authorized by the Water Resource Development Acts. ............................................... 2

    B.    Relevant History of the Broward County Water Preservation Areas Project. ........................................................................................... 3

    C.    The Evolving Nature of the BCWPA Project Over the Last Decade Shows the Corps' 2012 PIR/EIS Was Not an Actionable Project. ............. 4

ARGUMENT ...................................................................................................................... 6

    I.    Standard of Review. ......................................................................................... 6

    II.    Defendants' Statute of Limitations and Laches Arguments are Inappropriate at the Motion to Dismiss Stage. ......................................... 7

        A.    Defendants' Statute of Limitations and Laches Arguments are Affirmative Defenses Inappropriate for a Motion to Dismiss. ................. 7

        B.    Defendants' Motion Raises Issued of Disputed Material Facts That Cannot be Resolved in a Motion to Dismiss. ................................ 8

    III.    Plaintiffs' First and Third Causes of Action Challenging the Corps Failure to Comply with NEPA are Not Time Barred. ................................ 9

        A.    Plaintiffs NEPA and RFRA Causes of Action Did Not Accrue at the Earliest Until the Corps Received Congressional Funding for the BCWPA Project in December of 2022. ......................................... 9

        B.    Defendants Confuse NEPA Ripeness Requirements with the Supreme Court's Injury-in-Fact Accrual Jurisprudence in *Corner Post*. ........................................................................................... 12

    IV.    Plaintiffs Have Adequately Plead Their RFRA Claims, And Those Claims Are Not Time Barred. ......................................................... 14

        A.    Plaintiffs' RFRA Claims are Plausibly Plead. ............................ 14

        B.    Plaintiffs' RFRA Claims are Not Time Barred. .......................... 18

    V.    Plaintiffs' Claims Are Not Barred by Laches Due To The Corps' Own Conduct. ...................................................................................... 18

        A.    Defendants Fail to Establish Inexcusable Delay. ........................ 19

        B.    Defendants Fail to Establish Any Prejudice. .............................. 20

CONCLUSION ................................................................................................................ 20

i

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Apache Stronghold v. United States*,
    101 F.4th 1036 (9th Cir. 2024) ......................................................................................16, 17

*Apache Survival Coal. v. United States*,
    21 F.3d 895 (9th Cir. 1994) ................................................................................................19

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)............................................................................................................6

*Banner Health v. Sebelius*,
    797 F.Supp.2d 97 (D.D.C. 2011) ........................................................................................7

*Bay Area Laundry and Dry Cleaning Pension Fund v. Ferbar Corp. of Cal.*,
    522 U.S. 192 (1997)..........................................................................................................10

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007)............................................................................................................6

*Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs*,
    781 F.3d 1271 (11th Cir. 2015) ........................................................................................18

*Bonilla v. Stulz*,
    2020 WL 13348973 (S.D. Fla. 2020) ..............................................................................9, 7

*Bowen v. Mich. Acad. of Fam. Physicians*,
    476 U.S. 667 (1986)............................................................................................................7

*Brown v. Gov't of District of Columbia*,
    390 F. Supp. 3d 114 (D.D.C. 2019) ....................................................................................7

*Buccellati Holding Italia SPA v. Laura Buccellati, LLC*,
    5 F.Supp.3d 1368 (S.D. Fla. 2014) ...................................................................................19

*Burnett v. New York Central R. Co.*,
    380 U.S. 424 (1965)..........................................................................................................18

*Carlo v. Gustafson*,
    512 F.Supp. 833 (D. Alaska) ........................................................................................18, 19

*Corner Post, Inc. v. Bd. Of Govs. Of Fed. Rsrv. Sys.*,
    603 U.S. 799 (2024)..........................................................................1, 7, 8, 9, 10, 12, 13, 18

*Davila v. Gladden*,
    777 F.3d 1198 (11th Cir. 2015) ........................................................................................14

*Ecology Center of Louisiana, Inc. v. Coleman*,
    515 F.2d 860 (5th Cir. 1975) ............................................................................................20

*Finca Santa Elena, Inc. v. U.S. Army Corps of Eng'rs*,
    873 F.Supp.2d 363 (D.D.C. 2012) ...............................................................................13, 14

*Graham County Soil & Water Conservation Dist. v. United States ex rel. Wilson*,
   545 U.S. 409 (2005)................................................................................................10

*Green v. Brennan*,
   578 U.S. 547 (2016)................................................................................................18

*Irwin v. Dept. of Veteran Aff's.*,
   498 U.S. 89 (1990)...................................................................................................9

*Kansas v. Colorado*,
   514 U.S. 673 (1995)................................................................................................19

*La Grasta v. First Union Secs., Inc.*,
   358 F.3d 840 (11th Cir. 2004) ..............................................................................7, 9

*Lockhart v. Kenops*,
   927 F.2d 1028 (8th Cir. 1991) ...............................................................................17

*Lujan v. National Wildlife Federation*,
   497 U.S. 871 (1990)................................................................................................13

*Lyng v. Northwest Indian Cemetary Protective Ass'n*,
   485 U.S. 439 (1988)...........................................................................................16, 17

*Mach Mining, LLC v. EEOC*,
   575 U.S. 480 (2015)..............................................................................................6, 7

*Miccosukee Tribe of Indians of Fla. v. United States*,
   722 F. Supp. 2d 1293 (S.D. Fla. 2010), aff'd, 716 F.3d 535 (11th Cir. 2013) .......12

*Midrash Sephardi, Inc. v. Town of Surfside*,
   366 F.3d 1214 (9th Cir. 2004) ...........................................................................14, 15

*Natural Resources Defense Council, Inc. v. Train*,
   519 F.2d 287 (D.C. Cir. 2008)................................................................................7

*Ohio Forestry Ass'n Inc. v. Sierra Club*,
   523 U.S. 726 (1998)........................................................................................12, 13, 14

*Omnipotent Commc'ns, Inc. v. City of White Plains*,
   202 F.R.D. 402 (2001) ...........................................................................................17

*Ouachita Watch League v. Jacobs*,
   463 F.3d 1163 (11th Cir. 2006) .........................................................................12, 13

*Peter Letterese & Assocs., Inc. v. World Inst. of Scientology Enters., Int'l*,
   533 F.3d 1287 (11th Cir. 2008)..........................................................................18, 19

*Ray v. Adams & Assocs., Inc.*,
   599 F. Supp. 3d 1250 (S.D. Fla. 2022) ...............................................................7, 9

*Sec'y of Labor v. Labbe*,
   319 F. App'x 761 (11th Cir. 2008).......................................................................7, 9

*Sherbert v. Verner*,
   374 U.S. 398 (1963)................................................................................................14

*Summers v. Earth Island Institute*,
555 U.S. 488 (2009) ............................................................................................14

*Thai Meditation Assoc. of Ala., Inc. v. City of Mobile, Ala.*,
980 F.3d 821 (11th Cir. 2020) .................................................................15, 16, 17

*U.S. v. Wong*,
575 U.S. 402 (2015) ..............................................................................................9

*United States v. Grady*,
18 F.4th 1275 (11th Cir. 2021) ............................................................................14

*Wilderness Soc'y v. Alcock*,
83 F.3d 386 (11th Cir. 1996) ...............................................................................14

**Statutes**

5 U.S.C. § 702 .................................................................................................................6

28 U.S.C. § 1658(a) ......................................................................................................18

28 U.S.C. § 2401(a) ........................................................................................................9

28 U.S.C. § 2401(b) ........................................................................................................9

42 U.S.C. § 2000bb-1(a) ..............................................................................................14

42 U.S.C. § 2000bb-1(b) ..............................................................................................14

42 U.S.C. § 2000cc-5(7)(A) .........................................................................................17

42 U.S.C. § 2000cc-5(7)(B) .........................................................................................17

2014 Water Resources Reform and Development Act, Pub. L. 113-121, 128 Stat.
1193 (2014) ("2014 WRDA") .............................................................................4

Religious Freedom Restoration Act, Pub.L. 103-141, Nov. 16, 1993, 107 Stat.
1488 ("RFRA") .......................................................................................... *passim*

1996 Water Resource Development Act, Pub. L. No. 104-303, 110 Stat. 3658
(1996) ("1996 WRDA") ...................................................................................2, 3

2000 Water Resource Development Act, Pub. L. No. 106-541, 114 Stat. 2572,
2681 (2000) ("2000 WRDA") ...........................................................................3, 5

**Other Authorities**

Dec. 8, 2008 Special Notice
https://sam.gov/opp/f13f714f2b808d2d6820499f4110fc3e/view  (last visited
April 13, 2025) ......................................................................................................4

Nov. 29, 2011 Special Notice
https://sam.gov/opp/ff8dce74dfab868d627361b35b0b7d1b/view (last visited
April 13, 2025) ......................................................................................................4

Oct. 11, 2023 Special Notice
https://sam.gov/opp/d725c8f9f82c48928eacfd6abdddc463/view (last visited
April 13, 2025)..................................................................................................5

July 23, 2024 Presolicitation Notice
https://sam.gov/opp/f981d71636744c0cbd11b0c649e63e22/view (last visited
April 13, 2025)..................................................................................................5

South Florida Ecosystem Restoration Task Force, 2018 Biennial Report
https://www.evergladesrestoration.gov/s/2018_Biennial_Report-wcda.pdf ...........................5

South Florida Ecosystem Restoration Task Force, 2020 Biennial Report
https://static1.squarespace.com/static/5d5179e7e42ca1000117872f/t/6017f7d8
bc2f951141e66caa/1612183513940/2020_Biennial_Report.pdf .............................................5

South Florida Ecosystem Restoration Task Force, 2022 Biennial Report
https://static1.squarespace.com/static/5d5179e7e42ca1000117872f/t/63a493a6
2905c4171d028c83/1671730088082/December+2022+Final+Biennial+Report
.pdf ...................................................................................................................6

**Exhibits**

Exhibit A – Florida Department of Environmental Protection Comprehensive
    Everglades Restoration Plan Regulation Act (CERPA) Permit Construction
    and Interim Operations Authorization (March 27, 2025) ......................................5, 9

Exhibit B – Fiscal Year 2022 Cross-Cut Budget Request, Task Force Working
    Document.........................................................................................................2, 6

## INTRODUCTION

Plaintiffs Soka Gakkai International-USA ("SGI-USA") and Florida Nature and Culture Center, LLC ("FNCC") (collectively, "Plaintiffs") submit this Opposition to Defendants' Motion for Partial Dismissal (ECF No. 22, "Motion"). The Motion by Defendants the United States Army Corps of Engineers and Colonel Brandon L. Bowman, (collectively, "Defendants" or "Corps") should be denied.

First, Defendants' statute of limitations and laches arguments are affirmative defenses that are inappropriate for a motion to dismiss, and must fail when accepting Plaintiffs factual allegations as true. Second, Defendants' motion to dismiss must be denied because their statute of limitations and laches arguments rely on and raise several disputed material facts that contest Plaintiffs' well-pleaded facts.

Third, even if Defendants' statute of limitations and laches defenses were appropriate at the motion to dismiss stage, Defendants are incorrect that Plaintiffs' National Environmental Policy Act ("NEPA") and Religious Freedom Restoration Act ("RFRA") claims accrued outside the statute of limitations. Under the Supreme Court's recent decision in *Corner Post, Inc. v. Bd. Of Govs. Of Fed. Rsrv. Sys.,* 603 U.S. 799 (2024) ("*Corner Post*"), Plaintiffs' NEPA and RFRA Claims did not accrue at the earliest until the Broward County Water Preservation Area Project ("BCWPA Project") was finally funded by Congress in 2022, and more likely when the C-11 Impoundment project entered its concrete final design phase. Before that time, there was no actual, non-speculative project that could cause injury to Plaintiffs.

Defendants acknowledge that (i) Congress did not fund the BCWPA and the C-11 Impoundment subcomponent until December 2022, (ii) both the BCWPA and the C-11 Impoundment subcomponent were in a frequent and uncertain start-and-stop status prior to receiving Congressional funding, and (iii) the BCWPA Project and C-11 Impoundment did not even enter the final design phase until 2021 – years after the 2012 Project Implementation Report and Environmental Impact Statement ("2012 PIR/EIS"). Indeed, the C-11 Project's design changes persisted for years, as reflected in the Corps' 2023 Memorandum of Record ("2023 MFR Determination"), including the addition of a deep, largely underground seepage barrier wall that will circumvent the entire C-11 Impoundment. Defendants similarly do not dispute that they held numerous meetings with Plaintiffs and repeatedly assured them that their concerns would be addressed without the need for litigation. As such, accepting Plaintiffs' allegations as true, the

1

statute of limitations for Plaintiffs to file a legal challenge to the BCWPA Project and C-11 Impoundment subcomponent of the project did not begin to run more than six years before Plaintiffs initiated this case. Holding otherwise would violate the basic principles of analyzing motions to dismiss under Rule 12(b)(6).

Fourth, Plaintiffs have adequately plead their RFRA claims to establish a *prima facie* case that the BCWPA Project will impose a substantial burden on Plaintiffs' exercise of religion at their property bordering the C-11 Impoundment. This Circuit's recent case law clarifies that a defendant's significant pressure causing a plaintiff to modify its religious practices, including the use of the plaintiffs' own property for religious exercise, is sufficient to establish a *prima facie* RFRA claim. That is especially true when, as is the case here, the Defendants' actions essentially deprives Plaintiffs of their ability to exercise their religion on their own property.

Fifth, Plaintiffs' claims are not barred by laches. Plaintiffs' claims did not accrue until the BCWPA Project and C-11 Impoundment subcomponent matured into a concrete project after Congressional funding of the BCWPA Project in December of 2022. Further, Defendants' own conduct in continually assuring Plaintiffs' that they were considering their objections to the C-11 Impoundment Project over the last decade and a half, luring Plaintiffs to believe that their concerns were being addressed, negates any claim of laches. Defendants have also failed to establish prejudice from any delay in Plaintiffs bringing this challenge.

## FACTS

Defendants mischaracterize and ignore the uncertain and stop-start nature of the BCWPA Project and the lack of finality that has plagued the project over the last decade and a half, improperly contest the well-pleaded facts in Plaintiffs' Amended Complaint, and raise and rely on other disputed issues of material derived from sources outside of Plaintiffs' Amended Complaint.[1]

### A. The Comprehensive Everglades Restoration Plan as Authorized by the Water Resource Development Acts.

The 1996 Water Resource Development Act ("1996 WRDA") directed the Corps to develop a "proposed comprehensive plan" for the South Florida Everglades System, directed the

---

[1] Defendants ask the Court to take judicial notice of publicly filed documents, and provide select materials in support of their Motion. ECF No. 22 at 7. If the Court is inclined to move beyond the four corners of Plaintiffs' Complaint, Plaintiffs provide select additional public materials relating to the development of the BCWPA here including Biennial Reports for the BCWPA; a 2025 version of the permit for the C-11 Impoundment; the Corps' public facing sam.gov procurement notices; and the Corps 2022 Cross-Cut Budget Working Document.

Corps to submit that proposed plan to Congress, and noted that "[n]otwithstanding the completion of the feasibility report . . . the Secretary shall continue to conduct such studies and analyses as are necessary." Pub. L. No. 104-303, § 528(b), 110 Stat. 3658, 3767-68 (1996)). The 2000 WRDA approved the Comprehensive Everglades Restoration Plan ("CERP") "as a *framework* for modifications and operational changes to the Central and Southern Florida Project." Pub. L. No. 106-541, 114 Stat. 2572, 2681 (2000) (emphasis added).

The 2000 WRDA further authorized projects, including the C-11 Impoundment and C-9 projects for "implementation" (*id.* at 2682), but required that "[b]efore implementation of a project . . . the Secretary shall review and approve for the project a project implementation report prepared in accordance with subsections (f) and (h)" and submit such reports to the House and Senate for review (*id.* at 2683). The 2000 WRDA further noted that funding for the authorized projects was contingent on approval, and that "[n]o appropriation shall be made to construct any project . . . if the project implementation report . . . has not been approved by resolutions adopted by" the identified House and Senate Committees." *Id.* at 2683. The 2000 WRDA clearly required both Congressional approval *and funding* as prerequisites to the BCWPA moving forward.

### B.   Relevant History of the Broward County Water Preservation Areas Project.

In the 2012 ROD (ECF No. 22-2), the Corps recognized that "[t]he selected plan would require authorization." ECF No. 22-2 at 3. Similarly, the 2012 PIR/EIS "recommend[ed] authorization of this Project," but the Corps' recommendation for authorization is not actual authorization, which could only be done by Congress. ECF No. 22-1 at 6. The 2012 PIR/EIS went on to explicitly acknowledge the need for detailed design work, stating:

> "*Detailed design* of the BCWPA Project will be accomplished by the Jacksonville District. *Detailed design* will be coordinated and reviewed by the SFWMD. All features will be designed in accordance with USACE regulations and standards and comply with State of Florida laws . . ."

*Id.* at 29 (emphasis added). The 2012 PIR/EIS had significant further indications that additional environmental evaluations would need to be completed for the BCWPA Project to be realized, noting that (1) "[t]he USFWS has initially indicated that existing selenium soil residues may require corrective actions," and that the USFWS "will provide a final determination of the need to perform the associated corrective actions once toxicity and bioaccumulation studies are completed" *Id.* at 21; (2) that expected costs for the C-11 Project "may be increased or decreased based on a more detailed analysis during the crediting review process after approval of the Project, [and] execution of a Project Partnership Agreement" *id.* at 24; (3) as to the C-11 Impoundment,

3

noted that "[m]easures to avoid or mitigate . . . adverse effect[s to cultural resources] are being developed as a part of the *detailed design*" and that if "adverse effects cannot be avoided in the *final design*, then measures to mitigate the effects" will be developed, *id.* at 27 (emphasis added).

The 2012 PIR/EIS also acknowledged that the BCWPA Project was "sequenced" in components, with the C-11 Impoundment being the first component slated for construction. *Id.* at 32. As to coordination with the South Florida Water Management District ("SFWMD"), the 2012 PIR/EIS acknowledged that a Project Partnership Agreement would need to be executed, which agreement "may include designing" and "building" project components. *Id.* at 54.

Further, the Congressional authorization for the BCWPA Project in the 2014 Water Resources Reform and Development Act, Pub. L. 113-121, 128 Stat. 1193 (2014) ("2014 WRDA") was for the conceptual *feasibility* of the BCWPA Project and not any final actionable design. Specifically, § 7002 authorized the "following final feasibility studies for water resources development and conservation . . . to be carried out by the Secretary substantially in accordance with the plan, and subject to the conditions, described in the respect reports designated in this section". 2014 WRDA, 128 Stat. at 1364, 1370. The 2014 WRDA thus only authorized the "final feasibility stud[y]" for the BCWPA Project, which was the 2012 PIR/EIS, that, as noted above, contemplated further study and design for the C-11 Impoundment as it was a *feasibility* study, not a final (or even substantial) design document. The 2014 WPRA did not provide Congressional funding for the BCWPA, which was not provided until December of 2022. Thus the C-11 Impoundment project which is causing Plaintiffs' injuries was speculative and still in "feasibility" and design phases until late 2022 at the earliest.

### C. The Evolving Nature of the BCWPA Project Over the Last Decade Shows the Corps' 2012 PIR/EIS Was Not an Actionable Project.

The Corps own public posting both before and after the 2012 PIR/EIS show that the BCWPA Project was only conceptual and not an actionable project until 2022. On December 8, 2008, the Corps issued a Special Notice on sam.gov for the BCWPA, which was described as "FOR INFORMATIONAL PURPOSES ONLY" and that "FINAL PLANS AND SPECIFICATIONS" would follow.[2] The Corps then issued an additional Special Notice on November 29, 2011, which again stated it was for information purposes only and that the government was preparing "final plans and specs" for the BCWPA Project.[3] The Corps did not

---

[2] https://sam.gov/opp/f13f714f2b808d2d6820499f4110fc3e/view (last visited April 13, 2025).
[3] https://sam.gov/opp/ff8dce74dfab868d627361b35b0b7d1b/view (last visited April 13, 2025).

issue any further solicitations for the BCWPA Project until over a decade later on October 11, 2023, when the Corps issued another Special Notice that stated it was "<u>NOT A SOLICITATION</u> FOR PROPOSALS AND <u>NO CONTRACT</u> SHALL BE AWARDED."[4]  It was only on July 23, 2024 that the Corps finally issued a notice accepting contract bids for the BCWPA Project.[5]

Defendants' selective characterization of the April 27, 2017 permit issued by the Florida Department of Environmental Protection ("FDEP") also raises disputed issues of fact contested by Plaintiffs regarding the status of the C-11 Impoundment project.  *See* ECF No. 22 at 10, ECF No. 22-3.  That 2017 permit does not demonstrate that the C-11 Impoundment project was finalized since it was only for the preliminary construction phase and specifically acknowledged it did "not authorize any construction or operational activities associated with future portions of the project." *Id.* at 15.  That FDEP permit neither authorized nor funded the C-11 Impoundment project, and the project could not be commenced based solely on that permit.  Defendants also omit that the 2017 permit was substantially and materially modified in 2024 and 2025 to authorize "construction of an additional seepage barrier wall (also referred to as a cutoff wall) to encompass the entire C-11 Impoundment."  Exhibit A at 2, March 27, 2025 FDEP Permit.  This expanded seepage barrier is a key project component which Plaintiffs have alleged will cause them harm, through likely blasting during the construction processes, and noise, vibration, and air quality impacts to Plaintiffs' property and members.  ECF No. 21 at 17, ¶58; 31-32, ¶¶118-119.

As further evidence of the evolving nature of C-11 Impoundment Project design, the 2000 WRDA required Biennial Reports on the progress of the various CERP projects.  Pub. L. No. 106-541, 114 Stat. 2572, 2691.  In 2018, the Defendants' Biennial Report stated that "Design of the C-11 Impoundment *resumed* in June of 2018", reflecting a multi-year delay and the uncertain stop-and-start nature of the C-11 Impoundment Project that remained a speculative work in progress. South Florida Ecosystem Restoration Task Force, 2018 Biennial Report at 3 (emphasis added).[6] Similarly, as of 2020, the Biennial Report again indicated that "[d]esign of the C-11 Impoundment is currently underway."  South Florida Ecosystem Restoration Task Force, 2020 Biennial Report at 3.[7]  And, as of 2022, the Biennial Report yet again indicated that "[d]esign of the C-11

---

[4] https://sam.gov/opp/d725c8f9f82c48928eacfd6abdddc463/view (last visited April 13, 2025).
[5] https://sam.gov/opp/f981d71636744c0cbd11b0c649e63e22/view (last visited April 13, 2025).
[6] https://www.evergladesrestoration.gov/s/2018_Biennial_Report-wcda.pdf (last visited April 13, 2025).
[7] https://static1.squarespace.com/static/5d5179e7e42ca1000117872f/t/6017f7d8bc2f951141e66caa/1612183513940/2020_Biennial_Report.pdf (last visited April 13, 2025).

Impoundment is underway."  South Florida Ecosystem Restoration Task Force, 2022 Biennial Report at 3.[8]

    Recently, in the Corps 2022 Cross-Cut Budget Working Document, the Corps described the PIRs for WRDA projects as documents that:

> provide further information on plan formulation and evaluation, engineering and design, estimated benefits and costs, and environmental effects of planned restoration activities. The PIRs serve to bridge the gap between the conceptual level of detail contained in the CERP and the detailed design plans and specifications required to proceed with construction.

Exhibit B, Fiscal Year 2022 Cross-Cut Budget Request, Task Force Working Document, at 14. Thus, the C-11 Project has been a work in progress with an uncertain future for many years, with even the planning stopping and starting for years at a time, and only obtaining the necessary Congressional appropriations to begin to make it a reality at the end of 2022.  Further, Defendants' recharacterized and inaccurate narrative reveals a series of issues of disputed issues of material fact that cannot be resolved in a motion to dismiss.

## ARGUMENT

### I.  Standard of Review.

    Pursuant to Federal Rule of Civil Procedure 12, a complaint should be dismissed only where the facts alleged fail to state a plausible claim for relief.  *See Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009).   A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.  *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 556 (2007).  The Supreme Court has explained that a complaint "does not need detailed factual allegations," but the allegations "must be enough to raise a right to relief above the speculative level." *Id.* at 555.  Furthermore, "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Id.* at 556 (quotation marks omitted).

    The Administrative Procedure Act ("APA") provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702. The Supreme Court "applies a 'strong presumption' favoring judicial review of administrative action." *Mach Mining,*

---

[8]https://static1.squarespace.com/static/5d5179e7e42ca1000117872f/t/63a493a62905c4171d028c83/1671730088082/December+2022+Final+Biennial+Report.pdf) (last visited April 13, 2025).

*LLC v. EEOC*, 575 U.S. 480, 486 (2015) (citing *Bowen v. Mich. Acad. of Fam. Physicians*, 476 U.S. 667, 670 (1986)).

## II. Defendants' Statute of Limitations and Laches Arguments are Inappropriate at the Motion to Dismiss Stage.

As a threshold matter, Defendants' statute of limitations and laches arguments as to Plaintiffs' NEPA and RFRA claims are affirmative defenses that should be pled in their answer and not resolved through a motion to dismiss, and are inextricably intertwined with factual disputes as to when the BCWPA project, and the C-11 Impoundment project specifically, became a concrete actualized project sufficient to injure Plaintiffs and accrue for purposes of a claim under *Corner Post*. They also fail to address Defendants' repeated assurances that could—at minimum—support tolling the statute of limitations.

### A. Defendants' Statute of Limitations and Laches Arguments are Affirmative Defenses Inappropriate for a Motion to Dismiss.

Defendants' statute of limitations and laches arguments are both affirmative defenses under Fed. R. Civ. P. 8(c)(1). Whether a claim is barred by statute of limitations or laches should be raised as an affirmative defense in the answer rather than in a motion to dismiss. *Ray v. Adams & Assocs., Inc.,* 599 F. Supp. 3d 1250, 1257 (S.D. Fla. 2022) ("plaintiffs are not required to negate an affirmative defense in their complaint." (citing *La Grasta v. First Union Secs., Inc.*, 358 F.3d 840, 845 (11th Cir. 2004))). Dismissal based on an affirmative defense such as statute of limitations is appropriately only if the plaintiff can prove no set of facts that would toll the statute. *Sec'y of Labor v. Labbe*, 319 F. App'x 761, 764 (11th Cir. 2008) ("we cannot conclude beyond a doubt that [the plaintiff] can prove no set of facts that toll the statute"); *Brown v. Gov't of District of Columbia*, 390 F. Supp. 3d 114, 123 (D.D.C. 2019) ("it is well established that the Court's analysis of any applicable defenses advanced in opposition to claims that have been properly pleaded are to be reserved for later stages of the litigation" if the evaluation of those defenses "require[s] further factual development.").[9]

---

[9]As to Plaintiffs' NEPA claims, when presented with a motion to dismiss for an alleged failure to state a claim under the APA, it is generally inappropriate to reach the merits of the claim without an administrative record unless the action may be resolved with "reference to nothing more than the relevant statute and its legislative history." *Bonilla v. Stulz*, 2020 WL 13348973 *3 (S.D. Fla. 2020) (quoting *Banner Health v. Sebelius*, 797 F.Supp.2d 97, 112 (D.D.C. 2011)); *see also Natural Resources Defense Council, Inc. v. Train*, 519 F.2d 287, 291 (D.C. Cir. 2008).

### B.  Defendants' Motion Raises Issued of Disputed Material Facts That Cannot be Resolved in a Motion to Dismiss.

Defendants argument that the 2007 EIS and 2012 PIR/EIS were "final" agency actions that started Plaintiffs' 6-year statute of limitations under the APA and 4-year statute of limitations for RFRA claims raise many issues of disputed material facts that cannot be resolved in a motion to dismiss.  Further, at the outset, Defendants have the law wrong: under the Supreme Court's precedent in *Corner Post*, the statute of limitations started to run not when Defendants took a final agency action, but rather when Plaintiffs were injured by Defendants' actions. Thus, Plaintiffs contest that they were injured by the finalization of the 2012 PIR/EIS sufficient to trigger the accrual of their NEPA and RFRA claims under *Corner Post* (*see* Section III, *infra*) as to the C-11 Impoundment Project because the Corps was only "for the first time in a position" to construct and operate the Project after it was funded in December of 2022, ECF No.  21 at 13, ¶45, and that before then the C-11 Impoundment Project was an uncertain work in progress, characterized by lengthy stops, and significant design developments including "Preliminary" Design Development Reports in 2021, *id.* at 11, ¶34; 15, ¶53; 16-17, ¶57-58.  These allegations, taken as true (which they must be at the motion to dismiss stage), establish that Plaintiffs' claims were timely filed. Further, contrasted with Defendants' incomplete and inaccurate narrative, they show that, at a minimum there are critical factual disputes as to when Plaintiffs' causes of action accrued.

Defendants' statute of limitations and laches arguments should also be rejected outright. However, to the extent they deserve serious consideration, they are inextricably intertwined with factual disputes as to when Congress finally authorized and funded the BCWPA project, and the C-11 Impoundment project specifically, thus causing Plaintiffs the injury that caused their NEPA and RFRA claims to accrue.  They are also intertwined with changes to the BCWPA Project, including the addition of a seepage barrier wall circumnavigating the entire C-11 Impoundment, and the modification of the construction schedule from an initial estimate of four years which later doubled to nine years.  ECF No. 21 at 12, ¶ 40.  They are also inextricably intertwined with the basis and substance of the communications between Plaintiffs and Defendants since 2007, during which time Plaintiffs allege Defendants continually assured Plaintiffs' that their concerns over the BCWPA and C-11 Impoundment projects were being heard and would be addressed, and whether Defendants have suffered any prejudice from Plaintiffs' timely claims.  *See* Compl., ECF No. 21 at 22-29, ¶¶73, 76, 79, 83, 89, 91, 92, 95, 98, 104, 106.  Defendants' own conduct in assuring Plaintiffs that their concerns were being heard is directly relevant to whether the APA's 6-year

statute of limitations may be tolled. *Irwin v. Dept. of Veteran Aff's.*, 498 U.S. 89, 96 (1990) (Equitable tolling appropriate where the "complainant has been induced or tricked by his adversary's misconduct into allowing the filing deadline to pass."); *Labbe*, 319 F. App'x at 764.[10] Plaintiffs' allegations, taken as true, are sufficient at the pleadings stage to withstand Defendants' statute of limitations and laches affirmative defenses (which, as discussed above, are not appropriate for a motion to dismiss). To the extent that Defendants dispute Plaintiffs' allegations, which they clearly do in their motion, then this demonstrates that there are disputed issues of material fact that cannot be resolved through a motion to dismiss.

Finally, Defendants' statute of limitations and laches arguments improperly rely on materials outside of Plaintiffs' First Amended Complaint, selectively chosen from developments both before and after the 2012 PIR/EIS. This effort should be rejected and the contested issues be decided after the parties have developed a full factual record for the Court. *La Grasta*, 358 F.3d at 845; *Ray*, 599 F.Supp.3d at 1257; *Bonilla v. Stulz*, 2020 WL 13348973 at *3. For example, Defendants offer Exhibits C, ECF No. 22-3 (a 2017 permit for the preliminary phase of the BCWPA issued by the Florida Department of Environmental Protection) and E, ECF No. 22-5 (an internet notice of the ROD) to support their assertion that Plaintiffs' claims accrued in the past, but omit significant points such as the fact that this state permit did not and could not authorize the federal BCWPA Project to proceed and thus did not trigger Plaintiffs' injury.[11]

### III. Plaintiffs' First and Third Causes of Action Challenging the Corps Failure to Comply with NEPA are Not Time Barred.

#### A. Plaintiffs NEPA and RFRA Causes of Action Did Not Accrue at the Earliest Until the Corps Received Congressional Funding for the BCWPA Project in December of 2022.

*Corner Post* clarifies that a final agency action does not automatically cause injury to a specific plaintiff and trigger the statute of limitations for that plaintiff, rejecting the premise that "a right of action 'accrues' when a regulation is final, full stop." 603 U.S. at 821. *Corner Post* held that an APA claim "does not accrue for purposes of § 2401(a)'s 6-year statute of limitations

---

[10] In *U.S. v. Wong*, 575 U.S. 402, 420 (2015) the Supreme Court held that 28 U.S.C. § 2401(b) was not jurisdictional and was thus subject to equitable tolling. The APA's 6-year statute of limitations in 28 U.S.C. § 2401(a) is thus also likely subject to equitable tolling.

[11] Subsequent developments only underline that the 2017 state water permit is irrelevant to the issue of determining the time of Plaintiffs' injury, such as the 2024 and 2025 major modifications of that 2017 permit which authorized "construction of an additional seepage barrier wall (also referred to as a cutoff wall) to encompass the entire C-11 Impoundment," a substantive revision to the project. *See* Exhibit A at 2; ECF No. 21 at 17, ¶58; 31-32, ¶¶118-119.

until the plaintiff is *injured* by final agency action." 603 U.S. at 825 (emphasis added). This is a plaintiff specific trigger that "looks to when '*the* plaintiff —this particular plaintiff—'has a complete and present cause of action.'" *Id.* at 817. An APA claim accrues "only after the plaintiff suffers the injury required to press her claim in court." *Id.* at 811. Here, Plaintiffs began to suffer injury, and their claims accrued, at the earliest when the C-11 Impoundment project ceased being a speculative plan and became a concrete reality when it was funded by Congress in December of 2022, and more reasonably when the Corps substantially finalized the C-11 Impoundment design plans and declared that it was not conducting any additional NEPA analysis in the 2023 MFR Determination. Prior to that time, Plaintiffs NEPA challenges lacked a "complete and present cause of action." *Id.* (quoting *Graham County Soil & Water Conservation Dist. v. United States ex rel. Wilson*, 545 U.S. 409, 418 (2005)). To hold otherwise would reach the untenable result that "only those fortunate enough to suffer an injury within six years of a rule's promulgation may bring an APA suit. Everyone else—no matter how serious the injury or how illegal the rule—has no recourse." *Id.* at 824; *see id.* at 811 ("we have 'reject[ed]' the possibility that a 'limitations period commences at a time when the [plaintiff] could not yet file suit' as 'inconsistent with basic limitations principles.'" (quoting *Bay Area Laundry and Dry Cleaning Pension Fund v. Ferbar Corp. of Cal.*, 522 U.S. 192, 200 (1997))).

The BCWPA Project lacked the sort of "concreteness" necessary to injure Plaintiffs and trigger the APA's statute of limitations until it received Congressional funding in December of 2022. Prior to that time it was only a conceptual project that may, or may not move forward. The BCWPA Project went through two conceptual feasibility studies (the 2007 EIS and 2012 PIR/EIS), and then went into an extended hiatus between late 2012 and 2015. ECF No. 21 at ¶ 73. The BCWPA Project did not receive initial Congressional approval until 2014, and even then, Congress did not appropriate the funding necessary for the project to proceed, which it only received in December of 2022. Without this funding, there was no project and thus no injury.

The uncertain nature of the BCWPA Project is further evidenced by the lack of concrete design plans prior to 2022. When the 2012 PIR/EIS was finalized, it lacked detailed design plans as to the C-11 Impoundment. *See* 2012 PIR/EIS, ECF No. 22-1 at 29 ("*Detailed design* of the BCWPA Project will be accomplished by the Jacksonville District. *Detailed design* will be coordinated and reviewed by the SFWMD.") (emphasis added). Plaintiffs were not injured in 2012,

as in addition to not being funded, the details of the C-11 were only conceptual, and required detailed design development.

Defendants' own public documents and declarant demonstrate that the BCWPA Project and the C-11 Impoundment subcomponent did not enter the level of "concreteness" necessary to injure plaintiffs until over a decade after the 2012 PIR/EIS. ECF No. 14-2 at 1-4, ¶¶2-13 (Corps' declarant acknowledging the BCWPA started final design phase in October of 2021; that the Corps was conducting "initial seepage modeling" for the BCWPA C-11 Impoundment in 2017 and 2018; that the Corps implemented "changes to the BCWPA project's design plans and specifications" in 2022; and that the Corps added additional mitigation requirements to construction contracts prior to letting those contracts); *see also* Facts, Section C, *supra*; ECF No. 21 at 17, ¶ 58. Finalizing the project design, along with Congressional funding in 2022, was necessary to transforming the off-and-on speculative plan into a definitive project causing injury to Plaintiffs.

Further, in 2023, the Corps explicitly acknowledged that the C-11 Impoundment project was now concrete, definitive and ready to be executed by issuing the 2023 MFR Determination which reviewed the validity of the 2012 PIR/EIS. First, the 2023 MFR Determination recognized that the BCWPA Project "has gone through design refinements since the 2007" PIR/EIS. ECF No. 22-4 at 2. Second, the 2023 MFR Determination acknowledged that "the project footprint has changed" since the 2007 PIR/EIS, and that "a ring levee was added to the design" of the C-11 Impoundment. *Id.* at 6. Third, the 2023 MFR Determination discusses a 2023 update to prior Endangered Species Act consultations through the completion of a new Biological Assessment and July 5, 2023 Biological Opinion. *Id.* at 6-7. Fourth, the 2023 MFR Determination discussed additional cultural resource investigations, including changes made to the ring levee at the C-11 impoundment reservoir in 2020 to add a keyhole levee to protect a culturally sensitive site. *Id.* at 7. These acknowledgments in the 2023 MFR Determination highlight two key points – (1) the project design for the C-11 Impoundment was clearly not final as of the 2012 PIR/EIS, and was continuing to undergo additional project design; and (2) the Corps felt it was necessary to re-evaluate its 2012 NEPA determinations now that the BCWPA Project had solidified into a "concrete" action that could only now, after Congressional funding, be constructed.[12]

---

[12] That the Corps concluded (incorrectly) that its NEPA analysis in the 2007 and 2012 PIR/EIS was sufficient is irrelevant to the analysis of when Plaintiffs' NEPA claims in Count 1 accrued – which is when the BCWPA and the C-11 Impoundment project actually became a reality through Congressional funding and finalized project design plans. Further, to the extent the Corps asserts

Defendants claim that Plaintiffs "knew or should have known" of their injury at the time the 2012 PIR/EIS was finalized.  ECF No. 22 at 18 (citing *Miccosukee Tribe of Indians of Fla. v. United States*, 722 F. Supp. 2d 1293, 1297 (S.D. Fla. 2010), aff'd, 716 F.3d 535 (11th Cir. 2013)). Setting aside that Defendants are making a factual argument not suitable for a motion to dismiss, Defendants have presented no evidence to support their claim.  Further, as explained above, Plaintiffs could not have "known" in 2012 when, if ever, the partially designed and unfunded project, that would continue in an uncertain stop/start mode for several more years, would be constructed.   The detailed design plans simply did not exist in 2012 and would not for another decade, and they would not know that the BCWPA Project would even be constructed until it was funded by Congress in December of 2022.  In short, the C-11 Impoundment Project was not funded, and lacked the material design plans necessary to cause injury to Plaintiffs prior to December of 2022 and trigger the APA's statute of limitations.

**B. Defendants Confuse NEPA Ripeness Requirements with the Supreme Court's Injury-in-Fact Accrual Jurisprudence in *Corner Post*.**

Defendants Motion relies on significant pre-*Corner Post* case law that discusses the concept of *ripeness* as to when NEPA claims become procedurally actionable to argue that Plaintiffs claims are barred.  However, when NEPA claims *ripen* is entirely distinct from the question of when Plaintiffs' injury *accrued* under *Corner Post*.

Defendants cite to dicta from *Ohio Forestry Ass'n, Inc. v. Sierra Club*,  for the unremarkable proposition that "a person with standing *who is injured* by a failure to comply with the NEPA procedure may complain of that failure at the time the failure takes place, for the claim can never get riper."  523 U.S. 726, 737 (1998) (emphasis added).  This is merely a commentary on when NEPA claims can ripen, and explicitly presumes an injured plaintiff at the time of the final agency action for the claims to be ripe. That is clearly not the case here: Plaintiffs were not injured at the time of the 2012 EIS on what was essentially a half-baked and unfunded project. Similarly, Defendants rely on *Ouachita Watch League v. Jacobs* for the also unremarkable statement that "a cognizable procedural injury exists when a plaintiff alleges that a proper EIS has

---

the 2023 MFR Determination was "not an assessment of project effects intended to inform the decision to approve the Project" (ECF No. 22 at 21), that argument is only relevant to Plaintiffs' supplementation claim (Count II) and not when Plaintiffs' injury occured.

not been prepared [and] *when the plaintiff also alleges a 'concrete' interest . . . that is threatened by the proposed actions*.") (emphasis added).  463 F.3d 1163, 1171 (11th Cir. 2006).

Thus, the cases relied upon by Defendants show that a concrete injury is necessary for a plaintiffs' claims to accrue and trigger the statute of limitations for a NEPA challenge, which is consistent with *Corner Post*.  For example, in *Ohio Forestry Ass'n*, the Supreme Court recognized that review of a Forest Service general management plan was unripe prior to the factual components of the plan being reduced to more manageable proportions and "its factual components fleshed out, by some concrete action."  523 U.S. at 737 (quoting *Lujan v. National Wildlife Federation,* 497 U.S. 871, 891 (1990)).  Contrastingly, in *Ouachita Watch League* the Eleventh Circuit found that plaintiffs had established both procedural NEPA injuries *and* affirmative concrete injuries from the agency's actions that made the case appropriate for adjudication.  463 F.3d at 1171-72

Indeed, if Plaintiffs had filed in 2012 (or earlier) as Defendants claim they should, the Defendants no doubt would have argued that the suit was premature, as the Corps successfully did in *Finca Santa Elena, Inc. v. U.S. Army Corps of Eng'rs,* 873 F.Supp.2d 363 (D.D.C. 2012) ("*Finca*")  In *Finca*, Plaintiffs challenged the Corps' Rio de la Plata stream stabilization/flood control project ("Rio Project").  *Id.* at 365.  Like the BCWPA here, the Rio Project had multiple components, including downstream and upstream components that would be completed in phases. *Id.*  The "study, design and approval" of the Rio Project went through "numerous changes" over the years.  *Id.*  The Corps first issued a project-wide EIS and ROD for the Rio Project in 1988, but Congress did not fund the Rio Project until 2009, but only as to the downstream components. Leaving the upstream components unfunded.  *Id.*  Defendants successfully moved to dismiss plaintiffs claims against the upstream components of the project, arguing that it was speculative as to whether the upstream components would ever move forward.  *Id.* at 367.

The Court agreed with the Corps, finding that plaintiff's claims against the upstream components were not prudentially ripe because (1) there was currently no funding for any of the upstream project components, nor any guarantee that the Corps would ever receive funding; (2) further administrative and environmental review would need to be completed before the upstream project components could go forward; (3) there was no funding approved even to perform the additional administrative review; (4) the upstream project components were still in the design phase; and (5) the solicitation and contracting process still needs to be initiated and concluded.  *Id.*

at 370.  Elaborating, the Court held there was no "no imminent threat of injury", *id.* at 371, because the "possibility that further consideration will actually occur before [implementation] is not theoretical, but real," *Id.* at 369 (quoting *Ohio Forestry Ass'n*, 523 U.S. at 735).  Defendants cannot be allowed to have it both ways: arguing in *Finca* that claims against an unformed and unfunded project are premature, yet asserting here that Plaintiffs should be barred from filing suit against a project for not challenging it when it was only a conceptual design without Congressional funding.

The Corps' 2012 PIR/EIS did not "injure" Plaintiffs, as the C-11 Impoundment Project was not even funded and would not be for another decade, the project design was far from complete and had no specific or "concrete" implementation plan.  *See Summers v. Earth Island Institute*, 555 U.S. 488, 496 (2009) ("deprivation of a procedural right without some concrete interest that is affected by the deprivation—a procedural right *in vacuo*—is insufficient to create Article III standing"); *Wilderness Soc'y v. Alcock,* 83 F.3d 386, 391 (11th Cir. 1996) (where an agency's scheme requires further site-specific actions to implement that scheme, a plaintiff's injury is not ripe until such actions have been proposed).  Had Plaintiffs challenged the BCWPA Project in 2012 (or even earlier, as Defendants appear to argue), Defendants were all but guaranteed to have made the same arguments as in *Finca* – arguing that the C-11 Impoundment was a speculative future action that lacked detailed design and funding.

## IV. Plaintiffs have Adequately Plead their RFRA Claims, and those Claims are Not Time Barred.

RFRA forbids the government from "substantially burden[ing] a person's exercise of religion" unless "application of the burden" furthers a "compelling governmental interest" and is "the least restrictive means of furthering that" interest. 42 U.S.C. § 2000bb-1(a) and (b). "[T]o establish a *prima facie* RFRA claim, a [movant] must first show (1) that he or she was exercising (or was seeking to exercise) his or her sincerely held religious belief, and (2) that the government substantially burdened the defendant's religious exercise." *United States v. Grady*, 18 F.4th 1275, 1285 (11th Cir. 2021) (citing *Davila v. Gladden*, 777 F.3d 1198, 1204 (11th Cir. 2015)).

### A.  Plaintiffs' RFRA Claims are Plausibly Plead.

Defendants apply an outdated and superseded standard in the Eleventh Circuit to assert that Plaintiffs must show that Defendants are "exercising coercion" over Plaintiffs use of their property, "such as imposing a fine or denying an otherwise available benefit" to establish a *prima facie* case that the Defendants have burdened their religion.  ECF No. 22 at 22-23 (citing to *Sherbert v. Verner,* 374 U.S. 398, 400-01 (1963) and *Midrash Sephardi, Inc. v. Town of Surfside,* 366 F.3d

14

1214 (9th Cir. 2004)).  Contrary to Defendants' assertion, this Circuit subsequently clarified what constitutes a "substantial burden" in *Thai Meditation Assoc. of Ala., Inc. v. City of Mobile, Ala.,* 980 F.3d 821 (11th Cir. 2020).  In *Thai Meditation Assoc. of Ala., Inc.* plaintiffs challenged a city zoning decision that required them to move from a residential area to a shopping center, which plaintiffs claimed substantially burdened their religious exercise due to traffic noise and a smaller location.  *Id.* at 826.  This Circuit stated that "coercion" and "inconvenience" are "bookend examples of conduct that plainly would and wouldn't meet" a substantial burden test.  *Id.* at 830. As to coercion, it was "*sufficient* to demonstrate a substantial burden— but it is not . . . *necessary.*" *Id.* at 830-31 (emphasis in original).  To that end, "a substantial burden *can* result from pressure that tends to force adherents to forego religious precepts or from pressure that mandates religious conduct."  *Id.* at 830 (emphasis in original).  Accordingly, "modified behavior, if the result of government coercion or *pressure*, can be enough."  *Id.* at 831 (emphasis added).

The Eleventh Circuit then laid out six factors a district court should consider in determining whether a governmental action affecting a plaintiff's religious use of its property amounted to a substantial burden, including: (1) whether the governmental decision "effectively deprives the plaintiffs of any viable means by which to engage in protected religious exercise"; (2) whether the government's decision making process "reflects any arbitrariness of the sort that might evince animus or otherwise suggests that the plaintiffs have been, are being, or will be (to use a technical term of art) jerked around"; (3) whether the government's action was "final or whether, instead, the plaintiffs had (or have) an opportunity to" request modifications that would reduce the burden; and (4) whether the burden "is properly attributable to the government (as where, for instance, plaintiff had a reasonable expectation of using its property for religious exercise)."  *Id.* at 832.

Here, Plaintiffs have alleged that the C-11 Impoundment project will create noise, air quality, odors, and aesthetic obstacles to their ability to exercise their religion at their property. Compl., ECF No. 21 at 31, ¶118.  Plaintiffs have also alleged that they began raising these concerns in 2007 and continued to do so for more than 15 years, and that the Defendants continually assured Plaintiffs that their concerns were being addressed, but that only recently it became clear that nothing would come from those assurances. Compl., ECF No. 21 at 22-29, ¶¶73, 76, 79, 83, 89, 91, 92, 95, 98, 104, 106.  Further, Plaintiffs have established that they purchased the FNCC Property nearly thirty years ago for the purpose of conducting and hosting religious activities, designed and developed the extensive improvements expressly for those purpose, and have

continuously used it for religious purposes since that time and had a reasonable expectation to be able to continue to do so.  Compl., ECF No. 21 at 2, ¶ 3.  Under *Thai Meditation Assoc. of Ala., Inc.*, and accepting the allegations in the Complaint as true, Plaintiffs have clearly met the plausibility standard for pleading a *prima facie* substantial burden on the exercise of their religion.

Separately, Defendants reliance on *Lyng v. Northwest Indian Cemetery Protective Ass'n* does not apply because *Lyng* dealt the federal government's management of its *own property* to the extent it impacted the challenging plaintiff's *use of the same federal government property* to practice their religion.  485 U.S. 439, 441-442 (1988).  *Lyng* also did not interpret the RFRA, but instead the American Indian Religious Freedom Act (AIRFA), and it could not have as the decision was decided in 1988, well before the RFRA was enacted in 1993.  *See* Pub.L. 103-141, Nov. 16, 1993, 107 Stat. 1488.[13]

Further, the Supreme Court in *Lyng* noted that the government had taken substantial steps to ameliorate the impacts on plaintiffs' exercise of religion on government property, and that "[e]xcept for abandoning its project entirely" it was "difficult to see how the Government could have been more solicitous."  485 U.S. at 454.  Here however, Plaintiffs allege that the Defendants specifically failed to consider the impacts of religious activities conducted on Plaintiffs' property from the adjoining C-11 Impoundment construction and operation, Defendants did not follow through on their reassurances to address Plaintiffs' concerns, and failed to comply with applicable legal and procedural safeguards.  Compl., ECF No. 21 at 4, ¶ 10; 14-19, ¶¶ 47-66.  While Defendants claim they have taken mitigation measures regarding the construction of the C-11 Impoundment in 2022 and 2023 (ECF No. 14-2 at 4-5 (¶¶ 9-14), Plaintiffs have disputed the existence and sufficiency of those mitigation measures on the substantial burden that the C-11 Impoundment places on the exercise of their religion (Compl., ECF No. at 39-40 (¶¶ 157-164)).  This is an obvious factual dispute not suitable for resolution in a motion to dismiss as to whether Defendants' conduct "suggests that the plaintiffs have been, are being, or will be (to use a technical term of art) jerked around."  *Thai Meditation Assoc. of Ala., Inc.*, 980 F.3d at 832.

---

[13] The Ninth Circuit reviewed the *Lyng* decision in light of the passage of the RFRA in *Apache Stronghold v. United States*, 101 F.4th 1036 (9th Cir. 2024) (cert. petition pending).  The *Apache Stronghold* court held that the RFRA subsumes *Lyng*.  *Id.* at 1044 (citing to *Lyng*, 485 U.S. at 449-450).  But like *Lyng*, *Apache Stronghold* only dealt with the Government's disposition of its *own land* and how that disposition impacted plaintiffs *use of the governments land* for religious purposes, which is not the case here.  101 F.4th at 1044.

Similarly, the other cases relied upon by Defendants for the proposition that the government does not burden religious exercise through the use of its own property fall short.  For example, *Omnipoint Commc'ns, Inc. v. City of White Plains* dealt with the construction of a telephone pole which merely obstructed a synagogue's aesthetic view, but did not physically intrude upon the synagogues property or threaten the congregation's exercise of religion on their property.  202 F.R.D. 402, 403 (2001); *see also Lockhart v. Kenops*, 927 F.2d 1028, 1030 (8th Cir. 1991) (relating to land exchange between the government and a private land owner, where challenging plaintiff sought religious interest in the federal land).

This case is decidedly different, because it is the Defendants' use of neighboring land that substantially burdens Plaintiffs' exercise of their religious rights *on their own property*.  As recognized in *Apache Stronghold*, Congress rewrote the definition of "exercise of religion" in RFRA to include the "use, building, or conversion of real property for the purpose of religious exercise." *Id.* at 1063 (citing to 42 U.S.C. § 2000cc-5(7)(A)–(B)).  Unlike *Apache Stronghold* and *Lyng,* which involved the exercise of religious rights on government property, Plaintiffs have properly pled that Defendants' actions substantially burden Plaintiffs' exercise of their religion on Plaintiffs' own property, which was purchased, designed and improved specifically for religious purposes long before Defendants challenged actions were even contemplated.

Here, Plaintiffs have alleged that the C-11 Impoundment project will "substantially disrupt and interfere with SGI's and its members' protected religious activity on the FNCC Property." Compl., ECF No. 21 at 3, ¶6; 5, ¶14; 9, ¶27; 21, ¶71; 26, ¶95; 31-32, ¶118.  Even applying the stricter "bookend" from *Thai Meditation Ass. of Ala., Inc.* looking at governmental conduct that "that tends to force adherents to forgo religious precepts," 980 F.3d at 830,  Plaintiffs have alleged that the precepts of their Buddhist faith "are fundamentally based on quiet and contemplative harmony with nature," Compl., ECF No. 21 at 32, ¶122.  Plaintiffs allege that the construction of the C-11 Impoundment project, and the noise and vibration from blasting during construction and the permanent operation of the seven-story C-11 Impoundment Pump Station (*id.* at 31-32, ¶118), will substantially burden and effectively prohibit Plaintiffs' ability to engage in that contemplative harmony necessary to the exercise of their sincerely held religious beliefs.  Where Defendants contest Plaintiffs' allegations, they are raising disputed issues of fact inappropriate for a motion to dismiss.  Plaintiffs have sufficiently plead a plausible RFRA claim and established a *prima facie* basis for a substantial burden on their exercise of religious beliefs on their own real property.

17

**B.  Plaintiffs' RFRA Claims are Not Time Barred.**

Plaintiffs RFRA claims are based upon injuries caused by "the construction and subsequent operation of the C-11 Impoundment Project."  Compl., ECF No. 21 at 40, ¶ 161.  For that reason, Plaintiffs RFRA claims are not time barred as they did not "accrue" at the earliest until the Corps finalized design plans and started letting contracts for the C-11 Impoundment Project in 2024.

The statute of limitations for the RFRA is four years: "a civil action arising under an Act of Congress enacted after the date of the enactment of this section may not be commenced later than 4 years after the cause of action *accrues*." 28 U.S.C. § 1658(a) (emphasis added).  Thus, Plaintiffs' RFRA claims are timely because they accrued no earlier than December of 2022 when the Project was funded by Congress, with a more realistic time of injury closer to when the plans were finalized and initial construction contracts were let in 2024.  *See Corner Post,* 603 U.S. at 811 (discussing the accrual standard as the "standard rule for limitations periods" under federal statutes) (quoting *Green v. Brennan,* 578 U.S. 547, 554 (2016).

**V.  Plaintiffs' Claims are Not Barred by Laches Due to the Corps' Own Conduct.**

The affirmative defense of laches is not available to Defendants because Plaintiffs' filed their claims in a timely manner, well within the applicable statutes of limitation and, to the extent that Plaintiffs may have delayed filing, any such delay was attributable to Defendants' efforts over the years to placate Plaintiffs by reassuring them, falsely as it would turn out, that all of Plaintiffs' concerns would be addressed.  Defendants have also failed to establish any undue prejudice.

To establish a laches defense in the Eleventh Circuit, "[t]he defendant must show a delay in asserting a right or claim, that the delay was not excusable and that there was undue prejudice to the party against whom the claim is asserted." *Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs,* 781 F.3d 1271, 1283 (11th Cir. 2015).  Inexcusable delay and prejudice are both a necessary element of laches, and a finding on either element disposes of the issue. *Id.* at 1286.  What constitutes an unreasonable amount of time must be determined from the circumstances of each case. *Burnett v. New York Central R. Co*., 380 U.S. 424, 435 (1965).  As a fact-dependent analysis, laches does not lend itself to resolution through motions to dismiss.  Time delay alone is insufficient to invoke the doctrine as it is "principally a question of the inequity of permitting a claim to be enforced." *Carlo v. Gustafson,* 512 F.Supp. 833, 837 (D. Alaska).   Additionally, "there is a strong presumption that a plaintiff's suit is timely if it is filed before the statute of limitations has run." *Peter Letterese & Assocs., Inc. v. World Inst. of Scientology Enters., Int'l,*

533 F.3d 1287, 1320 (11th Cir. 2008).  Finally, "[l]aches must be invoked sparingly" in NEPA suits brought to vindicate the public interest.  *Apache Survival Coal. v. United States*, 21 F.3d 895 (9th Cir. 1994).

### A.  Defendants Fail to Establish Inexcusable Delay.

Here, Plaintiffs did not inexcusably delay bringing their claims, Defendants' own conduct encouraged Plaintiffs to believe that litigation would not be necessary, and Defendants have failed to establish any prejudicial impact from such delay.  First, Plaintiffs have not delayed in bringing this suit as their cause of action only recently accrued at the earliest after the BCWPA was funded by Congress in late 2022 and the Corps finalized design and construction plans. Filing a claim within 3 years of the earliest date of accrual, and with half of the remaining statute of limitations to run, can hardly be characterized as an unreasonable or prejudicial delay.  Defendants' argument that Plaintiffs could and should have filed in 2007, 15 years before the Project was even funded, must be rejected.

Courts have also found that where the "parties were in constant communication, in an attempt to ascertain whether a peaceful co-existence was possible . . . and during the entire course of their discussions Plaintiffs continued to lodge formal and informal objections" could justify a Plaintiffs' timing.  *Buccellati Holding Italia SPA v. Laura Buccellati, LLC,* 5 F.Supp.3d 1368, 1375 (S.D. Fla. 2014).  Courts have refused to find inexcusable delay when it is the defendant's own actions that caused the plaintiff to delay in bringing their suit.  *Kansas v. Colorado,* 514 U.S. 673, 687 (1995) *Carlo,* 512 F.Supp. at 837 (defendant's "false assurances" caused plaintiffs delay).  Here, Plaintiffs have pled, and Defendants have not disputed, that Plaintiffs were in continual communication with the Corps since the 2007.  *See e.g.* ECF No. 14-2 at 3-5; *see also* Compl. ECF No. 21 at 3, ¶8; 19-21, ¶¶67-71.

Since 2007 and up to the filing of Plaintiffs' initial Complaint, the Corps repeatedly met and communicated with Plaintiffs, assuring Plaintiffs the Corps was working to address Plaintiffs concerns.  ECF No. 21 at 22-29, ¶¶73, 76, 79, 83, 89, 91, 92, 95, 98, 104, 106; ECF No. 14-2 at 1-4, ¶¶2-13.  Indeed, in their opposition to Plaintiffs' Motion for Preliminary Injunction, Defendants alleged that they had made accommodations to address Plaintiffs' concerns (Plaintiffs dispute the existence and efficacy of such accommodations).  Having reassured Plaintiffs throughout this process that the Corps "heard them" and would address their concerns, Defendants can now hardly claim that Plaintiffs unreasonably delayed in filing this action.

## B.  Defendants Fail to Establish Any Prejudice.

Defendants' claims of prejudice fall short when the timeline of the BCWPA is considered. The project was only funded by Congress in December of 2022.  Any spending since that time is well within the statutory period a defendant could expect to have the action challenged.  Any spending during the earlier feasibility and planning phases for the C-11 Impoundment Project, before Congressional funding in 2022, was "at risk" because the future of the project was uncertain and could have been dropped (as was reflected by the some of the years-long delays when nothing was happening).  Further, Defendants have made no efforts to quantify the prejudice it may allegedly suffer, but given the long-term nature of the BCWPA, it is likely that actual expenditures since the Congressional funding at the end of 2022 will pale in comparison to the ultimate project budget for this project that will take at least a decade to construct and then have long-term operation and maintenance costs. *See Ecology Center of Louisiana, Inc. v. Coleman,* 515 F.2d 860 (5th Cir. 1975) (declining to find prejudice where defendants had spent $1,000,000 and let out $39,000,0000 of work for a project estimated to cost $667,000,000). In addition, any arguments made by Defendants regarding the nature or extent of the alleged prejudice they may suffer are outside of Plaintiffs' First Amended Complaint, raise disputed issues of material fact, and thus are unsuitable to be resolved through a motion to dismiss.

Contrastingly, serious prejudice would befall Plaintiffs if the Court were to dismiss their claims.  First, Plaintiffs' exercise of their religion and use of their property for that purpose would be substantially burdened.  Second, Plaintiffs have spent substantial organizational funds, effort, and time reaching out to the Corps to have them conduct the review required by NEPA, including conducting the engineering studies analyzing the impacts of the C-11 Project on their property. Compl., ECF No. 21 at 23-29, ¶¶84-107.

Defendants have failed to establish either inexcusable delay or prejudice to allowing Plaintiffs to proceed with this action.  Either one independently precludes their laches arguments, and their Motion on these grounds should be denied.

## CONCLUSION

For the reasons set forth herein, the Court should deny Defendants' Motion.

Date: April 14, 2025

Respectfully Submitted,

**GREENBERG TRAURIG, LLP**
1144 15th Street, Suite 3300
Denver, Colorado 80202
T. 303.572.6584

**GREENBERG TRAURIG, P.A.**
401 East Las Olas Boulevard, Suite 2000
Fort Lauderdale, Florida 33301
T. 954.765.0500

*/s/ Paul M. Seby*
**PAUL M. SEBY**
*Admitted Pro Hac Vice*
sebyp@gtlaw.com

*/s/ Glenn E. Goldstein*
**GLENN E. GOLDSTEIN**
Fla. Bar No. 435260
goldsteing@gtlaw.com
geistc@gtlaw.com
**ZACHARY R. NEEDELL**
Fla. Bar No. 1011742
zachary.needell@gtlaw.com
jennifer.shiner@gtlaw.com
flservice@gtlaw.com

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on April 14, 2025, I electronically filed the foregoing with the Clerk of Court using CM/ECF. I also certify that the foregoing document was served on all counsel of record via transmission of Notice of Electronic Filing generated by CM/ECF.

*/s/ Glenn E. Goldstein*
**GLENN E. GOLDSTEIN**

21